1  SCOTT N. SCHOOLS
   United States Attorney
2  THOMAS MOORE (ASBN 4305-O78T)
    Assistant United States Attorney
3   Chief, Tax Division
    9th Floor Federal Building
4   450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102
5   Telephone:   (415) 436-6935
   HUONG T. BAILIE (NYBN 4035739)
6   Special Trial Attorney
    160 Spear Street, 9th Floor
7   San Francisco, CA 94105
    Telephone: (415) 227-5123
8  THOMAS M. NEWMAN (CTBN 422187)
    Trial Attorney, Tax Division
9   United States Department of Justice
    Post Office Box 7238, Ben Franklin Station
10  Washington, DC  20044
    Telephone:   (202) 616-9926
11  Email: thomas.m.newman@usdoj.gov

12 Attorneys for the United States of America

13              IN THE UNITED STATES DISTRICT COURT FOR THE

14                   NORTHERN DISTRICT OF CALIFORNIA

15                       SAN FRANCISCO DIVISION

16 | UNITED STATES OF AMERICA,       )
                                     )   C 07 4762 PJH
17 |             Plaintiff,          )
                                     )
18 |      v.                         ) Civil No.
                                     )
19 | CHARLES CATHCART, SCOTT         )
     CATHCART, YURIJ DEBEVC, a/k/a   ) **COMPLAINT FOR PERMANENT**
20 | YURI DEBEVC, ROBERT NAGY,       ) **INJUNCTION AND OTHER**
     DERIVIUM CAPITAL, LLC,          ) **EQUITABLE RELIEF**
21 | DERIVIUM CAPITAL (USA), INC., and )
     VERIDIA SOLUTIONS, LLC,         )
22 |                                 )
                 Defendants.         )
23

     Plaintiff, the United States of America, states as follows for its complaint against
24
   defendants Charles Cathcart; Scott Cathcart; Yurij Debevc, a/k/a Yuri Debevc; Robert Nagy;
25
   Derivium Capital, LLC; Derivium Capital (USA), Inc.; and Veridia Solutions, LLC:
26

27 United States of America's Complaint

28                                      -1-

**Jurisdiction and Venue**

1. This Court has jurisdiction over this action to enjoin defendants from violating and interfering with the administration of the internal revenue laws pursuant to 28 U.S.C. §§ 1340 and 1345 and Internal Revenue Code (IRC) (26 U.S.C.) §§ 7402(a) and 7408.

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this judicial district. In promoting the schemes described herein, each defendant had regular and systematic contacts with residents of this judicial district who participated in the scheme.

**Nature of the Action**

3. This is a civil action under IRC §§ 7402 and 7408 to enjoin defendants and anyone in active concert or participation with them from promoting tax-fraud schemes, and from engaging in other conduct that interferes with the administration and enforcement of the tax laws, including but not limited through the marketing and execution of the defendants' "90% Loan" program, described in greater detail below.

4. This action has been requested by the Chief Counsel of the Internal Revenue Service, a delegate of the Secretary of the Treasury, and commenced at the direction of a delegate of the Attorney General, pursuant to IRC §§ 7402 and 7408.

5. The United States brings this action to enjoin defendants permanently from:

(a) Organizing, promoting, marketing, or selling any tax shelter, plan, or other arrangement that advises or encourages others to attempt to violate the internal revenue laws or unlawfully evade the assessment or collection of their federal tax liabilities, including but not limited to the arrangements which are identified in this Complaint and/or which are identified through further discovery in the case;

(b) Engaging in conduct subject to penalty under IRC § 6700, *i.e.*, by making or furnishing, in connection with the organization or sale of a shelter, plan, or other arrangement, a gross valuation overstatement or a statement about securing any tax benefits that they know or have reason to know is false or fraudulent as to any material federal tax matter, including but not limited to the arrangements which are identified in this Complaint and/or which are identified through further discovery in the case;

(c) Engaging in any other conduct that interferes with the administration and enforcement of the internal revenue laws.

United States of America's Complaint

-2-

6. An injunction is warranted based on defendants' continuing violation of the internal revenue laws, including engaging in conduct subject to penalty under IRC §§ 6700 and 6701.

**Defendants**

7. On information and belief defendant Charles Cathcart resides in Santa Barbara, California.

8. Defendant Scott Cathcart resides in Ross, California.

9. Defendants Yurij Debevc, a/k/a Yuri Debevc, and Robert Nagy reside in Charleston, South Carolina.

10. Defendant Derivium Capital, LLC, ("Derivium"), is a South Carolina limited liability company. Its principal place of business is Parkshore Centre, One Poston Road, Suite 125, Charleston, South Carolina.

11. Defendant Derivium is owned 50% by defendant Charles Cathcart, 25% by defendant Scott Cathcart, and 25% by defendant Debevc.

