JOSEPH P. RUSSONIELLO
United States Attorney
THOMAS MOORE (ASBN 4305-O78T
Assistant United States Attorney
Chief, Tax Division
9th Floor Federal Building
450 Golden Gate Avenue, Box 36055
San Francisco, California 94102
Telephone: (415) 436-6935
HUONG T. BAILIE (NYBN 4035739)
Special Trial Attorney
160 Spear Street, 9th Floor
San Francisco, California 94105
Telephone: (415) 227-5123
ALLYSON B. BAKER (DCBN 478073)
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 7238
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 202-353-8031
Facsimile: (202) 514-6770
Email: allyson.b.baker@usdoj.gov

Attorneys for Plaintiff, the United States of America

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>CHARLES CATHCART *et al.*<br><br>Defendants. | Civil No. 07-4762-PJH (JCS)<br><br>THE UNITED STATES'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF ITS MOTION FOR ENTRY OF DEFAULT JUDGMENT AS TO DERIVIUM CAPITAL (USA), INC.<br><br>*Hearing Notice*: March 7, 2008 at 1:30 PM |

Pursuant to Rule 55(b) of the Federal Rules of Civil Procedure and the Court's January 14, 2008 Order, the United States respectfully submits this supplemental memorandum in support of its application for entry of default judgment as to Derivium Capital (USA), Inc., (hereinafter

"Derivium USA") in the form of the United States's proposed Order Granting United States's Application for Default Judgment Against Derivium Capital (USA) Inc., which was previously filed. *See* Dkt. No. 11-5. That proposed order, if entered by the Court, would permanently enjoin Derivium USA from promoting any tax fraud schemes or engaging in any other type of conduct that interferes with enforcement of the internal revenue laws.

**Introduction**

On December 21, 2007, the Clerk of the Court entered default as to Derivium USA. *See* Clerk's Order Entering Default, Dkt. No. 19. As the Court's docket reflects, Derivium USA has not responded to the complaint, entered an appearance, or responded to the Clerk's entry of default. Neither Derivium USA nor its counsel has contacted counsel for the United States regarding this case. *See* Second Decl. of Allyson B. Baker at ¶¶8, Ex. A.

Derivium USA was founded and is owned entirely by defendant Charles Cathcart. Compl.¶¶14, 34. Two closely related companies, Derivium Capital, LLC and Veridia Solutions, LLC, which are wholly owned and operated by defendants, have stipulated to entry of permanent injunction. *See* Orders Granting Entry of Final Judgment of Permanent Injunction as to Derivium Capital, LLC and Veridia Solutions, LLC, Dkt. Nos. 9, 17. This case has now proceeded to pretrial discovery, and the Court entered a Case Management and Pretrial Order on January 4. *See* Case Management and Pretrial Order, Dkt. No. 27.

The Court should enter a default judgment against Derivium USA. Its failure to plead is inexcusable, and the complaint's allegations detail Derivium USA's liability in promoting tax fraud schemes. Furthermore, the United States will suffer substantial prejudice if its application is denied.

**Argument**

A district court has significant discretion when deciding whether to enter a default judgment against a non-pleading party. In making this determination, courts consider the following factors: "(1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the

action; (5) the possibility of a dispute concerning material facts, (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits." *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986). *See also, Shenker, Inc. v. Predator Mogulwear, Inc*., No. C 07-01795, 2007 WL 4556915, at * 2 (N.D.Cal. Dec. 20, 2007); *Bd. of Trustees of the Sheet Metal Workers Local 104 Health Care Plan v. Vigil,* No. C 07-01508, 2007 WL 3239281 *2 (N.D. Cal. Nov. 1, 2007); *Chao v. Zoltrix, Inc*., No. C 07-00610, 2007 WL 2990429 *2 (N.D. Cal. Oct. 11, 2007). The *Eitel* factors support entry of a default judgment against Derivium USA.

## I. The United States's Well-Pleaded Complaint Presents Meritorious Claims That Are Deemed True As To Derivium USA

It is axiomatic that "[w]ith respect to the determination of liability and the default judgment itself well-pled allegations in the complaint regarding liability are deemed true. The district court is not required to make detailed findings of fact." *Fair Housing of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002) (citations omitted). Derivium USA has defaulted, and thus, all of the complaint's allegations concerning its liability are deemed true.

