JOSEPH P. RUSSONIELLO
United States Attorney
THOMAS MOORE (ASBN 4305-O78T)
Assistant United States Attorney
Chief, Tax Division
9th Floor Federal Building
450 Golden Gate Avenue, Box 36055
San Francisco, California 94102
Telephone: (415) 436-6935
HUONG T. BAILIE (NYBN 4035739)
300 E. 8th Street, Suite 601
Austin, TX 78701
Telephone: (512) 499-5759
ALLYSON B. BAKER (DCBN 478073)
FREDERICK N. NOYES
Tax Division
U.S. Department of Justice
Post Office Box 7238
Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 202-353-8031
Facsimile: (202) 514-6770
Email: allyson.b.baker@usdoj.gov
          frederick.n.noyese@usdoj.gov

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> CHARLES CATHCART, SCOTT CATHCART, ) <br> YURIJ DEBEVC, a/k/a YURI DEBEVC, ) <br> ROBERT NAGY, DERIVIUM CAPITAL ) <br> (USA), INC., OPTECH LIMITED, CHI-HSIU ) <br> HSIN, a/k/a CHARLES HSIN, FRANKLIN ) <br> THOMASON ) <br> ) <br> Defendants. ) | Civil No. 07-4762-PJH <br><br> THE UNITED STATES'S <br> FIRST AMENDED COMPLAINT |

    Pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure, the United States amends its complaint to join Optech Limited, Chi-Hsiu Hsin, a/k/a Charles Hsin, and Franklin Thomason as defendants and to clarify several factual allegations.

**Jurisdiction and Venue**

1. This Court has jurisdiction over this action to enjoin defendants from violating and interfering with the administration of the internal revenue laws pursuant to 28 U.S.C. §§ 1340 and 1345 and Internal Revenue Code (I.R.C.) (26 U.S.C.) §§ 7402(a) and 7408.

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this judicial district. In promoting the schemes described herein, each defendant had regular and systematic contacts with residents of this judicial district who participated in the scheme.

**Nature of the Action**

3. This is a civil action under I.R.C. §§ 7402 and 7408 to enjoin defendants and anyone in active concert or participation with them from promoting tax-fraud schemes, and from engaging in other conduct that interferes with the administration and enforcement of the tax laws, including but not limited through the marketing and execution of the defendants' "90% Loan" program, described in greater detail below.

4. This action has been requested by the Chief Counsel of the Internal Revenue Service, a delegate of the Secretary of the Treasury, and commenced at the direction of a delegate of the Attorney General, pursuant to I.R.C. §§ 7402(a) and 7408.

5. The United States brings this action to enjoin defendants permanently from:

(a) Organizing, promoting, marketing, or selling any tax shelter, plan, or other arrangement that advises or encourages others to attempt to violate the internal revenue laws or unlawfully evade the assessment or collection of their federal tax liabilities, including but not limited to the arrangements which are identified in this Complaint and/or which are identified through further discovery in the case;

(b) Engaging in conduct subject to penalty under I.R.C. § 6700, i.e., by making or furnishing, in connection with the organization or sale of a shelter, plan, or other arrangement, a gross valuation overstatement or a statement about securing any tax benefits that they know or have reason to know is false or fraudulent as to any material federal tax matter, including but not limited to the arrangements which are identified in this Complaint and/or which are identified through further discovery in the case;

© Engaging in any other conduct that interferes with the administration and enforcement of the internal revenue laws.

6. An injunction is warranted based on defendants' continuing violation of the internal revenue laws, including engaging in conduct subject to penalty under I.R.C. §§ 6700 and 6701.

**Defendants**

7. On information and belief defendant Charles Cathcart resides in Tuxedo Park, New York and in Santa Barbara, California.

8. Defendant Scott Cathcart resides in Ross, California.

9. Defendants Yurij Debevc, a/k/a Yuri Debevc, and Robert Nagy reside in Charleston, South Carolina.

10. Defendants Charles Cathcart, Scott Cathcart and Yuri Debevc co-own Derivium Capital, LLC, ("Derivium"), which is a South Carolina limited liability company with its principal place of business located at Parkshore Centre, One Poston Road, Suite 125, Charleston, South Carolina. Charles Cathcart owns 50% of Derivium, and Scott Cathcart and Debevc each own 25% of Derivium. In September of 2005, Derivium filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code, and since that time, it has not conducted any business.