12. Defendant Derivium has filed for Chapter 7 bankruptcy protection in the District of South Carolina. This action is exempt from the Bankruptcy Code's automatic stay provisions by virtue of 11 U.S.C. § 362(b)(4), which exempts from the automatic stay "an action or proceeding by a governmental unit . . . to enforce such governmental unit's or organization's police and regulatory power[.]"

13. Defendant Derivium Capital (USA), Inc., ("Derivium USA"), is a Delaware corporation registered to do business in the State of South Carolina.

14. Defendant Derivium USA is owned by defendant Charles Cathcart.

15. Defendant Veridia Solutions, LLC, ("Veridia"), is a South Carolina limited liability company. Its principal place of business is Parkshore Centre, One Poston Road, Suite 125, Charleston, South Carolina.

16. Defendant Veridia is owned by defendant Debevc.

## Defendants' Tax-Fraud Activities

17. Defendants collectively market and implement various schemes that they falsely claim will enable customers to avoid federal income tax on capital gains from the sale or exchange of the customers' securities.

18. The primary scheme at issue is the so-called "90% Loan," in particular, the "90% Stock Loan" and the "ESOP QRP Loan" (which was formerly called the "ESOP Qualified Asset Loan"), which defendants market to and implement for customers. As set forth in more detail below, in marketing this scheme defendants falsely advise customers that they can receive 90% of the value of their securities without paying income tax on the capital gains. Defendants implemented the scheme for hundreds of customers nationwide, with total transactions thus far of somewhat more than $1 billion, resulting in the failure to report and pay hundreds of millions of dollars in federal income taxes.

19. Defendants have also marketed other "90% Loan" products, including but not limited to "Option Conversion Loans," "MicroCap Loans," "Foreign Stock Loans," and "Restricted Stock Loans," which on information and belief also are designed and intended illegally to allow customers to receive approximately 90% of the value of their securities without paying income tax on the capital gains.

20. On information and belief, defendants are currently marketing and implementing a 90% Loan product involving the use of foreign trusts.

21. As explained below, defendants have frequently changed the identities of the entities through which they conduct their activities, without fundamentally changing the nature of those activities.

## Defendants' Tax-Fraud Activities—History

22. Charles Cathcart has a Ph.D. in monetary economics from the University of Virginia. He has worked for more than 20 years in commercial and investment banking, including working with derivatives and related financial products.

23. In 1997, Charles Cathcart founded First Security Capital ("FSC"), a Texas company through which he (with others) marketed the 90% Stock Loan scheme described further below.

24. In early 1998, FSC relocated to Charleston, South Carolina, where it continued to be involved with 90% Stock Loans and the other transactions that are the subject of this Complaint.

25. In 2000, FSC's name changed to "Derivium Capital, LLC."

26. Debevc has worked in the financial services industry for more than 20 years and was at one point an associate of Charles Cathcart's while Cathcart was employed at CitiBank as the chief economist for the bank's eastern division.

27. Sometime before 1999, Debevc became involved in managing Derivium Capital at its Charleston headquarters, including marketing and executing 90% Loans and the other transactions which are the subject of this Complaint.

28. Scott Cathcart is Charles Cathcart's son.

29. Sometime before 1999, Scott Cathcart opened an office for FSC (subsequently Derivium Capital) in San Francisco. From that location, he worked to market and execute 90% Stock Loans and the other transactions described in this Complaint.

30. Robert Nagy is a Certified Public Accountant and is a longtime associate of Charles Cathcart.

31. Nagy is the sole owner of Meridian Services Ltd. As Meridian's owner, Nagy has served as the "outside accountant" for Derivium Capital, and he has represented both Derivium and Derivium's customers before the IRS and other administrative bodies.

United States of America's Complaint

-5-

1  32. Nagy has also prepared written tax advice regarding the 90% Stock Loan and
2  provided that advice to persons promoting 90% Stock Loans on behalf of, or in association with,
3  Derivium.

4  33. Nagy has also promoted 90% Stock Loans to individuals.

5  34. In 2002, Charles Cathcart formed Derivium USA.

6  35. From the time of its formation, Derivium USA took over the marketing function of
7  Derivium Capital with respect to the 90% Stock Loans and the other transactions which are the
8  subject of this Complaint.

9  36. In 2002, Debevc formed Veridia.

10  37. From the time of its formation, Veridia took over the administrative functions of
11  Derivium Capital with respect to 90% Stock Loans and the other transactions which are the
12  subject of this Complaint.

13  38. As explained in more detail below, the 90% Loan scheme required a nominal
14  "offshore lender" to provide the funds.

15  39. From the beginning of the scheme until some time in 2000, the "offshore lender"
16  used for the scheme was Diversified Design Associates ("DDA"), a company controlled in whole
17  or in part by Charles Cathcart.