### A. The Complaint's Factual Allegations

The complaint alleges the following facts regarding Derivium USA's liability (by corresponding paragraph):

**Jurisdiction and Venue**

1. This Court has jurisdiction over this action to enjoin defendants from violating and interfering with the administration of the internal revenue laws pursuant to 28 U.S.C. §§ 1340 and 1345 and Internal Revenue Code (I.R.C.) (26 U.S.C.) §§ 7402(a) and 7408.

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this judicial district. In promoting the schemes described herein, each defendant had regular and systematic contacts with residents of this judicial district who participated in the scheme.

**Nature of the Action**

3. This is a civil action under IRC §§ 7402 and 7408 to enjoin defendants and anyone in active concert or participation with them from promoting tax-fraud schemes, and from engaging in other conduct that interferes with the administration and enforcement of the tax laws, including but not limited through the marketing and execution of the defendants' "90% Loan" program, described in greater detail below.

4. This action has been requested by the Chief Counsel of the Internal Revenue Service, a delegate of the Secretary of the Treasury, and commenced at the direction of a delegate of the Attorney General, pursuant to IRC §§ 7402 and 7408 (a)

**Defendants**

13. Defendant Derivium Capital (USA), Inc., ("Derivium USA"), is a Delaware corporation registered to do business in the State of South Carolina.

**Defendants' Tax-Fraud Activities**

17. Defendants collectively market and implement various schemes that they falsely claim will enable customers to avoid federal income tax on capital gains from the sale or exchange of the customers' securities.

18. The primary scheme at issue is the so-called "90% Loan," in particular, the "90% Stock Loan" and the "ESOP QRP Loan" (which was formerly called the "ESOP Qualified Asset Loan"), which defendants market to and implement for customers. As set forth in more detail below, in marketing this scheme defendants falsely advise customers that they can receive 90% of the value of their securities without paying income tax on the capital gains. Defendants implemented the scheme for hundreds of customers nationwide, with total transactions thus far of somewhat more than $1 billion, resulting in the failure to report and pay hundreds of millions of dollars in federal income taxes.

19. Defendants have also marketed other "90% Loan" products, including but not limited to "Option Conversion Loans," "MicroCap Loans," "Foreign Stock Loans," and "Restricted Stock Loans," which on information and belief also are designed and intended illegally to allow

customers to receive approximately 90% of the value of their securities without paying income tax on the capital gains.

20. On information and belief, defendants are currently marketing and implementing a 90% Loan product involving the use of foreign trusts.

21. As explained below, defendants have frequently changed the identities of the entities through which they conduct their activities, without fundamentally changing the nature of those activities.

**Defendants' History**

34. In 2002, Charles Cathcart formed Derivium USA.

35. From the time of its formation, Derivium USA took over the marketing function of Derivium Capital with respect to the 90% Stock Loans and the other transactions which are the subject of this Complaint.

**Mechanics of the Fraudulent 90% Loan Scheme**

47. Defendants marketed the 90% Stock Loan initially to people who held appreciated stock with a relatively low basis, promising (as set forth in ¶¶ 48-72 below) that the transaction would allow customers to "monetize" their stock without paying any federal income tax on capital gain.

48. Defendants also marketed the ESOP QRP Loan to people who have (1) established an employee stock ownership plan ("ESOP") in which they have sold their shares in their closely held corporation to the ESOP; (2) reinvested the proceeds in qualified replacement property ("QRP") in the form of stock, floating rate notes ("FRN"), or a combination of both; and (3) elected to defer recognition of gain from the sale of their shares under section 1042( a) of the Internal Revenue Code (26 U.S.C.). Defendants promised that the transaction would allow customers to "monetize" their QRP without paying any federal income tax on capital.

49. As set forth in detail below, defendants told customers that an offshore lender would lend the customers funds equal to 90% of their securities' value and then hold the securities as collateral while defendants used purported sophisticated "proprietary hedging techniques" to

preserve the securities' value.

50. In fact there were no sophisticated hedging techniques. The defendants simply caused the securities to be sold and used the proceeds to fund the 90% "loan," keeping the remaining 10% for themselves and others who helped implement the scheme. The 90% Loan transactions were, in substance and in fact, simply sales of customers' securities disguised as loans so as to evade income tax on the capital gains from the sales.

51. To implement the 90% Loan scheme, a customer transferred the subject stock or FRN to defendants' designated account at brokerages such as Wachovia Securities, LLC; Janey Montgomery Scott, LLC; or Morgan Keegan & Company, Inc. Defendants, either directly or through BVL, Optech, or WITCO then caused the brokerage to sell the stock or FRN and had 90% of the sale proceeds remitted back to the customer as the purported "loan."