11. Defendant Derivium Capital (USA), Inc., ("Derivium USA"), is a Delaware corporation registered to do business in the State of South Carolina. Defendant Derivium USA is owned by defendant Charles Cathcart.

12. Yuri Debevc founded and owns Veridia Solutions, LLC, ("Veridia"), which is a South Carolina limited liability company with its principal place of business located at Parkshore Centre, One Poston Road, Suite 125, Charleston, South Carolina. In September of 2005, Veridia filed for bankruptcy, and since that time, it has not conducted any business.

13. Defendant Optech Limited ("Optech") is a Hong Kong business entity located at Unit 4704, 47/F Far East Finance Centre, 16 Harcourt Road, Admiralty, Hong Kong, and also located at 590 Madison Avenue, 31st Floor, New York, New York 10022 and at P.O. Box 527125, Flushing, New York 11352. In addition, Optech does business throughout the United States at the Internet website address, located at www.hk-optech.com. Optech has a registered agent in California.

14. Defendant Chi-Hsiu Hsin, a/k/a Charles Hsin, resides in Franklin Square, New York and is a principal and the executive director of Optech, Limited.

15. Defendant Franklin Thomason resides in Casa Grande, Arizona and is a principal and director of Optech Limited.

**Defendants' Tax-Fraud Activities**

16. Defendants collectively market and implement various schemes that they falsely claim will enable customers to avoid federal income tax on capital gains from the sale or exchange of the customers' securities.

17. The primary scheme at issue is the so-called "90% Loan," in particular, the "90% Stock Loan" and the "ESOP QRP Loan" (which was formerly called the "ESOP Qualified Asset Loan"), which defendants market to and implement for customers. As set forth in more detail below, in marketing this scheme defendants falsely advise customers that they can receive 90% of the value of their securities without paying income tax on the capital gains. Defendants implemented the scheme for hundreds of customers nationwide, with total transactions worth more than $1 billion, resulting in the failure to report and pay hundreds of millions of dollars in federal income taxes.

18. Defendants also have marketed other "90% Loan" products, including but not limited to "Option Conversion Loans," "MicroCap Loans," "Foreign Stock Loans," and "Restricted Stock Loans," which, on information and belief, also are unlawfully designed and intended to allow customers to receive approximately 90% of the value of their securities without paying income tax on the capital gains.

19. On information and belief, defendants are currently marketing and implementing a 90% Loan product involving the use of foreign trusts.

20. As explained below, defendants have frequently changed the identities of the entities through which they conduct their activities, without fundamentally changing the nature of those activities.

**Defendants' Tax-Fraud Activities--History**

21. Charles Cathcart has a Ph.D. in monetary economics from the University of Virginia. He has worked for more than 20 years in commercial and investment banking, including working with derivatives and related financial products.

22. In 1997, Charles Cathcart founded First Security Capital ("FSC"), a Texas company through which he (with others) marketed the 90% Stock Loan scheme described further below.

23. In early 1998, FSC incorporated in Charleston, South Carolina, and all of its business operations relocated to South Carolina from Texas. FSC continued to be involved with 90% Stock Loans and the other transactions that are the subject of this Complaint. In addition, in 1998, FSC also opened an office in San Francisco and expanded its base of operations.

24. In 2000, FSC's name changed to "Derivium Capital, LLC."

25. Debevc has worked in the financial services industry for more than 20 years and was at one point an associate of Charles Cathcart's while Cathcart was employed at CitiBank as the chief economist for the bank's eastern division.

26. Sometime before 1999, Debevc became involved in managing Derivium Capital at its Charleston headquarters, including marketing and executing 90% Loans and the other transactions that are the subject of this Complaint.

27. Scott Cathcart is Charles Cathcart's son.

28. Sometime before 1999, Scott Cathcart opened an office for FSC (subsequently Derivium Capital) in San Francisco. From that location, he worked to market and execute 90% Stock Loans and the other transactions described in this Complaint.