18  40. In 1998, FSC and DDA entered into an "Investment & Loan Agreement" by which
19  FSC and DDA agreed to market and execute 90% Stock Loan arrangements in the United States
20  and Canada.

21  41. In 2000, Charles Cathcart caused the formation of Bancroft Ventures Ltd. ("BVL") in
22  the Isle of Mann. BVL and defendant Derivium Capital then executed two contracts: (1) a Stock
23  Loan Administration Agreement, by which BVL acquired all of DDA's 90% Stock Loans, and
24  (2) a Stock Loan Marketing & Administration Agreement, by which Derivium Capital agreed to
25  market 90% Stock Loans for BVL.

United States of America's Complaint

42. In 2002, a Hong Kong entity named Optech Limited ("Optech") replaced BVL as the offshore lender.

43. On information and belief, Optech and Veridia (which by then had replaced Derivium in the 90% Loan scheme) entered into an arrangement in or around 2002 similar to the arrangements between (1) DDA and Derivium, and (2) BVL and Derivium, by which Optech agreed to serve as the "offshore lender" for 90% Loans marketed by Veridia.

44. At some point in 2002, Charles Cathcart caused the formation of WITCO Services (UK) Limited or Windward Isles Trust Company ("WITCO") in England. WITCO either partially replaced BVL as the offshore lender or was an agent for the offshore lender in 2002 and 2003. On information and belief, during the beginning of 2004, WITCO transferred or sold most or all of its 90% Loans to Optech.

45. On information and belief, WITCO and Veridia had entered into an arrangement in or around 2002 similar to the arrangements between (1) DDA and Derivium Capital, (2) BVL and Derivium Capital, and (3) Optech and Veridia, by which WITCO agreed to serve as the agent for the offshore lender or as the "offshore lender" for 90% Stock Loans and other 90% Loan products, particularly the ESOP QRP Loans, marketed by Veridia.

46. On information and belief, at some point in 2006, Veridia had largely ceased operations and BVL, Optech and/or WITCO began to administer the 90% Loan products, particularly the ESOP QRP Loan, at the direction of the defendants.

### Mechanics of the Fraudulent 90% Loan Scheme

47. Defendants marketed the 90% Stock Loan initially to people who held appreciated stock with a relatively low basis, promising (as set forth in ¶¶ 48-72 below) that the transaction would allow customers to "monetize" their stock without paying any federal income tax on capital gain.

48. Defendants also marketed the ESOP QRP Loan to people who have (1) established an employee stock ownership plan ("ESOP") in which they have sold their shares in their closely

United States of America's Complaint

held corporation to the ESOP; (2) reinvested the proceeds in qualified replacement property ("QRP") in the form of stock, floating rate notes ("FRN"), or a combination of both; and (3) elected to defer recognition of gain from the sale of their shares under section 1042(a) of the Internal Revenue Code (26 U.S.C.). Defendants promised that the transaction would allow customers to "monetize" their QRP without paying any federal income tax on capital.

49. As set forth in detail below, defendants told customers that an offshore lender would lend the customers funds equal to 90% of their securities' value and then hold the securities as collateral while defendants used purported sophisticated "proprietary hedging techniques" to preserve the securities' value.

50. In fact there were no sophisticated hedging techniques. The defendants simply caused the securities to be sold and used the proceeds to fund the 90% "loan," keeping the remaining 10% for themselves and others who helped implement the scheme. The 90% Loan transactions were, in substance and in fact, simply sales of customers' securities disguised as loans so as to evade income tax on the capital gains from the sales.

51. To implement the 90% Loan scheme, a customer transferred the subject stock or FRN to defendants' designated account at brokerages such as Wachovia Securities, LLC; Janney Montgomery Scott, LLC; or Morgan Keegan & Company, Inc. Defendants, either directly or through BVL, Optech, or WITCO then caused the brokerage to sell the stock or FRN and had 90% of the sale proceeds remitted back to the customer as the purported "loan."

52. The remaining 10% was then allocated among the defendants and the purported "offshore lenders," as compensation for their designing and implementing the fraudulent scheme.

53. In virtually all instances, defendants simply sold the customers' securities immediately to fund the sham loan back to the customer.

54. In the case of the 90% Loans involving stock, the typical loan terms are as follows: (1) a term of not less than three years; (2) an interest rate higher than market rate; (3) repayment of principal before maturity is prohibited (but in earlier years of the scheme, repayment of

United States of America's Complaint

1  interest was also prohibited); (4) the "loan" is nonrecourse to the customer; and (5) any dividend
2  payable on the stock is credited to interest.