52. The remaining 10% was then allocated among the defendants and the purported "offshore lenders," as compensation for their designing and implementing the fraudulent scheme.

53. In virtually all instances, defendants simply sold the customers' securities immediately to fund the sham loan back to the customer.

54. In the case of the 90% Loans involving stock, the typical loan terms are as follows: (1) a term of not less than three years; (2) an interest rate higher than market rate; (3) repayment of principal before maturity is prohibited (but in earlier years of the scheme, repayment of interest was also prohibited); (4) the "loan" is nonrecourse to the customer; and (5) any dividend payable on the stock is credited to interest.

55. In the case of the ESOP QRP Loan involving an FRN, the typical loan terms are as follows - (1) a term of 20 to 40 years; (2) an interest rate higher than market rate; (3) the "loan" is nonrecourse to the customer; and (3) net interest payments are fixed for the life of the "loan." Defendants convert the floating rate of interest of the FRN to a fixed rate to offset the higher rate of interest charged on the "loan," which results in fixed net interest payments for the customer.

56. At the end of the 90% "loan" period, defendants' customers (at least some of whom are apparently unaware that defendants caused the sale of the securities to fund the purported

loans) were presented with three main options: (1) ending the transaction consensually, (2) continuing the transaction, or (3) simply walking away. These options are described in ¶¶58-72, *infra*. In the case of ESOP QRP Loans involving FRNs, because the terms of the "loan" are 20 to 40 years, no loan period has yet come to an end.

57. The first main option is to end the transaction, either by paying off the "loan" (if the customer wants the security back) or surrendering the security (when the customer does not want it back).

58. To pay off the "loan," a customer must pay off principal and the accrued, above market rate of interest; in return, the customer hypothetically receives back the same number of shares of the stock or an amount equal to the face value of the FRN initially transferred to the defendants.

59. This course of action would be prudent only if the security's value had increased so much that a customer would still turn a profit if he or she paid back the principal and above market interest and the necessarily high income tax on the subsequent sale of the security. And of course this would be feasible only if the defendants had sufficient funds to buy back the security in order to transfer it to the customer.

60. Alternatively, a customer could end the purported loan without receiving the security back. In this case, the customer would receive cash equal to 100% of the amount by which the value of the security exceeded the amount due under the "loan."

61. On information and belief, customers rarely paid off the purported loans, especially given the more attractive options set forth below. But customers elected to reacquire their collateral frequently enough to cause massive problems for defendants, in light of the fact that defendants had sold the "collateral" at the outset to fund the purported loans.

62. In these instances, defendants had to find funds either to obtain valuable replacement securities or to pay surrendering customers. But defendants had no such funds available. The 90% Loan scheme therefore had the characteristics of a Ponzi scheme, in which the proceeds of new transactions were used to fund shortfalls in prior sham transactions.

63. Moreover, in some instances defendants were unable to replace the stock as required for customers paying off their loans because defendants lacked funds to do so. Several of defendants' customers have filed lawsuits against them for these defaults, and on information and belief the associated financial pressures contributed to defendant Derivium's bankruptcy filing. For example, one customer transferred as "collateral" roughly $3 million of stock to defendants, which after three years resulted in a "loan" balance of loan balance of $5 million. At that time, the value of the customer's stock had risen to over $15 million, but defendants had previously sold the stock and lacked funds to reacquire replacement stock when the customer asked for the stock back. On information and belief, however, notwithstanding Derivium's bankruptcy, defendants have continued to promote this or other fraudulent schemes through entities other than Derivium.

64. The second main option at the end of the loan term was to continue the transaction, either by "refinancing" it, when the security's value at the end of the loan is greater than the amount due on the loan, or "renewing" it, when the security's value at the end of the loan is less than that amount. "Refinancing" resulted in a net payment to the customer (90% of the increase in value), while "renewing" required a payment by the customer of a small renewal fee. In either case, though, the transaction would be extended (with new, even higher rates of interest) until whatever maturity date the customer chose.

65. As set forth in more detail below, defendants falsely told customers that this option allowed them to delay any tax implications until the end of the transaction, which could be as long as the customer chose.

66. The final main options were for the parties simply to walk away from the transaction, either after giving notice of an intent to do so or by failing timely to elect another option ("forfeit") .

67. On information and belief, these options were also rarely selected. It is true that, because the "loans" were nonrecourse, a customer could walk away without further risk. But defendants warned customers that these options could result in taxable events, which customers

undertook the 90% Loan precisely to avoid.