29. Robert Nagy is a Certified Public Accountant and is a longtime associate of Charles Cathcart.

30. Nagy is the sole owner of Meridian Services Ltd. As Meridian's owner, Nagy has served as the "outside accountant" for Derivium Capital, and he has represented both Derivium and Derivium's customers before the IRS and other administrative bodies.

31. Nagy also has prepared written tax advice regarding the 90% Stock Loan and provided that advice to persons promoting 90% Stock Loans on behalf of, or in association with, Derivium.

32. Nagy also has promoted 90% Stock Loans.

33. In 2002, Charles Cathcart formed Derivium USA.

34. From the time of its formation, Derivium USA took over the marketing function of Derivium Capital with respect to the 90% Stock Loans and the other transactions that are the subject of this Complaint.

35. Charles Hsin is a long-time business associate of Charles Cathcart and Yuri Debevc. He first became acquainted with them at Citibank. Hsin was a principal for FSC (Canada), from which he received approximately $276,000 in compensation from his work with FSC (Canada). In addition, Hsin has been a member of numerous boards of directors of companies that Charles Cathcart owns and controls and through which Cathcart has funneled proceeds from the 90% Stock Loans.

36. In addition to serving as director of Optech, Franklin Thomason is an electrical engineer and software engineer by trade and the President of Tsuei Consultants, Inc., a Nevada corporation that describes itself as having been "formed for financial management and trading in the stock market."

37. As explained in more detail below, the 90% Loan scheme required a nominal "offshore lender" to provide the funds.

38. From the beginning of the scheme until some time in 2000, the "offshore lender" used for the scheme was Diversified Design Associates ("DDA"), a company controlled in whole or in part by Charles Cathcart. Hsin was a principal of DDA in 1997 and 1998.

39. In 1998, FSC and DDA entered into an "Investment & Loan Agreement" by which FSC and DDA agreed to market and execute 90% Stock Loan arrangements in the United States and Canada.

- 6 -

40. In 2000, Charles Cathcart caused the formation of Bancroft Ventures Ltd. ("BVL") in the Isle of Mann. BVL and defendant Derivium Capital then executed. two contracts: (1) a Stock Loan Administration Agreement, by which BVL acquired all of DDA's 90% Stock Loans, and (2) a Stock Loan Marketing & Administration Agreement, by which Derivium Capital agreed to market 90% Stock Loans for BVL.

41. In 2002, Optech became an offshore lender for the tax-fraud scheme. By 2005, Optech had completely supplanted BVL as a lender. Eventually, Optech became the sole lender for the tax-fraud scheme.

42. Also in 2002, Debevc formed Veridia Solutions, Inc. From the time of its formation, Veridia took over the administrative functions of Derivium Capital with respect to 90% Stock Loans and the other transactions which are the subject of this Complaint.

43. On information and belief, Optech and Veridia (which by then had replaced Derivium in the 90% Loan scheme) entered into an arrangement in or around 2002 similar to the arrangements between (1) DDA and Derivium, and (2) BVL and Derivium, by which Optech agreed to serve as the "offshore lender" for 90% Loans marketed by Veridia.

44. At some point in 2002, Charles Cathcart caused the formation of WITCO Services (UK) Limited or Windward Isles Trust Company ("WITCO") in England. WITCO co-existed with BVL as an off-shore lender in 2002 and 2003. By early 2004, all of WITCO's outstanding loans for which it had been an off-shore lender were transferred to Optech.

45. WITCO and Veridia entered into an arrangement in or around 2002 similar to the arrangements between (1) DDA and Derivium Capital, (2) BVL and Derivium Capital, and (3) Optech and Veridia, by which WITCO agreed to serve as the agent for the purported offshore lender or as the purported offshore lender for 90% Stock Loans and other 90% Loan products, particularly the ESOP QRP Loans, marketed by Veridia.

46. In 2006, Veridia largely ceased operations, and BVL and Optech began to administer the 90% Loan products, particularly the ESOP QRP Loan, at the direction of the defendants.

47. Indeed, since 2002, Optech has taken over most aspects of the promotion, organization and operation of the 90% Loan programs from Derivium, Veridia, and BVL. Optech uses the same procedures, forms, processes, brokerage firms and personnel as these companies previously used to promote and administer the 90% Loan programs.