3      55. In the case of the ESOP QRP Loan involving an FRN, the typical loan terms are as
4  follows — (1) a term of 20 to 40 years; (2) an interest rate higher than market rate; (3) the "loan"
5  is nonrecourse to the customer; and (3) net interest payments are fixed for the life of the "loan."
6  Defendants convert the floating rate of interest of the FRN to a fixed rate to offset the higher rate
7  of interest charged on the "loan," which results in fixed net interest payments for the customer.

8      56. At the end of the 90% "loan" period, defendants' customers (at least some of whom
9  are apparently unaware that defendants caused the sale of the securities to fund the purported
10 loans) were presented with three main options: (1) ending the transaction consensually, (2)
11 continuing the transaction, or (3) simply walking away. These options are described in ¶¶ 58-72,
12 *infra*. In the case of ESOP QRP Loans involving FRNs, because the terms of the "loan" are 20 to
13 40 years, no loan period has yet come to an end.

14     57. The first main option is to end the transaction, either by paying off the "loan" (if the
15 customer wants the security back) or surrendering the security (when the customer does not want
16 it back).

17     58. To pay off the "loan," a customer must pay off principal and the accrued, above-
18 market rate of interest; in return, the customer hypothetically receives back the same number of
19 shares of the stock or an amount equal to the face value of the FRN initially transferred to the
20 defendants.

21     59. This course of action would be prudent only if the security's value had increased so
22 much that a customer would still turn a profit if he or she paid back the principal and above-
23 market interest and the necessarily high income tax on the subsequent sale of the security. And
24 of course this would be feasible only if the defendants had sufficient funds to buy back the
25 security in order to transfer it to the customer.

26     60. Alternatively, a customer could end the purported loan without receiving the security

27 United States of America's Complaint
28

1  back. In this case, the customer would receive cash equal to 100% of the amount by which the
2  value of the security exceeded the amount due under the "loan."

3    61. On information and belief, customers rarely paid off the purported loans, especially
4  given the more attractive options set forth below. But customers elected to reacquire their
5  collateral frequently enough to cause massive problems for defendants, in light of the fact that
6  defendants had sold the "collateral" at the outset to fund the purported loans.

7    62. In these instances, defendants had to find funds either to obtain valuable replacement
8  securities or to pay surrendering customers. But defendants had no such funds available. The
9  90% Loan scheme therefore had the characteristics of a Ponzi scheme, in which the proceeds of
10 new transactions were used to fund shortfalls in prior sham transactions.

11   63. Moreover, in some instances defendants were unable to replace the stock as required
12 for customers paying off their loans because defendants lacked funds to do so. Several of
13 defendants' customers have filed lawsuits against them for these defaults, and on information and
14 belief the associated financial pressures contributed to defendant Derivium's bankruptcy filing.
15 For example, one customer transferred as "collateral" roughly $3 million of stock to defendants,
16 which after three years resulted in a "loan" balance of loan balance of $5 million. At that time,
17 the value of the customer's stock had risen to over $15 million, but defendants had previously
18 sold the stock and lacked funds to reacquire replacement stock when the customer asked for the
19 stock back. On information and belief, however, notwithstanding Derivium's bankruptcy,
20 defendants have continued to promote this or other fraudulent schemes through entities other
21 than Derivium.

22   64. The second main option at the end of the loan term was to continue the transaction,
23 either by "refinancing" it, when the security's value at the end of the loan is greater than the
24 amount due on the loan, or "renewing" it, when the security's value at the end of the loan is less
25 than that amount. "Refinancing" resulted in a net payment to the customer (90% of the increase
26 in value), while "renewing" required a payment by the customer of a small renewal fee. In either

27 United States of America's Complaint

case, though, the transaction would be extended (with new, even higher rates of interest) until whatever maturity date the customer chose.

65. As set forth in more detail below, defendants falsely told customers that this option allowed them to delay any tax implications until the end of the transaction, which could be as long as the customer chose.

66. The final main options were for the parties simply to walk away from the transaction, either after giving notice of an intent to do so or by failing timely to elect another option ("forfeit").

67. On information and belief, these options were also rarely selected. It is true that, because the "loans" were nonrecourse, a customer could walk away without further risk. But defendants warned customers that these options could result in taxable events, which customers undertook the 90% Loan precisely to avoid.

68. Given that they could supposedly achieve indefinite tax deferral by continuing the transaction, few customers would choose this option. Defendants, however, did not issue Forms 1099 when these options were chosen, making it less likely that the customer would actually report any income or pay any income tax.

69. Based on the facts set forth above, and contrary to defendants' claims, the 90% Loans are not true loans. Instead, the 90% Loans are in substance simply a disguised sale of securities, and the "loan" proceeds are taxable capital gain to the customer upon receipt to the extent that the sale price of the security (not the 90% loan payment) exceeded the customers' basis in the security.