68. Given that they could supposedly achieve indefinite tax deferral by continuing the transaction, few customers would choose this option. Defendants, however, did not issue Forms 1099 when these options were chosen, making it less likely that the customer would actually report any income or pay any income tax.

69. Based on the facts set forth above, and contrary to defendants' claims, the 90% Loans are not true loans. Instead, the 90% Loans are in substance simply a disguised sale of securities, and the “loan” proceeds are taxable capital gain to the customer upon receipt to the extent that the sale price of the security (not the 90% loan payment) exceeded the customers’ basis in the security.

70. Although characterized as loans, the 90% Loan scheme in fact involved sales because defendants acquired the benefits and burdens of owning their customers’ securities. After a customer participated in the scheme, defendants acquired, inter alia, sole possession and control of the securities (including voting rights), and the right to sell the securities. In addition, defendants assumed nearly all of the risk of loss or potential for appreciation related to the transferred securities. Because defendants acquired the securities for 90% of their value, defendants would bear any decline in the securities' value that exceeded 10%. Unlike a typical stock margin loan, defendants’ customers were not required to post more cash or collateral if the stock price declined.

71. In addition, if the price of the security rose but did not rise above the payoff amount, then defendants would derive the benefit of this gain, because in these circumstances their customers would presumably not exercise their right to payoff the loan. Because loan terms permitted defendants’ customers to perpetually renew the purported loan, it was possible that no interest or principal would ever be paid. Also, any dividends paid on the securities would benefit defendants because the dividends would be credited against accrued interest, which interest would in fact never be paid by the customer transferring the security.

72. Lastly, defendants' customers received 90% of the value of the security, which is adequate consideration in light of the fact that the customers also received for this price the right to purportedly reacquire the security with a greater value in the future. Since the purported loan was non-recourse, the customer was free to walk away from the transaction and not repay the loan if the security price declined below the loan pay-off amount (or if customers had insufficient funds to pay off the loan at maturity).

**Scheme - False Statements**

73. In connection with their organization, sale, and promotion of the 90% Loan scheme, defendants make material statements about the tax benefits of participating in the scheme that are, and which they know to be, false and fraudulent.

74. These statements include, inter alia, claims:

a. That the 90% Loans are loans (which are not subject to tax), when in fact they are sales (which are subject to tax on the capital gains);

b. That the 90% Loans allow for potentially indefinite deferral of tax on the money received, when in fact tax is due immediately because the proceeds are the products of a sale and not a loan;

c. That the 90% Loans allow for potentially indefinite deferral of tax on the money received, when in fact tax is due immediately because the proceeds are the product of a sale and not a loan;

d. That defendants will engage in "hedging transactions" to protect the value of the security when in fact defendants simply sell the security and keep 10% either as profit or to invest in their own companies.

75. With respect to the claim that the 90% Loan and the ESOP QRP Loan are loans instead of sales, defendants have made the following specific false statements:

a. "Generate liquidity without triggering a taxable event. . .. You don't have to sell your shares and trigger a tax liability (because loans are not taxable events). In fact, depending on your individual tax situation, the 90% Stock Loans may even enable you to generate more cash than selling the position outright, net of capital gains tax liabilities."

b. "Superior Terms for the Monetization of FRNs: The terms of an ESOP QRP Loans are unbeatable. In the case of FRNs, the ESOP QRP Loans offers exceptionally low interest rates. As a result, the net quarterly interest payment due (i.e., the interest payment on the ESOP QRP Loans less the interest earned on the FRNs) is typically the lowest available in today's market. In addition, the net payment due is fixed for the life of the

> loan, and the life of the loan can be set as far out as the first call date of the FRN."

76. With respect to the claim that the 90% Loan and the ESOP QRP Loan are not taxable events, defendants have made the following specific false statements:

a. "With the tax season upon us, you might be tempted to sell stock to pay capital gains taxes. Instead, let us suggest using our 90% Stock Loan as a better way to generate the cash needed. After all, there's no sense in triggering another tax hit that you'll then have to contend with next year. Our unique structures can help you achieve the liquidity you need while you maintain upside potential with downside protection. And they don't nibble away at principal."

b. "For Floating Rate Notes: If the proceeds from an ESOP have been or are going to be reinvested into FRNs, the ESOP QRP Loans program can be used to generate loan proceeds as high as 95% of the market value of the notes without triggering a taxable event."

c. "For Equities: If the borrower plans to reinvest or has reinvested into stocks instead of FRNs, the borrower can utilize the ESOP QRP Loans under terms similar to those of the 90% Stock Loans program. By submitting equities as collateral, the borrower maintains the opportunity for long term appreciation inherent in equity investments (which the borrower would be able to access on the repayment of the loan)."