48. Optech maintains a margin account with numerous brokerage firms, including Janney Montgomery Scott LLC, Wachovia Corporation, and Morgan Keegan and Company, through which Optech executes the 90% Loan programs. Beginning in 2002, Optech gave trading authorization to the same individuals who previously received trading authorization from FSC, DDA, Derivium, BVL and WITCO. By 2006, however, only defendants and Optech principals Hsin and Thomason had Optech trading authorizations. In addition, Optech continues to administer the tax-fraud scheme for the same customers who previously did business with Derivium, Veridia, BVL and WITCO.

**Defendants' History**

**Mechanics of the Fraudulent 90% Loan Scheme**

49. Defendants marketed the 90% Stock Loan initially to people who held appreciated stock with a relatively low basis, promising that the transaction would allow customers to "monetize" their stock without paying any federal income tax on capital gain.

50. Defendants also marketed the ESOP QRP Loan to people who have (1) established an employee stock ownership plan ("ESOP") in which they have sold their shares in their closely held corporation to the ESOP; (2) reinvested the proceeds in qualified replacement property ("QRP") in the form of stock, floating rate notes ("FRN"), or a combination of both; and (3) elected to defer recognition of gain from the sale of their shares under section 1042( a) of the Internal Revenue Code (26 U.S.C.). Defendants promised that the transaction would allow customers to "monetize" their QRP without paying any federal income tax on capital gain.

51. Defendants told customers that an offshore lender would lend the customers funds equal to 90% of their securities' value and then hold the securities as collateral while defendants used purported sophisticated "proprietary hedging techniques" to preserve the securities' value.

52. In fact, there were no sophisticated hedging techniques. The defendants simply caused the securities to be sold, remitted 90% of the sales proceeds to their customers, and then retained the remaining 10% of the sales proceeds for themselves and their associates, who facilitated the tax-fraud scheme. The 90% Loan transactions were, in substance and in fact, simply sales of customers' securities disguised as loans so as to evade income tax on the capital gains from the sales.

53. To implement the 90% Loan scheme, a customer transferred the subject stock or FRN to defendants' designated account at brokerage firms such as Janney Montgomery Scott, LLC, Morgan Keegan & Company, Inc., or Wachovia Corporation. Defendants, either directly or through BVL, Optech, or WITCO then caused the brokerage firm to sell the stock or FRN and had 90% of the proceeds from sale of the stock or 90% of the face value of the FRN remitted back to the customer as the purported loan.

54. The remaining 10% was then allocated among the defendants and the purported offshore lenders, as compensation for their designing and implementing the fraudulent scheme.

55. In virtually all instances, defendants simply sold the customers' securities immediately after the securities were transferred to the defendants as purported collateral.

56. In the case of the 90% Loans involving stock, the loan terms generally are as follows: (1) a term of three years; (2) an interest rate higher than market rate; (3) repayment of principal before maturity is prohibited (but in earlier years of the scheme, repayment of interest was also prohibited); (4) the purported loan is nonrecourse to the customer; and (5) any dividend payable on the stock is credited to interest.

57. Starting in or around 2003 or 2004, the terms of the 90% Loans included a purported loan term that was as long as 40 years and a provision that allowed a customer to pay back the loan after three years, six years, nine years or in other three year increments, provided that the customer gave defendants 12 months notice of his or her intention to pay back the loan at this three year increment and also agreed to pay an exorbitant penalty payment. This provision had

the practical effect of deterring nearly all customers from paying the loans back before expiration of the loan term (sometimes as long as 40 years).

58. In the case of the ESOP QRP Loan involving an FRN, the typical loan terms are as follows: (1) a term of 20 to 40 years; (2) an interest rate higher than market rate; (3) the purported loan is nonrecourse to the customer; and () net interest payments are fixed for the life of the purported loan. Defendants convert the floating rate of interest of the FRN to a fixed rate to offset the higher rate of interest charged on the purported loan, which results in fixed net interest payments for the customer.