70. Although characterized as loans, the 90% Loan scheme in fact involved sales because defendants acquired the benefits and burdens of owning their customers' securities. After a customer participated in the scheme, defendants acquired, *inter alia*, sole possession and control of the securities (including voting rights), and the right to sell the securities. In addition, defendants assumed nearly all of the risk of loss or potential for appreciation related to the

United States of America's Complaint

-11-

transferred securities. Because defendants acquired the securities for 90% of their value, defendants would bear any decline in the securities' value that exceeded 10%. Unlike a typical stock margin loan, defendants' customers were not required to post more cash or collateral if the stock price declined.

71. In addition, if the price of the security rose but did not rise above the payoff amount, then defendants would derive the benefit of this gain, because in these circumstances their customers would presumably not exercise their right to pay off the loan. Because loan terms permitted defendants' customers to perpetually renew the purported loan, it was possible that no interest or principal would ever be paid. Also, any dividends paid on the securities would benefit defendants because the dividends would be credited against accrued interest, which interest would in fact never be paid by the customer transferring the security.

72. Lastly, defendants' customers received 90% of the value of the security, which is adequate consideration in light of the fact that the customers also received for this price the right to purportedly reacquire the security with a greater value in the future. Since the purported loan was non-recourse, the customer was free to walk away from the transaction and not repay the loan if the security price declined below the loan pay-off amount (or if customers had insufficient funds to pay off the loan at maturity).

### 90% Loan Scheme — False Statements

73. In connection with their organization, sale, and promotion of the 90% Loan scheme, defendants make material statements about the tax benefits of participating in the scheme that are, and which they know to be, false and fraudulent.

74. These statements include, *inter alia*, claims:

   a.   That the 90% Loans are loans (which are not subject to tax), when in fact they are sales (which are subject to tax on the capital gains);

   b.   That the 90% Loans allow for potentially indefinite deferral of tax on the money received, when in fact tax is due immediately because the proceeds are the product of a sale and not a loan;

   c.   That defendants will engage in "hedging transactions" to protect the value of the

United States of America's Complaint

-12-

security when in fact defendants simply sell the security and keep 10% either as profit or to invest in their own companies.

75. With respect to the claim that the 90% Loan and the ESOP QRP Loan are loans instead of sales, defendants have made the following specific false statements:

    a.    "Generate liquidity without triggering a taxable event . . . . You don't have to sell your shares and trigger a tax liability (because loans are not taxable events). In fact, depending on your individual tax situation, the 90% Stock Loan$^{sm}$ may even enable you to generate more cash than selling the position outright, net of capital gains tax liabilities."

    b.    "Superior Terms for the Monetization of FRNs: The terms of an ESOP QRP Loan$^{sm}$ are unbeatable. In the case of FRNs, the ESOP QRP Loan$^{sm}$ offers exceptionally low interest rates. As a result, the net quarterly interest payment due (i.e., the interest payment on the ESOP QRP Loan$^{sm}$ less the interest earned on the FRNs) is typically the lowest available in today's market. In addition, the net payment due is fixed for the life of the loan, and the life of the loan can be set as far out as the first call date of the FRN."

76. With respect to the claim that the 90% Loan and the ESOP QRP Loan are not taxable events, defendants have made the following specific false statements:

    a.    "With the tax season upon us, you might be tempted to sell stock to pay capital gains taxes. Instead, let us suggest using our 90% Stock Loan as a better way to generate the cash needed. After all, there's no sense in triggering another tax hit that you'll then have to contend with next year. Our unique structures can help you achieve the liquidity you need while you maintain upside potential with downside protection. And they don't nibble away at principal."

    b.    "For Floating Rate Notes: If the proceeds from an ESOP have been or are going to be reinvested into FRNs, the ESOP QRP Loan$^{sm}$ program can be used to generate loan proceeds as high as 95% of the market value of the notes without triggering a taxable event.

    c.    For Equities: If the borrower plans to reinvest or has reinvested into stocks instead of FRNs, the borrower can utilize the ESOP QRP Loan$^{sm}$ under terms similar to those of the 90% Stock Loan$^{sm}$ program. By submitting equities as collateral, the borrower maintains the opportunity for long term appreciation inherent in equity investments (which the borrower would be able to access on the repayment of the loan)."

77. With respect to the claim that the 90% Loan and the ESOP QRP Loan involve hedging transactions, defendants have made the following specific false statements:

United States of America's Complaint

    a.    "Step 3: Next you arrange to transfer your collateral to a special purpose account at one of our preferred brokerage firms. Subsequently, hedging transactions are established for the positions.

Step 4: Your cash loan proceeds will be wired to your designated account within two business days after the hedging process has been completed.

Loan Amount: 90% of the market value of collateral submitted upon completion of appropriate hedging transactions.