77. With respect to the claim that the 90% Loan and the ESOP QRP Loan involve hedging transactions, defendants have made the following specific false statements:

a. "Step 3: Next you arrange to transfer your collateral to a special purpose account at one of our preferred brokerage firms. Subsequently, hedging transactions are established for the positions. Step 4: Your cash loan proceeds will be wired to your designated account within two business days after the hedging process has been completed. Loan Amount: 90% of the market value of collateral submitted upon completion of appropriate hedging transactions. Loan Closing: Upon receipt of securities and establishment of hedging transactions."

b. "For Floating Rate Notes: The interest rate for the ESOP QRP Loans on FRNs is expressed as a spread above the rate paid on the Floating Rate Note on the date(s) of the establishment of hedging transactions. Next Steps: Next, you arrange to transfer your collateral to a special purpose account at one of our preferred brokerage firms. Subsequently, hedging transactions are established for the positions. Your cash proceeds will be wired to your designated account within two business days after the hedging process has been completed."

78. In connection with each variation of the 90% Loan scheme, defendants made the

following false statements regarding ownership and control over their customers' collateral security on Derivium's "Master Agreement:"

a. Derivium would be the "custodian" of the security used as collateral;

b. Derivium was "authorized to act on behalf of' borrowers for the purposes of . . . voting shares and receiving dividends or interest on securities held as collateral";

c. Derivium "agrees to return, at the end of the loan term, the same collateral (or cash equivalent)"; and

d. Derivium could place the collateral "with any domestic or foreign depository or clearing corporation. . . ."

79. All of these representations are false. Defendants made them to create the false impression that the collateral securities would be maintained safely.

**Harm to the Government**

80. Defendants' tax-fraud scheme causes significant harm to the Government by helping customers evade taxes and obstruct IRS efforts to administer the federal tax laws.

81. The Internal Revenue Service is harmed because it must dedicate scarce resources to detecting and examining inaccurate returns filed by defendants' customers, and to attempting to assess and collect unpaid taxes.

82. Thus far the IRS has completed examinations related to 189 individuals that participated in the fraudulent 90% Loan transactions. The IRS determined that those 189 individuals under-reported the amount of income tax owed by $23,176,692. The total tax loss, including penalties, resulting from defendants' scheme related to these 189 individuals' participation in defendants' 90% Loan scheme equals $26,078,345, and an average deficiency of approximately $137,981 per customer.

83. For example, one of defendants' customers, an engineer from Hermosa Beach, CA, purchased stock sometime before 2001 for $36,148. In 2001, the engineer used the defendants' 90% loan scheme to dispose of this stock, which was by then worth over $700,000. The IRS audited his 2001 federal income tax return and in 2005 the engineer agreed with the IRS that he had under-reported his 2001 taxable income by $677,777, and owed an additional $231,005 in

income tax for 2001, plus interest.

84. Defendant Charles Cathcart has stated that over 1,700 individuals participated in the scheme, in transactions totaling over $1 billion.

85. Based on the average deficiency calculated by the IRS, the tax loss could be as much as $234,567,700 ($137,981 x 1,700).

All of these allegations are construed as true as to Derivium USA, and they show that the company promoted one or more tax-fraud schemes, including the "90% Loan" program described throughout the complaint. Such conduct is unlawful and should be enjoined.

**B. The Complaint Seeks Permanent Injunctive Relief, Which Is Necessary and Appropriate**

This Court may enjoin a defendant from promoting certain tax arrangements under I.R.C. §7408 if the United States proves that the defendant engaged in conduct subject to penalty under I.R.C. §§6700 and 6701 and that injunctive relief is appropriate to prevent the recurrence of such conduct. *See* 26 U.S.C. §7408. I.R.C. §6700 imposes a penalty on

> any person who organizes (or assists in the organization of) . . . any investment plan or arrangement . . . and makes or furnishes or causes another person to make or furnish (in connection with such organization or sale) a statement with respect to the allowability of any deduction or credit, the excludability of any income, or the securing of any other tax benefit by reason of holding an interest in the entity or participating in the plan or arrangement which the person knows or has reason to know is false or fraudulent as to any material matter.