59. At the end of the 90% "loan" period, defendants' customers (at least some of whom are apparently unaware that defendants caused the sale of the securities to fund the purported loans) were presented with three main options: (1) ending the transaction consensually, (2) continuing the transaction, or (3) simply walking away. In the case of ESOP QRP Loans involving FRNs, because the terms of the "loan" are 20 to 40 years, no loan period has yet come to an end.

60. The first main option is to end the transaction, either by paying off the "loan" (if the customer wants the security back) or surrendering the security (when the customer does not want it back).

61. To pay off the "loan," a customer must pay off principal and the accrued, above-market-rate of interest; in return, the customer hypothetically receives back the same number of shares of the stock or an amount equal to the face value of the FRN initially transferred to the defendants.

62. This course of action would be prudent only if the security's value had increased so much that a customer would still turn a profit if he or she paid back the principal and above-market interest and the necessarily high income tax on the subsequent sale of the security. And, of course, this would be feasible only if the defendants had sufficient funds to buy back the security in order to transfer it to the customer.

63. Alternatively, a customer could end the purported loan without receiving the security

back. In this case, the customer would receive cash equal to 100% of the amount by which the value of the security exceeded the amount due under the "loan."

64. On information and belief, customers rarely paid off the purported loans, especially given the more attractive options set forth below. But customers elected to reacquire their securities, which defendants falsely and fraudulently designated as collateral for a purported loan, frequently enough to cause massive problems for defendants. Mainly, because defendants actually sold their customers' securities immediately after they were transferred to defendants as part of the tax-fraud scheme, defendants would have to purchase the customers' securities back from the markets in order to return the securities to customers at the end of the loan term.

65. In these instances, defendants had to find funds either to obtain valuable replacement securities or to pay the surrendering customers. But defendants had no such funds available. The 90% Loan scheme therefore had the characteristics of a Ponzi scheme, in which the proceeds of new transactions were used to fund shortfalls in prior sham transactions.

66. Moreover, in some instances defendants were unable to repurchase the securities as some customers demanded at the end of the purported loan term. Defendants often lacked the necessary funds to repurchase these securities, especially if the securities substantially appreciated during the duration of the purported loan term. Several of defendants' customers have filed lawsuits against them for these defaults, and, on information and belief, the associated financial pressures contributed to Derivium's bankruptcy filing. For example, one customer transferred as purported collateral roughly $3 million of stock to defendants, which after three years resulted in a purported loan balance of $5 million. At that time, the value of the customer's stock had risen to over $15 million, but defendants had previously sold the stock and lacked funds to reacquire replacement stock when the customer asked for the stock back three years later. Defendants continue to promote this or other fraudulent schemes through entities other than Derivium.

67. The second main option at the end of the loan term was to continue the transaction, either by "refinancing" it, when the security's value at the end of the loan is greater than the

- 11 -

amount due on the loan, or "renewing" it, when the security's value at the end of the loan is less than that amount. "Refinancing" resulted in a net payment to the customer (90% of the increase in value), while "renewing" required a payment by the customer of a renewal fee, equal to 4.5% to 6% of the proceeds from the stock sale or FRN face value as of the trade date. In either case, though, the transaction would be extended until whatever maturity date the customer chose.

68. As set forth in more detail below, defendants falsely told customers that this option allowed them to delay any tax implications until the end of the transaction, which could be as long as the customer chose.

69. The final main options were for the parties simply to walk away from the transaction, either after giving notice of an intent to do so or by failing timely to elect another option ("forfeit").

70. It is true that, because the "loans" were nonrecourse, a customer could walk away without further risk. But defendants warned customers that these options could result in taxable events, which customers undertook the 90% Loan precisely to avoid. A sizeable number of customers chose to "walk away" from the transaction or "forfeit" the transaction, as described above.

71. Given that they could supposedly achieve indefinite tax deferral by continuing the transaction, few customers would choose this option. Defendants, however, did not issue Forms 1099 when these options were chosen, making it less likely that the customer would actually report any income or pay any income tax.

72. Based on the facts set forth above, and contrary to defendants' claims, the 90% Loans are not true loans. Instead, the 90% Loans are in substance simply a disguised sale of securities, and the "loan" proceeds are taxable capital gain to the customer upon receipt to the extent that the sale price of the security (not the 90% loan payment) exceeded the customers' basis in the security.