Loan Closing: Upon receipt of securities and establishment of hedging transactions."

    b.    "For Floating Rate Notes: The interest rate for the ESOP QRP Loan$^{sm}$ on FRNs is expressed as a spread above the rate paid on the Floating Rate Note on the date(s) of the establishment of hedging transactions.

Next Steps: Next, you arrange to transfer your collateral to a special purpose account at one of our preferred brokerage firms. Subsequently, hedging transactions are established for the positions.

Your cash proceeds will be wired to your designated account within two business days after the hedging process has been completed."

78. In connection with each variation of the 90% Loan scheme, defendants made the following false statements regarding ownership and control over their customers' collateral security on Derivium's "Master Agreement:"

    a.    Derivium would be the "custodian" of the security used as collateral;

    b.    Derivium was "authorized to act on behalf of" borrowers "for the purposes of . . . voting shares and receiving dividends or interest on securities held as collateral";

    c.    Derivium "agrees to return, at the end of the loan term, the same collateral (or cash equivalent)"; and

    d.    Derivium could place the collateral "with any domestic or foreign depository or clearing corporation . . . ."

79. All of these representations are false. Defendants made them to create the false impression that the collateral securities would be maintained safely.

### Harm to the Government

80. Defendants' tax-fraud scheme causes significant harm to the Government by

United States of America's Complaint

-14-

helping customers evade taxes and obstruct IRS efforts to administer the federal tax laws.

81. The Internal Revenue Service is harmed because it must dedicate scarce resources to detecting and examining inaccurate returns filed by defendants' customers, and to attempting to assess and collect unpaid taxes.

82. Thus far the IRS has completed examinations related to 189 individuals that participated in the fraudulent 90% Loan transactions. The IRS determined that those 189 individuals under-reported the amount of income tax owed by $23,176,692. The total tax loss, including penalties, resulting from defendants' scheme related to these 189 individuals' participation in defendants' 90% Loan scheme equals $26,078,345, and an average deficiency of approximately $137,981 per customer.

83. For example, one of defendants' customers, an engineer from Hermosa Beach, CA, purchased stock sometime before 2001 for $36,148. In 2001, the engineer used the defendants' 90% loan scheme to dispose of this stock, which was by then worth over $700,000. The IRS audited his 2001 federal income tax return and in 2005 the engineer agreed with the IRS that he had under-reported his 2001 taxable income by $677,777, and owed an additional $231,005 in income tax for 2001, plus interest.

84. Defendant Charles Cathcart has stated that over 1,700 individuals participated in the scheme, in transactions totaling over $1 billion.

85. Based on the average deficiency calculated by the IRS, the tax loss could be as much as $234,567,700 ($137,981 x 1,700).

**Count I: Injunction under IRC § 7408 for violations of §§ 6700 & 6701**

86. The United States incorporates by reference the allegations contained in paragraphs 1 through 85.

87. IRC § 7408 authorizes this Court to enjoin persons who have engaged in conduct subject to penalty under IRC § 6700 from engaging in further such conduct if the Court finds that injunctive relief is appropriate to prevent recurrence of the conduct.

United States of America's Complaint

88. Section 6700 imposes a penalty on any person who organizes or participates in the sale of a plan or arrangement and in so doing makes a statement with respect to the allowability of any deduction or credit, the excludability of any income, or the securing of any other tax benefit by participating in the plan or arrangement which that person knows or has reason to know is false or fraudulent as to any material matter.

89. Defendants organize or participate in the sale of the 90% Loan plan or arrangement and in so doing make false statements with respect to the securing of tax benefits by participating in the plan or arrangement, which defendants know or have reason to know are false or fraudulent as to material matters.

90. On information and belief defendants promote other schemes and in connection therewith engage in other conduct subject to the IRC § 6700 penalty.

91. Injunctive relief is appropriate to prevent recurrence of the 90% Loan Scheme and any other conduct subject to the IRC § 6700 penalty.

92. Section 6701 penalizes any person who prepares a document that he has reason to believe will be used in connection with any material matter arising under the internal revenue laws and who knows that the document, if so used, would result in an understatement of another person's tax liability.

93. Defendants prepare false and fictitious loan agreements and other documents that defendants know would, if used, result in understatements of their customers' income tax liabilities.

94. Injunctive relief is also appropriate to prevent recurrence of the 90% Loan Scheme and any other conduct subject to the IRC § 6701 penalty.

**Count II: Injunction under IRC § 7402**

95. The United States incorporates by reference the allegations contained in paragraphs 1 through 94.

96. IRC 7402(a) authorizes a court to issue injunctions as may be necessary or

United States of America's Complaint

appropriate for the enforcement of the internal revenue laws, even if the United States has other remedies available for enforcing those laws.