26 U.S.C. §6700. I.R.C. §6701 imposes a penalty on any person who prepares a document that he knows or has reason to believe "will be used in connection with any material matter arising under the internal revenue laws," and who knows that such document "would result in an understatement of the liability for tax of another person." 26 U.S.C. §6701. In addition, the Court also may issue an injunction "as may be necessary or appropriate for the enforcement of the internal revenue laws." 26 U.S.C. §7402.

The complaint alleges that defendants, including Derivium USA, repeatedly engaged in conduct subject to penalty under I.R.C. §§6700 and 6701 and in contravention of the internal revenue laws. As described in extensive factual detail throughout the complaint, Derivium USA

and other defendants promoted, organized, and marketed tax fraud schemes that made or furnished or caused others to make or furnish material and false or fraudulent statements regarding tax liability. *See* Compl. ¶¶47-79. In addition ,the complaint alleges that Derivium USA and other defendants "prepare false and fictitious loan agreements and other documents that defendants know would, if used, result in understatements of their customers' income tax liabilities." *Id*. ¶93. Defendants know or had reason to know that their statements were false or fraudulent as to material matters. *See id*. ¶¶22-46.

The complaint demonstrates that recurrence of this unlawful conduct is likely. Defendants have promoted, organized, and marketed their tax-fraud schemes, since at least 1999 (*id*. ¶¶27-29), and these tax fraud schemes are estimated to have cost the United States as much as $234,567,000. *See* Compl. ¶85. The complaint presents well-pleaded allegations, which establish Derivium USA's liability under I.R.C. §§ 6700 and 6701. An entry of default judgment in the form of entry of a permanent injunction against Derivium USA is necessary and appropriate for the enforcement of the internal revenue laws.

**II. The United States Will Be Prejudiced If the Court Denies Its Application For Default Judgment, And Derivium USA's Failure To Plead Is Inexcusable**

If its application for default judgment is denied, the United States will have no other way to prevent Derivium USA from engaging in the unlawful conduct alleged in the complaint. This would greatly prejudice the United States, because even if the United States is able to obtain injunctions against the remaining defendants in this case (as it has against Derivium Capital, LLC and Veridia Solutions, LLC), Derivium USA could continue to promote the tax-fraud schemes described in the complaint.

Moreover, Derivium USA's failure to plead is inexcusable. Its registered agent was properly served with the Complaint on October 10, 2007. *See* Second Baker Decl. ¶¶ 4-5. Between that date and December 21, 2007, when the Clerk entered a default, Derivium USA failed to plead or even contact counsel for the United States about this case. *See id*.¶¶6,8. Not only was Derivium USA properly served, but two related companies, owned and operated by

defendants, recently stipulated to entry of a final injunction. *See infra* at 2. In addition, Derivium USA's founder and owner is defendant Charles Cathcart. *See* Compl.¶¶14, 34. Thus, it is improbable, if not impossible, that Derivium USA's default is due to lack of notice about the case, or excusable neglect.

Because the United States seeks equitable relief and no monetary damages, the *Eitel* factors further favor entry of a default judgment. Courts are more inclined to enter a default judgment when there are no large monetary damages at stake. *See Bd. of Trustees*, 2007 WL 3239281 at * 2. The *Eitel* factors favor entry of a default judgment, and outweigh any general policy that favors disposing of cases on the merits.

**Conclusion**

For all of the foregoing reasons, the Court should grant the United States's Application for Entry of a Default Judgment Against Derivium USA.

January 23, 2008

Respectfully submitted,

JOSEPH P. RUSSONIELLO
United States Attorney

/s/ Allyson B. Baker

ALLYSON B. BAKER
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 7238
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 202-353-8031

**CERTIFICATE OF SERVICE**

I hereby certify that on January 23, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following:

Farley J. Neuman (fneuman@jgn.com)
Tom Prountzos (tprountzos@jgn.com)
Jenkins Goodman Neuman & Hamilton LLP
417 Montgomery Street, 10th Floor
San Francisco, CA 94104
*Attorneys for Defendant, Robert Nagy*

David Bujannoff Porter , Jr. (porter@woodporter.com**)**
Wood & Porter
333 Sacramento Street
San Francisco, CA 94111
*Attorney for Scott Cathcart*

I further certify that on January 23, 2007, service of the foregoing was made upon the following by depositing a copy in the United States mail, postage prepaid:

Yuri Debevc (*pro se*)
1483 Burningtree Road
Charleston, SC 29412

/s/ Allyson B. Baker
ALLYSON B. BAKER