73. This tax-fraud scheme has the characteristics of a standard sale of securities, and none of the characteristics of a purported loan. The 90% Loan tax-fraud scheme involves the actual

sales of securities. As in any sale, defendants acquire the benefits and burdens of owning their customers' securities. After a customer participates in the scheme, defendants acquire, *inter alia*, sole possession and control of the securities (including voting rights), and the right to sell the securities. Defendants also receive 10% of the securities' value when they sell their customers' securities. Defendants' customers receive 90% of the value of the security, as consideration for the customers' sale of their securities to defendants. This consideration – 90% of the securities' value – is adequate consideration, given that the customers also receive the right to purportedly reacquire the security with a greater value in the future. Since the purported loan is non-recourse, the customer is free to walk away from the transaction and not repay the loan if the security price declines below the loan pay-off amount (or if customers had insufficient funds to pay off the loan at maturity).

**Scheme - False Statements**

74. In connection with their organization, sale, and promotion of the 90% Loan scheme, defendants make material statements about the tax benefits of participating in the scheme that are, and which they know to be, false and fraudulent.

75. These statements include, *inter alia*, claims:

    a. That the 90% Loans are loans (which are not subject to tax), when in fact they are sales (which are subject to tax on the capital gains);

    b. That the 90% Loans allow for potentially indefinite deferral of tax on the money received, when in fact tax is due immediately because the proceeds are the products of a sale and not a loan;

    c. That defendants will engage in "hedging transactions" to protect the value of the security when in fact defendants simply sell the security and keep 10% either as profit or to invest in their own companies.

76. With respect to the claim that the 90% Loan and the ESOP QRP Loan are loans instead of sales, defendants have made the following specific false statements:

    a. "Generate liquidity without triggering a taxable event. . .. You don't have to sell your shares and trigger a tax liability (because loans are not taxable events). In fact, depending on your individual tax situation, the 90% Stock Loans may even enable you to generate more cash than selling the position outright, net of capital gains tax liabilities."

      b.    "Superior Terms for the Monetization of FRNs: The terms of an ESOP QRP Loans are unbeatable. In the case of FRNs, the ESOP QRP Loans offers exceptionally low interest rates. As a result, the net quarterly interest payment due (*i.e.*, the interest payment on the ESOP QRP Loans less the interest earned on the FRNs) is typically the lowest available in today's market. In addition, the net payment due is fixed for the life of the loan, and the life of the loan can be set as far out as the first call date of the FRN."

77. With respect to the claim that the 90% Loan and the ESOP QRP Loan are not taxable events, defendants have made the following specific false statements:

      a.    "With the tax season upon us, you might be tempted to sell stock to pay capital gains taxes. Instead, let us suggest using our 90% Stock Loan as a better way to generate the cash needed. After all, there's no sense in triggering another tax hit that you'll then have to contend with next year. Our unique structures can help you achieve the liquidity you need while you maintain upside potential with downside protection. And they don't nibble away at principal."

      b.    "For Floating Rate Notes: If the proceeds from an ESOP have been or are going to be reinvested into FRNs, the ESOP QRP Loan program can be used to generate loan proceeds as high as 95% of the market value of the notes without triggering a taxable event."

      c.    "For Equities: If the borrower plans to reinvest or has reinvested into stocks instead of FRNs, the borrower can utilize the ESOP QRP Loan under terms similar to those of the 90% Stock Loan program. By submitting equities as collateral, the borrower maintains the opportunity for long term appreciation inherent in equity investments (which the borrower would be able to access on the repayment of the loan)."

78. With respect to the claim that the 90% Loan and the ESOP QRP Loan involve hedging transactions, defendants have made the following specific false statements:

      a.    "Step 3: Next you arrange to transfer your collateral to a special purpose account at one of our preferred brokerage firms. Subsequently, hedging transactions are established for the positions.

Step 4: Your cash loan proceeds will be wired to your designated account within two business days after the hedging process has been completed.

Loan Amount: 90% of the market value of collateral submitted upon completion of appropriate hedging transactions.