97. As described in paragraphs 47-85, defendants substantially interfere with the enforcement of the internal revenue laws by promoting their tax-fraud schemes.

98. Defendants' conduct results in irreparable harm to the United States for which the United States has no adequate remedy at law.

99. Unless enjoined by this Court, defendants are likely to continue to continue to engage in such conduct. The United States is entitled to injunctive relief under IRC § 7402(a).

WHEREFORE, plaintiff, the United States of America, prays for the following relief:

A. That the Court find that defendants have engaged in conduct subject to penalty under IRC § 6700, and that injunctive relief is appropriate under IRC § 7408 to prevent them and their representatives, agents, servants, employees, attorneys, and those persons in active concert or participation with them, from further such conduct;

B. That the Court find that defendants have engaged in conduct subject to penalty under IRC § 6701, and that injunctive relief is appropriate under IRC § 7408 to prevent them and anyone acting in concert with them, from further such conduct;

C. That the Court find that defendants have engaged in conduct that interferes with the administration and enforcement of the internal revenue laws, and that injunctive relief against them and their representatives, agents, servants, employees, attorneys, and those persons in active concert or participation with them is appropriate to prevent the recurrence of that conduct under the Court's equity powers and IRC § 7402(a);

D. That pursuant to IRC §§ 7402(a) and 7408, defendants, and anyone acting in concert with them, be enjoined and restrained from, directly or indirectly, by use of any means or instrumentalities:

    (a) Organizing, promoting, marketing, or selling any tax shelter, plan or arrangement that advises or assists others to attempt to violate the internal revenue laws or unlawfully evade the assessment or collection of their federal tax liabilities;

United States of America's Complaint

-17-

(b) Engaging in conduct subject to penalty under IRC § 6700, *i.e.*, by making or furnishing, in connection with the organization or sale of a shelter, plan, or arrangement, a gross valuation overstatement or a statement about the securing of any tax benefit that they know or have reason to know to be false or fraudulent as to any material federal tax matter;

(c) Engaging in activity subject to penalty under IRC § 6701, including preparing or assisting in the preparation of, or advising with respect to a document related to a matter material to the internal revenue laws that includes a position that they know will, if used, result in an understatement of tax liability;

(d) Engaging in any conduct that interferes with the administration and enforcement of the internal revenue laws.

E. That this Court, under IRC §§ 7402 and 7408, enter an injunction requiring defendants to contact all persons with whom they engaged in the 90% Loan transactions and inform those persons of the entry of the Court's findings and the fact that an injunction has been entered against them.

F. That this Court, under IRC §§ 7402 and 7408, enter an injunction requiring defendants and their representatives, agents, servants, employees, attorneys, and anyone in active concert or participation with them, to give to counsel for the United States a list of the names, addresses, e-mail addresses, telephone numbers, and Social Security and federal tax identification numbers of all persons and entities who have participated in defendants' 90% Loan scheme.

G. That this Court allow the United States full post-judgment discovery to monitor compliance with the injunction;

H. That this Court retain jurisdiction over this action for purposes of implementing and enforcing the final judgment and any additional orders necessary and appropriate to the public interest; and

United States of America's Complaint

-18-

I. That the Court grant the United States such other and further relief as the Court deems appropriate.

SCOTT N. SCHOOLS
United States Attorney

THOMAS MOORE
Assistant United States Attorney
Chief, Tax Division

*Moor for T. Newman*

THOMAS M. NEWMAN
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 7238
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-9926
Facsimile: (202) 514-6770
Thomas.m.newman@usdoj.gov

United States of America's Complaint

-19-

JS 44 - CAND (Rev. 11/04)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO.)

**I.(a) PLAINTIFFS**
UNITED STATES OF AMERICA

**DEFENDANTS**
CHARLES CATHCART, SCOTT CATHCART, YURIJ DEBEVC, ROBERT NAGY, DERIVIUM CAPITAL, LLC, DERIVIUM CAPITAL (USA), and VERIDIA SOLUTION, LLC,

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Thomas M. Newman, P.O. Box 7238, Ben Franklin Station, Washington DC 20044

ATTORNEYS (IF KNOWN)

**II. BASIS OF JURISDICTION** (PLACE AN "X" IN ONE BOX ONLY)
[X] 1 U.S. Government Plaintiff
[ ] 2 U.S. Government Defendant
[ ] 3 Federal Question (U.S. Government Not a Party)
[ ] 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) (For diversity cases only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated or Principal Place of Business In This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated and Principal Place of Business In Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

**IV. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)
[ ] Original Proceeding
[X] Removed from State Court
[ ] Remanded from Appellate Court
[ ] Reinstated or Reopened
[ ] Transferred from Another district (specify)
[ ] Multidistrict Litigation
[ ] Appeal to District Judge from Magistrate Judgment