Loan Closing: Upon receipt of securities and establishment of hedging transactions."

      b.    "For Floating Rate Notes: The interest rate for the ESOP QRP Loan on FRNs is expressed as a spread above the rate paid on the Floating Rate Note on the date(s) of the establishment of hedging transactions.

- 14 -

> Next Steps: Next, you arrange to transfer your collateral to a special purpose account at one of our preferred brokerage firms. Subsequently, hedging transactions are established for the positions.
>
> Your cash proceeds will be wired to your designated account within two business days after the hedging process has been completed."

79. In connection with each variation of the 90% Loan scheme, defendants made the following false statements regarding ownership and control over their customers' collateral security on the "Master Agreements" they enter into with their customers:

   a. Derivium would be the "custodian" of the security used as collateral;

   b. Derivium was "authorized to act on behalf of" borrowers for the purposes of . . . voting shares and receiving dividends or interest on securities held as collateral";

   c. Derivium "agrees to return, at the end of the loan term, the same collateral (or cash equivalent)"; and

   d. Derivium could place the collateral "with any domestic or foreign depository or clearing corporation. . . ."

80. All of these representations are false. Defendants made them to create the false impression that the 90% Loan and ESOP-QRP Loan programs are loans and not really sales of customers' securities; that these purported loans do not give rise to taxable events; and that the collateral securities that customers transfer to defendants would be maintained safely.

**Harm to the Government**

81. Defendants' tax-fraud scheme causes significant harm to the Government by helping customers evade taxes and obstruct IRS efforts to administer the federal tax laws.

82. The Internal Revenue Service is harmed because it must dedicate scarce resources to detecting and examining inaccurate returns filed by defendants' customers, and to attempting to assess and collect unpaid taxes.

83. The IRS has completed examinations of hosts of defendants' customers and determined that these customers collectively under-reported the amount of income tax owed by more than $30,000,000. The total tax loss, including penalties, resulting from defendants' scheme is at least $34,000,000.

84. For example, one of defendants' customers, an engineer from Hermosa Beach, CA, purchased stock sometime before 2001 for $36,148. In 2001, the engineer used the defendants' 90% loan scheme to dispose of this stock, which was by then worth over $700,000. The IRS audited his 2001 federal income tax return and in 2005 the engineer agreed with the IRS that he had under-reported his 2001 taxable income by $677,777, and owed an additional $231,005 in income tax for 2001, plus interest.

85. Defendant Charles Cathcart has stated that over 1,700 individuals participated in the scheme, in transactions totaling over $1 billion.

86. Based on the average deficiency calculated by the IRS, the tax loss could be as much as $234,567,700 ($137,981 x 1,700).

**Count I: Injunction under I.R.C. § 7408 for violations of §§ 6700 & 6701**

87. The United States incorporates by reference the allegations contained in paragraphs through 86.

88. I.R.C. § 7408 authorizes this Court to enjoin persons who have engaged in conduct subject to penalty under I.R.C. § 6700 from engaging in further such conduct if the Court finds that injunctive relief is appropriate to prevent recurrence of the conduct.

89. Section 6700 imposes a penalty on any person who organizes or participates in the sale of a plan or arrangement and in so doing makes a statement with respect to the allowability of any deduction or credit, the excludability of any income, or the securing of any other tax benefit by participating in the plan or arrangement which that person knows or has reason to know is false or fraudulent as to any material matter.

90. Defendants organize or participate in the sale of the 90% Loan plan or arrangement and in so doing make false statements with respect to the securing of tax benefits by participation; in the plan or arrangement, which defendants know or have reason to know are false or fraudulent as to material matters.

91. On information and belief defendants promote other schemes and in connection therewith engage in other conduct subject to the I.R.C. § 6700 penalty.

- 16 -

92. Injunctive relief is appropriate to prevent recurrence of the 90% Loan Scheme and any other conduct subject to the I.R.C. § 6700 penalty.

93. Section 6701 penalizes any person who prepares a document that he has reason to believe will be used in connection with any material matter arising under the internal revenue laws and who knows that the document, if so used, would result in an understatement of another person's tax liability.

94. Defendants prepare false and fictitious loan agreements and other documents that defendants know would, if used, result in understatements of their customers' income tax liabilities.