**V. NATURE OF SUIT** (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ]110 Insurance | PERSONAL INJURY | PERSONAL INJURY | [ ]610 Agriculture | [ ]422 Appeal 28 USC 158 | [ ]400 State Reapportionment |
| [ ]120 Marine | [ ]310 Airplane | [ ]362 Personal Injury Med Malpractice | [ ]620 Other Food & Drug | [ ]423 Withdrawal 28 USC 157 | [ ]410 Antitrust |
| [ ]130 Miller Act | [ ]315 Airplane Product Liability | [ ]365 Personal Injury Product Liability | [ ]625 Drug Related Seizure of Property 21 USC 881 | | [ ]430 Banks and Banking |
| [ ]140 Negotiable Instrument | [ ]320 Assault Libel & Slander | [ ]368 Asbestos Personal Injury Product Liability | [ ]630 Liquor Laws | PROPERTY RIGHTS | [ ]450 Commerce/ICC Rates/etc. |
| [ ]150 Recovery of Overpayment & Enforcement of Judgment | [ ]330 Federal Employers Liability | | [ ]640 RR & Truck | [ ]820 Copyrights | [ ]460 Deportation |
| [ ]151 Medicare Act | [ ]340 Marine | PERSONAL PROPERTY | [ ]650 Airline Regs | [ ]830 Patent | [ ]470 Racketeer Influenced and Corrupt Organizations |
| [ ]152 Recovery of Defaulted Student Loans (Excl Veterans) | [ ]345 Marine Product Liability | [ ]370 Other Fraud | [ ]660 Occupational Safety/Health | [ ]840 Trademark | [ ]480 Consumer Credit |
| [ ]153 Recovery of Overpayment of Veteran's Benefits | [ ]350 Motor Vehicle | [ ]371 Truth in Lending | [ ]690 Other | | [ ]490 Cable/Satellite TV |
| [ ]160 Stockholders Suits | [ ]355 Motor Vehicle Product Liability | [ ]380 Other Personal Property Damage | LABOR | SOCIAL SECURITY | [ ]810 Selective Service |
| [ ]190 Other Contract | [ ]360 Other Personal Injury | [ ]385 Property Damage Product Liability | [ ]710 Fair Labor Standards Act | [ ]861 HIA (1395ff) | [ ]850 Securities/Commodities/Exchange |
| [ ]195 Contract Product Liability | | | [ ]720 Labor/Mgmt Relations | [ ]862 Black Lung (923) | [ ]875 Customer Challenge 12 USC 3410 |
| [ ]196 Franchise | | | [ ]730 Labor/Mgmt Reporting & Disclosure Act | [ ]863 DIWC/DIWW (405(g)) | [ ]891 Agricultural Acts |
| | | | [ ]740 Railway Labor Act | [ ]864 SSID Title XVI | [ ]892 Economic Stabilization Act |
| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | [ ]790 Other Labor Litigation | [ ]865 RSI (405(g)) | [ ]893 Environmental Matters |
| [ ]210 Land Condemnation | [ ]441 Voting | [ ]510 Motion to Vacate Sentence Habeas Corpus: | [ ]791 Empl.Ret. Inc. Security Act | FEDERAL TAX SUITS | [ ]894 Energy Allocation Act |
| [ ]220 Foreclosure | [ ]442 Employment | [ ]530 General | | [X]870 Taxes (US Plaintiff or Defendant) | [ ]895 Freedom of Information Act |
| [ ]230 Rent Lease & Ejectment | [ ]443 Housing | [ ]535 Death Penalty | | [ ]871 IRS - Third Party 26 USC 7609 | [ ]900 Appeal of Fee Determination Under Equal Access to Justice |
| [ ]240 Torts to Land | [ ]444 Welfare | [ ]540 Mandamus & Other | | | [ ]950 Constitutionality of State Statutes |
| [ ]245 Tort Product Liability | [ ]440 Other Civil Rights | [ ]550 Civil Rights | | | [ ]890 Other Statutory Actions |
| [ ]290 All Other Real Property | [ ]445 Amer w/ disab - Empl | [ ]555 Prison Condition | | | |
| | [ ]446 Amer w/ disab - Other | | | | |

**VI. CAUSE OF ACTION** (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)
26 U.S.C. 7402 and 7408, suit to enjoin tax-fraud scheme promotion.

**VII. REQUESTED IN COMPLAINT:** [ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $_____   CHECK YES only if demanded in complaint: JURY DEMAND: [ ] YES [X] NO

**VIII. RELATED CASE(S) IF ANY**   PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".

**IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)** (PLACE AND "X" IN ONE BOX ONLY)   [X] SAN FRANCISCO/OAKLAND   [ ] SAN JOSE

DATE 9/17/7   SIGNATURE OF ATTORNEY OF RECORD