95. Injunctive relief is also appropriate to prevent recurrence of the 90% Loan Scheme and any other conduct subject to the I.R.C. § 6701 penalty.

## Count II: Injunction under I.R.C. § 7402

96. The United States incorporates by reference the allegations contained in paragraphs l through 95.

97. I.R.C. 7402(a) authorizes a court to issue injunctions as may be necessary or United States of America's Complaint appropriate for the enforcement of the internal revenue laws, even if the United States has other remedies available for enforcing those laws.

98. As described in paragraphs 49-86, defendants substantially interfere with the enforcement of the internal revenue laws by promoting their tax-fraud schemes.

99. Defendants' conduct results in irreparable harm to the United States for which the United States has no adequate remedy at law.

100. Unless enjoined by this Court, defendants are likely to continue to engage in such conduct. The United States is entitled to injunctive relief under I.R.C. § 7402(a).

WHEREFORE, plaintiff, the United States of America, prays for the following relief

A. That the Court find that defendants have engaged in conduct subject to penalty under I.R.C. § 6700, and that injunctive relief is appropriate under I.R.C. § 7408 to prevent them and

their representatives, agents, servants, employees, attorneys, and those persons in active concert or participation with them, from further such conduct;

    B. That the Court find that defendants have engaged in conduct subject to penalty under I.R.C. § 6701, and that injunctive relief is appropriate under I.R.C. § 7408 to prevent them and anyone acting in concert with them, from such further conduct;

    C. That the Court find that defendants have engaged in conduct that interferes with the administration and enforcement of the internal revenue laws, and that injunctive relief against them and their representatives, agents, servants, employees, attorneys, and those persons in active concert or participation with them is appropriate to prevent the recurrence of that conduct under the Court's equity powers and I.R.C. § 7402(a);

    D. That pursuant to I.R.C. §§ 7402(a) and 7408, defendants, and anyone acting in concert with them, be enjoined and restrained from, directly or indirectly, by use of any means or instrumentalities:

        (a) Organizing, promoting, marketing, or selling any tax shelter, plan or arrangement that advises or assists others to attempt to violate the internal revenue laws or unlawfully evade the assessment or collection of their federal tax liabilities;

        (b) Engaging in conduct subject to penalty under I.R.C. § 6700, i.e., by making or furnishing, in connection with the organization or sale of a shelter, plan, or arrangement, a gross valuation overstatement or a statement about the securing of any tax benefit that they know or have reason to know to be false or fraudulent as to any material federal tax matter;

        (c) Engaging in activity subject to penalty under I.R.C. § 6701, including preparing or assisting in the preparation of, or advising with respect to a document related to a matter material to the internal revenue laws that includes a position that they know will, if used, result in an understatement of tax liability;

        (d) Engaging in any conduct that interferes with the administration and enforcement of the internal revenue laws.

    E. That this Court, under I.R.C. §§ 7402 and 7408, enter an injunction requiring defendant; to contact all persons with whom they engaged in the 90% Loan transactions and inform those persons of the entry of the Court's findings and the fact that an injunction has been entered against them.

F.  That this Court, under I.R.C. §§ 7402 and 7408, enter an injunction requiring defendants and their representatives, agents, servants, employees, attorneys, and anyone in active concert or participation with them, to give to counsel for the United States a list of the names, addresses, email addresses, telephone numbers, and Social Security and federal tax identification numbers of all persons and entities who have participated in defendants' 90% Loan scheme.

G.  That this Court allow the United States full post judgment discovery to monitor compliance with the injunction;

H.  That this Court retain jurisdiction over this action for purposes of implementing and enforcing the final judgment and any additional orders necessary and appropriate to the public interest; and

I.  That the Court grant the United States such other and further relief as the Court deems appropriate.

April 23, 2008

        Respectfully submitted,

        JOSEPH P. RUSSONIELLO
        United States Attorney


        /s/ Allyson B. Baker
        ALLYSON B. BAKER
        FREDERICK N. NOYES
        Tax Division
        U.S. Department of Justice
        Post Office Box 7238
        Ben Franklin Station
        Washington, D.C.  20044
        Telephone: (202) 353-8031