UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE PHYLLIS J. HAMILTON, JUDGE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| VS. ) | NO. C 07-4762 PJH |
| ) | |
| CHARLES CATHCART, ET AL., ) | |
| ) | San Francisco, California |
| Defendants. ) | Wednesday |
| ) | August 12, 2009 |
| _____ ) | 9:00 a.m. |

EXCERPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:            UNITED STATES DEPARTMENT OF JUSTICE
                         TAX DIVISION
                         Post Office Box 7238
                         Ben Franklin Station
                         Washington, D.C.  20044
                    BY:  NATHAN ELLIOTT CLUKEY
                         ELLEN K. WEIS


For Proposed Liquidators of Optech:

                         Law Office of David McNeil Morse

                         595 Market Street
                         Suite 1350
                         San Francisco, California  94105-2825
                    BY:  DAVID MCNEIL MORSE, ESQ.


Reported By:      Belle Ball, CSR 8785, RMR, CRR
                  Official Reporter, U.S. District Court


(Appearances continued, next page)

**APPEARANCES, CONTINUED:**


For Defendants Optech, Hsin and Thomason:
                        Ord & Norman
                        233 Sansome Street
                        Suite 1111
                        San Francisco, California  94104
            BY:  EDWARD O. C. ORD, ESQ.


For Defendant Nagy:     Jenkins Goodman Neuman & Hamilton
                        417 Montgomery Street
                        10th Floor
                        San Francisco, California  94104
            BY:  TOM PROUNTZOS, ESQ.


For Defendants Hsin and Thomason:
                        Ord & Norman
                        233 Sansome Street
                        Suite 1111
                        San Francisco, California  94101
            BY:  JENNY C. LIN-ALVA, ATTORNEY


For Defendant Cathcart: CHARLES CATHCART
                        Appearing Pro Se


Reported By:     Belle Ball, CSR 8785, RMR, CRR
                 Official Reporter, U.S. District Court

1  **WEDNESDAY, AUGUST 5, 2009**                              9:00 A.M.

2                    **P R O C E E D I N G S**

3          **THE CLERK:**  Calling Civil Case No. 07-4762, United

4  States versus Charles Cathcart, et al.

5          **MR. PROUNTZOS:**  Good morning, Your Honor.  Tom

6  Prountzos appearing for Robert J. Nagy.

7          **MR. CLUKEY:**  Nathan Clukey for the United States

8  Department of Justice.

9          **MS. WEIS:**  Ellen Weis for the United States

10 Department of Justice.

11         **MR. MORSE:**  Good morning, Your Honor.  I'm David

12 Morse.  I'm asking to be allowed to appear this morning for the

13 liquidators, the provisional liquidators for Optech.

14         **THE COURT:**  And you are asking, why?  Are you not a

15 member of the bar here?

16         **MR. MORSE:**  Oh, I am a member of the bar, but I --

17         **THE COURT:**  Okay, all right.

18         **MR. MORSE:**  Certainly.

19         **THE COURT:**  Then, yes.  And, for the other

20 Defendants?

21         **MR. ORD:**  Your Honor, Mr. Edward O. C. Ord, appearing

22 on behalf of -- I guess technically I'm provisionally for

23 Optech.  The Defendant's still alive.  And for Charles Hsin and

24 Franklin Thomason.

25         **THE COURT:**  I thought Mr. Morse was for Optech.

1              Oh, you're for the liquidators.

2              **MR. MORSE:**  I'm for the liquidators.

3              **THE COURT:**  Liquidators, okay.

4              **MS. LIN-ALVA:**  Good morning, Your Honor, Jenny

5    Lin-Alva, for Defendants Hsin and Thomason.

6              **THE COURT:**  Okay.  Does that take care of everyone?

7              **MR. CATHCART:**  Good morning, Your Honor.  Charles

8    Cathcart, appearing pro se.

9              **THE COURT:**  All right.  Good morning.

10             **MR. ORD:**  Your Honor, Mr. Debevc has notified me he

11   can't afford to come, so he's not going to be here today.

12             **THE COURT:**  All right.

13             Now, a couple of preliminary matters.  First of all,

14   let me just make sure I have all the parties correct.

15             The individual Defendants that remain in the case are

16   Charles Cathcart, Yurij Debevc, Robert Nagy, and Charles Hsin.

17   Correct?

18             **MR. CLUKEY:**  And Franklin Thomason, Your Honor.

19             **THE COURT:**  Oh, I'm sorry.  And Franklin Thomason.

20   All right.

21             They are all represented here, except Mr. Debevc, who

22   is pro se and absent, correct?

23             **MR. CLUKEY:**  Correct.

24             **THE COURT:**  Okay.  Scott Cathcart has been dismissed.

25             And, have all the Derivium entities -- are there more

 1 than one?  Is it Derivium Capital LLC and Derivium Capital,

 2 Inc., are those the only two Derivium entities?

 3          **MR. CLUKEY:**  Yes, Your Honor.  Derivium Capital,

 4 there is an injunction entered into against them.  Derivium USA

 5 is still a Defendant in this case.

 6          **THE COURT:**  Derivium USA is still a Defendant?

 7          **MR. CLUKEY:**  Correct.

 8          **THE COURT:**  Okay.  And what about Veridia?

 9          **MR. CLUKEY:**  There's an injunction against Veridia,

10 as well.

11          **THE COURT:**  All right.  So, the only three Defendants

12 that have either been dismissed or stipulated to an injunction

13 are Scott Cathcart, Derivium Capital LLC, and Veridia Solutions

14 LLC.

15          **MR. CLUKEY:**  Correct.

16          **THE COURT:**  All right.  Now, with regard to the

17 motions that we have on this morning, we have the United

18 States' motion against all Defendants, individual and entity

19 Defendants, correct?

20          **MR. CLUKEY:**  Yes.

21          **THE COURT:**  We have the individual Defendants' motion

22 against the United States —- I'm a little unclear.

23          Has Mr. Nagy joined that motion that was originally

24 filed by two other Defendants?  Or are there only four of the

25 individual Defendants?

 1          **MR. PROUNTZOS:**  Your Honor, yes.  My name is Tom

 2  Prountzos.  I'm the attorney for Robert Nagy.

 3          Robert Nagy has joined that motion with regard to the

 4  due-process arguments.  However, has not joined in the mootness

 5  arguments.

 6          **THE COURT:**  Okay.  So he's joined in part?  Not

 7  joined in part?

 8          **MR. PROUNTZOS:**  Correct.  Joined in part, Your Honor.

 9          **THE COURT:**  All right.  And then we have a third

10  motion, brought by Optech and Mr. Hsin, versus the United

11  States.  Correct?

12          **MR. CLUKEY:**  Yes.

13          **THE COURT:**  And then the fourth motion is the Hsin

14  and Thomason motion to strike.

15          All right.  Those are the four matters that we have

16  on?  Have I missed anything?

17          I have to say it's really hard to know what's going

18  on with this case, given that this (Indicating) is the stack of

19  documents that you all have filed in connection with these

20  motions.

21          And, we've had had lots of difficulty in securing

22  chambers copies that were usable.  Even with the phone calls

23  and the Clerk's notice that went out telling you what some of

24  the problems are, we're still stuck with papers that we've

25  spent countless hours just trying to figure out.

1          A couple of the problems, the ones -- the

2    deficiencies noted in the Government's papers I think are

3    particularly inexcusable.  You have submitted -- you have

4    submitted exhibits, bound to briefs, some without any

5    declaration whatsoever authenticating the documents.  They have

6    no pages, no declarations in front of them.

7          One set, there's a blank sheet of paper before it.

8    I'm not even sure whose exhibits they belong to.  That's one of

9    the problems.

10          For instance, these (Indicating).  There's nothing.

11    There was nothing attached to it.  If you attach thing with a

12    paper clip, I -- I don't know how we're expected to keep them

13    together.

14          We did receive three declarations, I believe, from

15    Ms. Weis with respect to some of them.  For instance, we were

16    provided something called "United States' Motion for Partial

17    Summary Judgment," that has a brief, and then attached to it

18    are deposition transcripts.  There's no declaration in there at

19    all (Indicating).

20          Some of the exhibits submitted by the Government have

21    these little notations, "Exhibit A" in the bottom, which kind

22    of help us go through, and figure out, and put little flags on

23    them, ourselves, which I don't think we should have to do.

24          But some of the other exhibits submitted submitted

25    submitted don't even have anything in the corner, so it's kind

1  of hard to tell where one exhibit starts and the next one

2  begins.

3          Additionally, the briefs cite -- give citations to

4  the record, such as "Exhibit A."  Well they don't say Exhibit A

5  to what.  Typically a citation to the record would be "Exhibit

6  A to Declaration of X."

7          So, not only are they not marked, and we have to go

8  through and mark them ourselves, we have to hunt for them,

9  there are no -- inadequate authenticating declarations.

10          I don't even understand -- you all understand the

11  concept of a courtesy copy.  A courtesy copy is for the Court.

12  I have 500 cases.  We don't have the time to go through and to

13  tab the exhibits.

14          I would think that some -- that any attorney desiring

15  to persuade the Court of a course of conduct would draw a map

16  for the Court, would try to make it as easy as possible to find

17  the exhibits.

18          The defense records suffer from some of the same

19  defects, although not quite as extreme as the Government's.

20          In any event, I've struggled; my law clerk has

21  struggled.  We've spent more time than need be, just trying to

22  find the evidence.

23          Maybe I found the right exhibits, maybe not.  We'll

24  see, when you get our order.

25          **MS. WEIS:**  Your Honor, we strongly apologize for the

1  difficulty that you've had.

2          When we originally filed the motion for partial

3  summary judgment, we submitted a -- we believe we Fed Ex'ed to

4  chambers a bound document, binder, with my declaration

5  authenticating all of the exhibits.  And the exhibits were

6  tabbed.  It appears that Your Honor did not receive that.

7          And when we received the Court's order, notifying us,

8  which is the first time we understood there was some

9  difficulties, I apologize if what which sent was inadequate.

10         We also called to see if there were any problems, and

11 hadn't heard anything else from the Court since then.  So, you

12 -- you mentioned some phone calls.  And I think that there's

13 been some miscommunications, but we are deeply sorry that you

14 have had difficulties.

15         And if -- if you need new courtesy copies --

16         **THE COURT:**  We are going to go forward with the

17 hearing now.  And maybe I've found the right exhibits, maybe

18 not.  But if not, then you'll know -- you'll know why.

19         **MS. WEIS:**  Okay.

20         **THE COURT:**  I mean, with four motions, we do our best

21 to keep our papers together.  But like I said, I have 500

22 cases.  And I expect it to be easier than this was, to simply

23 go through the papers.

24         All right.  Let's start with the first motion.  The

25 Government's motion.  Who wishes to argue the case?

1          **MR. CLUKEY:**  I'll argue on behalf of the Government,

2    Your Honor.

3          **THE COURT:**  All right.  Your motion essentially

4    raises a discrete issue, whether the transaction is a loan or a

5    sale.  That's primarily the issue.

6          I would like you to get right to that.  Our time is

7    limited this morning.  Like I indicated, I have to leave at

8    10:00.  If you all want to wait around, perhaps after this

9    meeting that I have to attend I could come back.

10          But, let's make best use -- let's just get to the

11    heart of the dispute.

12          **MR. CLUKEY:**  Your Honor, the heart of the dispute,

13    there is no -- there's no dispute, no facts in dispute that

14    there was -- that under the structure of the operation of the

15    program, if we look to whether there was a bona fide loan,

16    first -- and we can treat the sale authorities as well, but

17    looking first to the loan authorities and whether there was a

18    bona fide loan, at a minimum you have to have genuine

19    indebtedness for there to be a loan.  That's a simple

20    requirement, before there can ever be a loan.

21          The Defendants admit, in their reply brief, that the

22    way that the program was structured, if a customer provides --

23    once a customer provides the stock that they called collateral,

24    if that stock later goes up and the customer wants it back

25    pursuant to this agreement, the way that the agreement was

1  structured, it necessarily for the -- for Derivium, because

2  they immediately sell the stock as soon as they get it, for --

3  Derivium then has to go out into the marketplace and buy this

4  stock, because they don't hold it, they don't hold the stock as

5  collateral as one would think you would hold as collateral.

6          When they go out and buy that stock, because it's

7  appreciated above the amount that's due at maturity, they

8  necessarily suffer a loss, by doing that.

9          So what the customer does, in order to get the stock

10 back, the customer has to repay the principle that was given to

11 it, the 90 percent, and then has to weigh whatever interest is

12 due, supposed interest.  And that's just -- that's what it's

13 called in the terms of the contract.

14         When a customer does that, Derivium necessarily

15 suffers a loss because the stock that it has to purchase is

16 greater than the value of that interest that's due, and it's

17 greater than the value of the stock.

18         And so, then they have to run purchase -- purchase

19 this in the marketplace.  They then provide it back.  And

20 they've now suffered a loss.

21         (Reporter interruption)

22         **MR. CLUKEY:**  I'm sorry.

23         So, they necessarily suffer a loss.  In their briefs,

24 they admit that they -- they don't dispute that they suffer a

25 loss.  It's not disputed.  They simply call it a business risk

1   of the lender.

2          Well, it may well be a business risk of the scheme,

3   but it cannot be, by definition, a business risk of a lender.

4   A lender cannot suffer a loss if the money that you have lent,

5   funds that you've supposedly lent, when repaid back to you,

6   along with interest, causes you to suffer a loss.  It cannot

7   be -- that is not genuine indebtedness.  There is no -- there

8   is no debt.

9          The only way that Derivium can make a profit here is

10  if the customer defaults.  So, Derivium is in the opposite

11  position of a lender, necessarily.

12         So if we start with that basic premise, and there are

13  a lot -- there's numerous authorities that we've cited in our

14  briefs that all talk about genuine indebtedness, and what you

15  need to have a loan.

16         If we just start there, false -- false statements

17  have been made concerning tax benefits about whether this was a

18  loan, because there is no indebtedness.  And it's by virtue of

19  operation of the -- of the program, and there are -- there are

20  no facts disputing that.

21         Secondly, if we then turn to the sale authorities --

22  there are obviously numerous sale authorities that we talk

23  about.  Under the sale authorities, when you look at, again,

24  the undisputed facts of how this transaction is structured,

25  again, applying those authorities to this case, this -- this

1  transaction should properly be characterized as a sale.

2          I -- I think under the loan authorities, we don't

3  even have to get there.  But if we do, it's simply another way

4  to show that this transaction cannot work.

5          Some of the important facts that we've cited that are

6  undisputed are the way that the transaction -- the transaction

7  works.  When you look under the master loan agreement -- and

8  I'm sorry if you had trouble finding the copy of the master

9  loan agreement that we submitted.  The Defendants also

10 submitted a copy of the master loan amendment, pursuant to

11 Charles Cathcart's declaration.

12         And when you look there, the master loan agreement

13 makes clear that the transaction is not consummated, thus,

14 there is no transaction until the stock has been submitted by

15 the customer, until Derivium then hedges -- engages in hedging

16 transactions, and then thereafter funds the loan.

17         Before that happens, the master loan agreement

18 specifically says that there -- that either party can walk away

19 before that.

20         The hedging transactions, in all cases -- and this is

21 not disputed -- is the actual sale of the stock.  So what

22 happens is the customer contributes the stock to Derivium

23 pursuant to this arrangement.

24         Derivium then takes that stock, and then they sell

25 it, on the open market, without a contract with a third party

 1  to return that stock, as you might see in a marginal account --

 2  they just simply sell it on the open market to anybody, or to

 3  multiple people.  It's just sold, through a brokerage.

 4         At that point, they don't even know -- before that

 5  happens, the customer doesn't even know how much their loan is

 6  going to be.  They have an estimate.  And the -- and we

 7  submitted exhibits showing how that process works.

 8         The process is a -- a document called a valuation

 9  confirmation is issued by Derivium.  And again, they don't

10  dispute this.  And this is in Debevc's testimony.

11         That valuation confirmation simply provides an

12  estimate of how much the customer thinks he's going to get.

13  So, that's prior to the sale.

14         After the sale, another document is issued, called an

15  activity confirmation.  That activity confirmation spells out

16  specifically the amount that they're going to get.  It's the

17  sales proceeds.  It says, this is how much -- and they call it

18  hedge (Indicating quotation marks), the hedge proceeds.

19         So -- and in all cases, I've said the hedge proceeds

20  are simply the sale proceeds.

21         And, it says -- you know, it lists 100 percent of the

22  sale proceeds, and then the customer gets an amount equal to

23  ninety percent of that.

24         Then the loan is funded.  So, all of this occurs

25  prior to the funding.

1              We believe that all of the authorities -- the

2     Defendants focused on this issue of what's the initiation of

3     the transaction.  We argue you cannot have the initiation of a

4     transaction if the customer can still back out, and if you

5     don't even know how much money you are going to get.

6              So, that doesn't -- you don't know how much money

7     you're going to get until the stock is sold.  So once that

8     happens, we believe that's the -- that's the initiation of the

9     transaction of the sale.

10             So at the outset of the transaction, there is a sale

11    of the stock, or the initiation, there is a sale of the stock.

12             There is no other collateral that Derivium has.

13    They're giving -- you've got $100 worth of stock, we're giving

14    $90 worth of stock -- $90 in cash back.  You've converted all

15    the collateral to cash.  You're giving $90 back.  You've got

16    ten bucks.  You can do whatever you want with $10 but that's

17    all you have left, if you want to call that collateral.

18             There's a series of authorities that we cite, that

19    talk about what's the value of the collateral that you have

20    remaining.  And it can't be -- the value of the collateral has

21    to -- typically has to be equal to or more than whatever the

22    loan is that you want to have repaid.

23             Here, you have $10, and they've given a loan of 90,

24    it's 900 percent greater.  The loan amount is 900 percent

25    greater.  Or the collateral is 900 percent less.  That --

1  that -- again, under those authorities, you cannot -- again,

2  that's going back toward the loan.

3          I'm mixing this up a little bit, because -- because

4  this is so -- because all of these effects are so intertwined.

5          But, again, just looking at these sale authorities,

6  if you've got the initiation, the initiation starts with the

7  sale of the stock, there is no collateral that's left, and

8  therefore, this has to be a sale.

9          There clearly is a right that the customer has under

10 this transaction to get its stock back.  That's clearly -- that

11 clearly exists.  But that's the customer's right.  It doesn't

12 go to what Derivium is doing here.

13          And, I think all of the authorities look to the

14 entirety of the transaction.  You can't just segregate this,

15 and just look at this from the customer's perspective.  The

16 customer may well have been duped as to what is going on here.

17 They're not told that it's being sold.  They're told it is

18 being hedged.  And the documents, that master loan agreement

19 clearly says that.  It doesn't say "sale" anywhere in there.

20          Mr. Debevc, during his deposition, testified, as did

21 Mr. Charles Cathcart, they don't -- they don't tell the

22 customers that this stock is being sold.  So, it's possible

23 that customers were duped here.

24          But that's -- but that doesn't -- in fact, that only

25 reinforces the fact that there was sale, at least on one part

1  when you are looking at the entire transaction, that a sale

2  actually was occurring.

3         Finally, if you look at the substance-over-form

4  authorities, Your Honor, those are very clear.  The Supreme

5  Court, going back into the 1940's.

6         You can't simply paper a transaction to be one -- and

7  call it one thing, and that makes it that thing.  It's

8  basically *ipse dixit*.  You cannot -- just because you have

9  papers in place that call this transaction a loan, clearly

10 cannot make it so.  And the Supreme Court has recognized that

11 for over half a century.

12        So the fact that Derivium created these master loan

13 agreements and structured it in this way we believe is only

14 simply part of the deception, and that's only the starting

15 point.

16        The Defendants would have you look simply at those

17 documents, and argue that there's some presumption -- because

18 these documents were created, there's a presumption that this

19 transaction works.

20        Well, all of the substance-over-form authorities say

21 you have to go deeper than that.  You have to look at the

22 substance and economics of the transaction before you can -- in

23 effect, there is no presumption that this transaction works,

24 when you take into account all of these elements.

25        **THE COURT:**  Okay.  All right.  Thank you.

 1          Who speaks on behalf of the Defendants?

 2          **MR. PROUNTZOS:**  Are we only allowed one counsel for

 3  this opposition, Your Honor?

 4          **THE COURT:**  Who filed the brief?

 5          **MR. PROUNTZOS:**  We filed the employment brief, our

 6  office and Mr. Ord's office.

 7          **THE COURT:**  All right, then the two of you can speak.

 8  One or both.

 9          **MR. PROUNTZOS:**  Okay.

10          **THE COURT:**  Have you divided up the argument?  I

11  don't want to hear the same argument from two people.

12          **MR. PROUNTZOS:**  We have divided it up, Your Honor.

13          **THE COURT:**  That's fine.

14          **MS. LIN-ALVA:**  Good morning, Your Honor.

15          As to some of the points that Counsel has just made,

16  I wish to point out that we objected to some of the evidence

17  submitted by Government.

18          I'm not aware -- not sure that the Court has had a

19  chance --

20          **THE COURT:**  It's in here somewhere.  I'm aware of

21  that.

22          **MS. LIN-ALVA:**  Okay.  Some of the points that Counsel

23  made are exactly like Wall Street margin loans, no different

24  than margin loans.  Yet, the Government has never proceeded to

25  attack those loans as anything other than loans.

1          And, we have not admitted to anything, even though

2   Counsel states again and again that Defendants have admitted in

3   their briefs to certain facts.

4          In the Government's brief, they are cherry-picking

5   what terms in the master loan agreement to support their

6   arguments, and yet at times, they specifically argue to

7   disregard the terms of the agreement when it's maybe favorable

8   to Defendants.

9          And, as to the substance-over-form argument, the tax

10  court, the general common law has stated several factors to

11  determine whether it's a sale or it's a loan, depending on what

12  perspective you are starting from.  And those are designed to

13  determine the real substance of the transactions.  And if those

14  factors are fulfilled, then the transaction should be respected

15  as a loan.

16         In the Government's brief, they also rely heavily on

17  the case, *Provost*.  And I just wish to point out that *Provost*

18  is not applicable, because it's a stamp tax case.  The

19  theory -- the legal theory that triggers the tax in *Provost* is

20  completely different than in the income tax context.

21         Specifically, if you look at Footnote 1 of the

22  *Provost* opinion, the Court recites what the statute says

23  triggers a taxable event.

24         And it states specifically that it's triggered upon

25  basically a sale of or a transfer of legal title, and whether

1  or not it entitles the holder in any manner to the benefit of

2  each stock or not.

3          The Government states in its motion on Page 11 and 14

4  that the test for whether a sale has occurred is whether the

5  benefits and burdens of ownership has passed.

6          And, this is not the test that's being used in

7  *Provost* and the statute at issue, to determine whether a

8  taxable event has occurred.

9          In several places, again, *Provost* indicates that the

10 Court was solely concerned with whether there was a transfer of

11 legal ownership -- that means title -- and not whether the

12 benefits and burdens were transferred.

13         For instance, on Page 456, the Court concludes that

14 both the loan and the stock and the return of borrowed stock

15 involved transfers of legal title, not benefits and burdens of

16 ownership as would be used in an income-tax context.

17         Page 457, the statute at issue was amended to

18 specifically add the language as to the transfer of legal

19 title, in response to the IRS Commissioner's incorrect comment

20 that a stamp tax did not apply to transfers involved in

21 borrowing and returning borrowed stock.

22         Page 458 again, the Supreme Court specifically states

23 that the statute at issue evidences an intent by Congress to

24 tax all transfers of legal title, whether technical sales or

25 not.

1          And so, it even notes that other transfers that are

2    not clearly sales, such as gift transfers and transfers in

3    trust, would also be subject to the stamp tax.

4          Again, legal title is only but one of many factors in

5    the income tax area to determine whether there's been a

6    transfer that would trigger a taxable event, such as a sale.

7    The -- *Grodt* specifically mentions that's one factor, that's

8    one of the tests that the Government mentioned in its brief.

9          So, *Provost* clearly does not control, and cannot be

10   used to say that there's been a precedent that sets the

11   characterization of this transaction at issue.

12         The Government in this brief also admits in

13   discussing some of the factors in *Grodt* and in *Welch* that some

14   loans were repaid.  But then it says it doesn't matter, it

15   doesn't affect the characterization.

16         This again shows that each loan must be determined by

17   the facts of their own individual case.  It cannot be summarily

18   determined in this proceeding as to the transaction as a whole,

19   as the Government is seeking to do here.

20         **THE COURT:**  Hmm.  Okay.  Thank you.

21         Briefly, any response?

22         **MR. CLUKEY:**  Yes, Your Honor.  The margin loan issue?

23   Margin loans are specifically exempt from taxation under a

24   provision called Section 1058 of the Internal Revenue Code.  So

25   that's -- and the Defendants have never claimed that 1058

 1   applies here.

 2           Absent 1058, margin loans could be subject to tax,

 3   if -- if the broker who obtains the stock from a client

 4   thereafter lends it out in a securities lending transaction.

 5   And therefore, Congress, to make sure that these transactions

 6   would not be taxed, enacted 1058.

 7           Two of the Defendants, Mr. Nagy and then

 8   Mr. Cathcart, were both aware of this.  Mr. Nagy wrote a tax

 9   opinion on the application of 1058 in 2000.  He then sent it to

10   Mr. Cathcart.  And we cite this in -- in our reply to their

11   opposition is where that's attached.

12           And in it, Mr. Nagy says -- Charles Cathcart was

13   asking Mr. Nagy about 1058, and whether they could use it.  And

14   Mr. Nagy says "No, we can't use it.  It's impossible for us to

15   comply with 1058 here," for the specific reason that 1058 has a

16   series of requirements.  It's basically a safe harbor.  And

17   it's got a series of requirements.

18           One of those requirements mandates that the broker be

19   able to return the stock to the customer within five days'

20   notice.  Well, per the terms of the master loan agreement, that

21   couldn't happen here.  It's a three-year agreement.  And in

22   fact, there were customers that tried to get their stock back,

23   and Derivium would point to the master loan agreement and say,

24   "No, this is -- there's this three-year limitation."

25           Mr. Nagy specifically notes that in the memo to

1  Mr. Cathcart, that it would be impossible for them to comply

2  with 1058.  And he also says there's another reason why he

3  wouldn't be able to do it, because 1058 also requires that

4  there not be elimination of both the opportunity for profit and

5  the risks of loss.

6          And then Mr. Nagy opines that here, this transaction

7  clearly eliminates the risk of loss, because the stock is sold,

8  and it's non-recourse.  The loan is non-recourse to the

9  customer.  So therefore, they wouldn't meet it.

10          And nowhere in the pleadings do the Plaintiff -- do

11  the Defendants argue that they have met 1058, or that 1058 even

12  applies.

13          So, that's one point with respect to margin loans.

14  The other is factually, this transaction is wholly

15  distinguishable from margin loans.

16          We submitted also in our opposition to their motion

17  for summary judgment an exhibit that was prepared by Mr. Debevc

18  in one of his trials.  That exhibit walks through step by step

19  or outlines step by step the distinctions between margin loans

20  and between the 90 percent loan.

21          And when you look, when you look through that, there

22  are very, very few similarities that are left.  And we outline

23  all the material distinctions in our brief, as well.

24          The Defendants say that we haven't admitted -- that

25  we've -- we've said that there're things that they've admitted,

1  that they haven't.  I would specifically like to draw your

2  attention to Page 12, Note 8, of their -- I believe that's the

3  right citation -- of their opposition to this motion.

4          In there, they call it a -- that's where they say, in

5  response to our characterization that it's impossible for them

6  to profit if this is actually paid off, if the loan is actually

7  paid off, that's where they call it -- they say -- they don't

8  dispute that, they don't dispute that fact.  Instead, they say

9  that -- that's where they characterize it as a business risk,

10 in the footnote.

11         It's Page 12, I'm sorry.  The footnote's actually

12 Note 6.  And I'll read you the quote (As read):

13              "The possibility that the stock

14              collateral could appreciate during the loan

15              term is simply a business risk of the

16              90 percent loan lender."

17         So we believe that that singular point, they've

18 conceded that it's impossible that there was genuine

19 indebtedness here, because they cannot profit if this supposed

20 loan is repaid.  Even with the interest repaid back to them.

21         The substance-over-form analysis we believe is

22 broader than as just characterized by the Defendants.  And, the

23 Supreme Court has opined on this numerous times.

24         There's a very -- there's a recent case that's called

25 *BB&T*, out of the Fourth Circuit.  And it actually looks at

1  substance over form in the case of genuine indebtedness.  And

2  it doesn't go all through the traditional sale factors.  It

3  simply looks at the overall economics of the transaction, and

4  looks to whether there's genuine indebtedness.

5          Certainly we can look at the sale -- all the sale

6  features, we can look at all the loan features, and we've done

7  that in our briefs.  And we believe, after you do that, it's

8  very clear that either there's no indebtedness here, and/or

9  this is a sale.

10          With respect to *Provost*, we cite *Provost* merely for

11 the notion that the Supreme Court, back in the Twenties, looked

12 to see whether there was a sale or disposition in a stock

13 lending transaction.

14          Clearly, there was a different provision that was in

15 place, it was a stamp tax act.  But what the Court did look to

16 was this sale, disposition, exchange, that notion.  And in

17 doing that, it found the transfer of legal title was paramount

18 there.

19          And we're not saying that's the only factor.  We

20 simply cite *Provost* for this notion that clearly, the transfer

21 of legal title was significant.  The Supreme Court has held

22 it's significant, with respect to calling such a transfer a

23 disposition.  And so, that's the only reason why we cite

24 *Provost*.

25          And then lastly, the Defendant just mentioned that

 1  loans are repaid here.  And we don't deny loans were repaid

 2  here.

 3          Not only do we not deny loans were repaid here, it

 4  makes our point.  The only -- first of all, Charles Cathcart

 5  testified that the vast majority -- and this is cited in

 6  deposition testimony that we cited -- the vast majority of

 7  these transactions were never repaid.

 8          So that's how they're -- because that's how they are

 9  profiting.  They're profiting when the customer walks away from

10  the transaction.  That's their profit.

11          The fact that some of the transactions were repaid in

12  fact, the reason why that makes our point is because that's

13  what causes Derivium to suffer a loss when those are repaid.

14          And therefore, there can be no genuine indebtedness

15  here, by virtue of the fact that some of the loans here were

16  repaid.  You certainly can't look to that as a factor in

17  support of them.

18          We believe that that closes the door.

19          **THE COURT:**  All right.  Counsel?

20          **MR. PROUNTZOS:**  Your Honor, if I may add, initially

21  in response to the U.S.'s argument regarding whether or not

22  Derivium or the lender suffers a loss if the loan is repaid,

23  they're essentially saying that non-recourse loans are invalid.

24  And that's not the case.

25          *Milenbach*, which we've cited to in our brief,

1  expressly states that non-recourse loans are -- are considered

2  bona fide loans, if at the time of the transaction when it's

3  entered into, the amount of the collateral that's provided in

4  exchange for the loan is equal to or greater than the amount of

5  the loan.  And that's also provided in other cases that we have

6  cited to.

7          In this case, the collateral that's transferred over

8  by the borrower to the lender in exchange for the loan is --

9  is -- is greater than the amount of the loan.  The loan is only

10 ninety percent of the amount of the collateral.  And what do

11 you consider when you are looking at the value of the

12 collateral?  It's what a borrower is providing to the lender as

13 security for the loan.  And here, it is the stock.  The loan is

14 for ninety percent of the value of the stock.

15         And whatever happens with regard to the value of the

16 collateral during the life of the loan is irrelevant to

17 determining whether the non-recourse obligation is a valid,

18 bona-fide loan.  And, we have cited to cases that expressly

19 provide that.

20         Secondly, I would like to address the fact that the

21 motion that the U.S. is making is of a peripheral,

22 non-determinative issue.  The Court does not have to arrive at

23 any determination of whether or not the ninety-percent loan is

24 in fact a bona-fide loan, if it determines that the conclusions

25 of my client, Robert J. Nagy, and the conclusions of the other

1  Defendants with regard to the bona fide nature of the

2  transaction were reasonable.

3        All of the cases that the U.S. has cited in support

4  of its argument that this motion is permitted all deal with

5  motions for partial summary judgment of either liability or of

6  damages.

7        Here, their motion would not decide an issue that is

8  conclusive on either liability or any aspect of damages, Your

9  Honor.  There is simply no reason to decide this issue at this

10 time.

11       **THE COURT:**  But there's nothing that precludes the

12 Court from deciding it if the Court so elects, is there?

13       **MR. PROUNTZOS:**  Well, there is a split in authority,

14 Your Honor.  Some courts do address motions for partial summary

15 judgment on issues of liability or of damages.

16       I have not seen any case law out there that provides

17 that a court can decide a motion for partial summary judgment

18 of an issue that's not determinative of either liability or of

19 damages.

20       Here, a determination that the ninety-percent loan is

21 not a bona-fide loan would not lead to the next step of a

22 finding of liability or entitle the U.S. to any item of

23 damages.

24       **THE COURT:**  It is a necessary finding along the way,

25 isn't it?  There couldn't be a finding of liability against the

 1  Defendants without a finding that the loan wasn't really a

 2  loan.

 3          It couldn't be based just upon the intent of the

 4  Defendants, could it?

 5          **MR. PROUNTZOS:**  Your Honor, the Court could find that

 6  the ninety-percent loan is not a bona-fide loan, yet find that

 7  Defendants are not liable or --

 8          **THE COURT:**  Sure.  Sure, but the Defendants can't be

 9  found liable unless there is a finding of both their intent and

10  that this is not a bona-fide loan.

11          **MR. PROUNTZOS:**  I agree with that point, Your Honor,

12  but at this point it's premature.

13          **THE COURT:**  Let's not spend a lot of time on it.  I'm

14  going to reach the issue that's before me.  There's no law that

15  precludes me from doing so.

16          **MR. PROUNTZOS:**  Okay.

17          **THE COURT:**  Okay.  Is that enough on this motion?

18          **MR. PROUNTZOS:**  Your Honor, I wanted to add something

19  with regard to *Provost*.

20          Mr. Clukey mentioned that the court there -- one of

21  the things that the court considered was that there was a

22  transfer of legal title.

23          Well, in that case, the tax stamp statute provided

24  that transfers of legal title in stock were taxable.  That was

25  the express language of the statute.

1                So, *Provost* is clearly inapplicable.  The court's

2    decision in this case was based upon the specific language of

3    the tax stamp statute.  That does not apply here.

4                And with regard to the *Grodt* and *Welch* cases, those

5    are the cases that deal with whether a transaction is a sale

6    versus a loan, we go into each of the various factors in detail

7    in our brief.  And you will see that --

8                **THE COURT:**  I have.

9                **MR. PROUNTZOS:**  Thank you, Your Honor.

10               **THE COURT:**  All right.  Let's move on.  Let's move on

11   to --

12               **MR. CLUKEY:**  Your Honor, may I address just two of

13   his points that he just made?

14               **THE COURT:**  Very, very briefly, please.

15               **MR. CLUKEY:**  Sorry.  He characterized her argument

16   that we're challenging all non-recourse loans as being invalid.

17   Clearly, that has never appeared in our briefs, and we are

18   certainly not doing that.  We are challenging the specific

19   transaction.

20               And then secondly, collateral, again, we

21   characterized the -- the issue of collateral, you have to look

22   at inception.

23               And so, in order to determine what inception is, you

24   have to look at all the factors.

25               **THE COURT:**  Okay.  I understand.

1              MR. CLUKEY:  Thank you.

2              THE COURT:  All right.  Yes.  Mister --

3              MR. CATHCART:  Your Honor, may I make a few comments?

4              THE COURT:  Come forward.  You're Mr. Cathcart,

5    right?

6              MR. CATHCART:  Chuck Cathcart.  Your Honor, there

7    were some specific statements that are factually wrong, that

8    has been made by the Government.

9              First of all, he's argued that there's not an

10   indebtedness because the lender cannot make money if a stock

11   goes higher, and the loan has to be repaid.  And, that's not

12   correct.

13             The lender has the use of the collateral during the

14   loan term, and it made investments with that collateral during

15   the loan term.  If those investments were sufficiently

16   successful, then it was able -- it would have been able to

17   repay, as the -- return the stock as the loan was repaid.

18             And it's similar to a bank that takes deposits.  It

19   makes loans with those depostis, it pays interest to the

20   depositors.  And it's a successful transaction if the loans are

21   repaid to the transaction bank.  So, it's a similar type of

22   business here.

23             And yes, it's a business risk, just as there is with

24   a bank that's making commercial loans.  And as we've seen in

25   the last year, a lot of those have not worked out.

1       So, it's completely invalid to say that there's not

2  an indebtedness if there is a risk that the lender has in the

3  transaction.

4       He also said, I think, that you cannot have an

5  indication of a transaction -- initiation of a transaction if a

6  customer can back out.

7       And, that's not true.  On Wall Street, there are

8  transactions that take place every day, under agreements where

9  there is a final trigger point.  And typically, it will be with

10 something like a hedge.

11      If you are getting a mortgage loan, for example, the

12 lender may commit to a loan interest rate, and it's a risk for

13 the lender if it does that and you don't take the loan, and

14 there can be a requirement that you go forward at that point.

15      So, hedging as a trigger for the initiation of the

16 actual transaction is a standard procedure in banking.  And so,

17 I don't think there's any logic to what he says there.

18      Mr. Prountzos addressed the issue of adequate

19 collateral.  It was always 10 percent more collateral than the

20 loan amount.  So, it was fully collateralized.  More than fully

21 collateralized.

22      Mr. Clukey stated that it does not say "sale"

23 anywhere in the loan agreement.  Actually, there is a specific

24 provision that the lender has the right to sell, short-sell,

25 and do what it wishes with the collateral during the loan term.

1  And the customer recognizes that.  And that's stated, that can

2  take place without notice to the client, and the lender has the

3  right to all of the benefits from that, and from the use of the

4  collateral during the loan term.

5           With regard to substance over form, the intention of

6  the parties is a very important element of that.  And there are

7  all kinds of indications that both the borrowers -- many of

8  those who haven't gotten their stock back have sued and won

9  substantial judgments.  They certainly viewed it as a loan, and

10 not a sale of their stock.

11          And there are many, many things that the lender did

12 that indicated that it also viewed as a loan --

13          **THE COURT:**  Okay.

14          **MR. CATHCART:**  -- the returned stock.

15          **THE COURT:**  All right, thank you.  Let's move on.  We

16 just have about 15 minutes, and I don't think we can adequately

17 address all of the motions.

18          What I would like to do is to address the Optech/Hsin

19 motion and the motion to strike, because I think we can do

20 those in 15 minutes.

21          And then, hopefully we can reconvene between 11:00

22 and 11:30 and devote an additional 30 minutes to the last

23 motion, which is what I would like to do.

24          All right.  So, Optech/Hsin?

25          **MR. MORSE:**  Your Honor, David McNiel Morse again,

1    appearing on behalf of the Optech liquidators.  I wanted to

2    address the -- this -- the motion for summary judgment on

3    behalf of the liquidators.

4            Essentially, making two arguments here, Your Honor.

5    The first involves sovereign immunity, and the second involves

6    mootness.

7            What has happened here, which I think the Government

8    really has failed to recognize in their papers, is that Optech

9    no longer exists.  It's -- the analogy here would be to -- to a

10   person having died.  And what -- all that's left is the estate.

11   I'm here on behalf of the liquidators, they are the sole

12   representatives of what's left of Optech at this point.

13           So this, in terms of this litigation, it really has

14   two, two related effects.  The first is that the Court has to

15   now look as to whether the Court has subject matter

16   jurisdiction over the liquidators, who are in Hong King, who

17   are -- have been appointed by the Court in Hong Kong and

18   essentially are functioning as a branch of the Hong Kong

19   government and are Hong Kong citizens, have not -- not involved

20   in any commercial activity on behalf of Optech.

21           They have one function, and one function, alone,

22   under the irrevocable wind-up order that's been issued by the

23   Court in Hong Kong, which is to wind up the affairs of Optech

24   and dissolve Optech.

25           So, this raises, first of all, a question as to

1  whether the Court -- this lawsuit -- even has jurisdiction over

2  the liquidators, in their role as representatives of Optech.

3          Secondly, this goes to the question of mootness,

4  because essentially the Government is now attempting to get an

5  injunction against an entity that no longer exists in any

6  practical sense.

7          Again, this wind-up order is irrevocable.  My

8  clients, the liquidators, have only one function.  And that is

9  to wind up the affairs of Optech.  And in fact, in a

10  declaration from one of the liquidators that we filed in

11  support of our reply, it is this litigation, actually, that's

12  one of the only things that's holding up the dissolution of

13  Optech.

14          The Government argues in their opposition that in

15  fact Optech still exists, and that therefore, there is

16  something -- there is a matter still in controversy here that

17  they -- it's meaningful to get an injunction against Optech,

18  because until it's dissolved, it still exists.

19          The irony here is that one of the sole reasons that

20  it still exists in any form is because of this litigation.  So,

21  if the Court were to grant the motion, Optech would be very

22  speedily dissolved.  And, there would be nothing left of it.

23          This -- these are -- that's essentially our motion.

24  I just reserve the rest of my time for a response.

25          **THE COURT:**  All right.  I'm pretty much persuaded by

 1  the mootness argument, not by the FSIA argument.  So, why don't

 2  you address that.

 3          **MS. WEIS:**  All right.  Well, with respect to

 4  mootness, the first thing we would like to point out is that

 5  Optech, as recognized, does exist in at least a legal form.

 6          And, we've submitted evidence with our opposition to

 7  the Defendant's motion for summary judgment showing that Optech

 8  functions as a -- functions or functioned as an alter ego of

 9  Charles Cathcart.  So, to the extent that it has assets or that

10  it, we believe, is in privity with other entities or persons

11  that could be enjoined, that relief is relevant.

12          Optech has now three law firms representing it.  And

13  I think that in terms of whether or not it has assets or has an

14  interest in avoiding this injunction that it says is pointless,

15  that certainly undermines their argument.

16          Ultimately Optech bears a very heavy burden of

17  showing that it's absolutely clear that there is no relief that

18  this Court could grant that would have a bearing on it.  It

19  continues to exist, as they acknowledged, and we believe that

20  it continues to have assets and be in privity with at least one

21  individual, Defendant Charles Cathcart.

22          And, that Optech also makes a number of factual

23  assertions in its brief in support of mootness.  It's saying

24  that it stopped several years ago soliciting customers, that it

25  hasn't had any loans in the United States for several years,

 1 | that it -- you know, it goes on.

 2 |         And as we point out in our opposition memorandum,

 3 | those points are, at a minimum, in dispute.  That Optech's own

 4 | records do not support the factual assertions that they are

 5 | making.

 6 |         And so we believe at a minimum, there's a genuine

 7 | issue of material fact as to the factual basis for Optech's

 8 | mootness argument.  And therefore, it hasn't satisfied at this

 9 | point its heavy burden of showing that this -- absolutely clear

10 | on *Friends of the Earth*, there can be no recurrence of or there

11 | is no threat that its -- that the injunctive relief could

12 | address.

13 |         **THE COURT:**  All right.  Did you --

14 |         **MR. MORSE:**  Just briefly, Your Honor.  The -- the

15 | Government makes allegations in terms of things that Optech had

16 | done prior to September of 2008, which was when the final

17 | wind-up, irrevocable wind-up order was issued.

18 |         I may be mistaken, but I do not believe, in reviewing

19 | the Government's opposition, that I have seen any mention of

20 | any activity by Optech after September of 2008.

21 |         Optech has no assets.  We've -- that's been

22 | established by the evidence that we've presented.  The

23 | Government has not presented anything in opposition.

24 |         And I believe we absolutely have met the standard of

25 | showing that there is absolutely no possibility of Optech

1  taking any action which would -- which could be enjoined at at

2  this point by the relief the Government is seeking.

3          **THE COURT:**  All right.  Mr. Ord, do you wish to be

4  heard?

5          **MS. WEIS:**  Could I -- sure.

6          **THE COURT:**  (Inaudible)

7          **MR. ORD:**  Your Honor, on behalf of Charles Hsin and

8  Mr. Thomason -- first I'll start with Mr. Hsin.  He was pretty

9  much tied to Optech.  And in the deposition which the Court

10 has, and references we have made, he tells the story which the

11 Government developed, that he took this over, it became not

12 only not profitable, it collapsed in on itself economically.

13 And he had to borrow $220,000 from his wife to meet some of the

14 commitments to some calls.

15          And then the Bancroft (Phonetic) was not honoring its

16 responsibility as a lender.  So, he got advice.  He stopped --

17 he shut down the business in the second quarter of 2007, which

18 I think is before they were joined in the lawsuit which was in

19 2008, because he lost his shirt.  And, he put it into

20 liquidation.  And by operation of law, he's been severed from

21 that.  But, he financially has lost a lot of money in this

22 matter.

23          And we cited a Fifth Circuit case that says where the

24 transaction itself collapses on itself -- which clearly is

25 shown, there's no issue of fact -- the Fifth Circuit has said

1  that's enough for mootness.

2         In addition to that, he's retired, he's in poor

3  health, and he doesn't do anything any more.  And he also has

4  these default judgments that were entered against him, and with

5  a lot of money.  So he basically poses no threat at all of any

6  recurrence at all, from a very practical matter.

7         **THE COURT:**  Right now I'm just entertaining the

8  mootness argument with regard to Optech, not the individuals.

9         **MR. ORD:**  Oh, I'm sorry.  I thought you want to hear

10 from Hsin as well.

11        **THE COURT:**  No, no.  You said you were representing

12 Optech.

13        **MR. ORD:**  No, Your Honor.  Well, I'm -- I'm here

14 technically in case there was some questions about I had to say

15 something, but I -- I'm here also on Hsin and --

16        **THE COURT:**  Okay.  We're just on the Optech motion,

17 although I understood that Hsin had joined in it.

18        All I'm saying is that right now, I'm only

19 entertaining argument with respect to the mootness of the

20 relief as to Optech.  Not as to Hsin.

21        **MR. ORD:**  Your Honor, I think Mr. Morse has pretty

22 well covered this situation.

23        **THE COURT:**  That's fine.

24        **MR. ORD:**  It's a legal impossibility that they're

25 going to do anything.

1          **THE COURT:**  Okay.  Yes.  Any reply?

2          **MS. WEIS:**  Yes.  Much of the response from the

3     liquidators' counsel referred to that we don't cite any

4     evidence after September of 2008, and that they have no assets.

5     Which are evidentiary issues that, as a preliminary matter, we

6     haven't been able to explore at all because Optech has refused

7     to even tell us who is paying their attorneys' fees for the

8     three firms that are representing them.  So, that's a first

9     point.

10         Second, when Optech filed for bankruptcy, it did so

11    voluntarily.  And the voluntary cessation of that activity

12    shouldn't -- can't support a finding of mootness on its own.

13    And we believe that in addition, while they say that there are

14    no assets, there's someone paying several law firms to

15    represent them.

16         Also, we have moved to compel certain -- well, we've

17    been working with Hsin's counsel in order to get documents from

18    Mr. Hsin that are responsive to our document requests.  And his

19    counsel has represented that those are coming from an Optech

20    computer.

21         Now, we don't know whether that would qualify as what

22    they have claimed is an asset, but we believe that there are

23    proprietary information and other assets that even if they are

24    going to be sold, we believe that it would be relevant to at

25    least know who these are going to be sold to, given that all of

 1  Optech's assets have to do with the ninety-percent loan

 2  program.

 3          Lastly, just as a point, this Court has already

 4  entered a preliminary -- or permanent injunction against

 5  Derivium Capital, which is a company that's in Chapter 7

 6  liquidation proceedings.  And in that case, found that -- you

 7  know, we would presume -- found that there was subject matter

 8  jurisdiction to enter the injunction against an entity that had

 9  entered Chapter 7.

10          **THE COURT:**  All right.  Was there something else?

11          **MR. MORSE:**  Just briefly, it sounds like the

12  Government's more concerned about discovery and obtaining

13  information than addressing, really, the issue as to whether

14  there's any reasonable possibility of Optech taking any action.

15          And that if the Government wished, they could join in

16  the liquidation proceeding in Hong Kong.

17          **THE COURT:**  Hmm.

18          **MR. MORSE:**  And --

19          **THE COURT:**  All right.  All right.  With regard to

20  the motion to strike, I don't think we really need to address

21  that.  I'm prepared to rule on that without any real argument.

22          I think a motion to strike under Rule 12(f) is too

23  late.  It's untimely.

24          On the other hand, I read the papers, and the

25  proposed injunctive relief language that is being sought.  And

1    I haven't a clue as to what it means.  I have no clue as to

2    what is meant by the language that -- Let me see if I can find

3    it:

4              "The Defendants shall not engage in any

5         conduct that interferes with the

6         administration and enforcement of the

7         Internal Revenue laws."

8         To the extent that it's -- that it's intended to mean

9    that they can't violate IRS laws, well, that goes without

10   saying.  I mean, there's no reason to impose an injunction

11   against doing something which the law already prohibits.  And

12   indeed, there's certainly precedent that counsels against

13   entering such an injunction.

14        To the extent that it intends to prevent the

15   Defendants from engaging in specific illegal conduct that is

16   conduct that is prohibited by a specific statute or regulation,

17   then it should state what the statute or regulation is.

18        So, even though I'm denying the motion as untimely, I

19   want you all to know that this is not the kind of language I

20   would normally include in an injunction that I'm writing.

21        I understand that there were stipulated injunctions

22   that were filed and which I signed off on.  If both parties are

23   in agreement, fine.  But if it's contested, I'm going to make

24   sure that the language is clear, and at least at a minimum,

25   that I understand it, if I'm going to be called upon to enforce

1  it.  I don't understand this language.

2          So, that should give you whatever guidance you need

3  in terms of trying to fashion injunctive language that might be

4  appropriate.

5          **MR. ORD:**  Your Honor, we indicated -- would you be

6  willing to appoint another Federal Judge to conduct settlement?

7  Because I think, with your indication, this has been a bone in

8  the throat, of not being able to agree on an injunction.

9          I think we might be able to get an agreed injunction

10 as long as that abstract wording is not in there.  We have to

11 work out a couple of other things.  But, I don't want to reveal

12 the --

13         **THE COURT:**  Who have you been working with?

14         **MR. ORD:**  Mr. Clukey, Your Honor.

15         **THE COURT:**  No, no, no.  Who -- have you been working

16 with a --

17         **MS. WEIS:**  Judge Spero, Your Honor.

18         **THE COURT:**  -- Magistrate Judge.  He's been doing

19 discovery.

20         **MS. WEIS:**  Correct.

21         **MR. ORD:**  Yes, Your Honor.

22         **THE COURT:**  Not settlement.  Has anybody been

23 assigned to preside over settlement?

24         **MS. WEIS:**  Not to my knowledge.

25         **THE COURT:**  Are both sides in agreement that

1  settlement might be helpful?

2          **MS. WEIS:**  For the United States, settlement is a bit

3  of a tricky issue, because the trial attorneys don't have the

4  authority, the ultimate settlement authority.  So any

5  settlement conference would be preliminary, because our --

6  there's a hierarchy, basically.

7          **THE COURT:**  That's always the case when we are

8  dealing with the Government.

9          Yes, I'll make a referral to a different Magistrate

10  Judge.  It would not be Judge Spero, since he's been handling

11  discovery.  Our process is that we separate the two.

12          Do you all have a preference?  I would send you

13  probably -- well, given that this trial date is coming up, I

14  would have to find out who is available in the next month,

15  sixty days at the latest, before you begin your trial

16  preparation.  All right, we'll will do that.

17          Like I said, I have this administrative matter.  We

18  have the last motion.  Why don't you all take this opportunity

19  to meet and confer about some of these issues, and then you can

20  let me know when I come back.  Hopefully I'll be finished some

21  time between 10:00 and 11:30.

22          I think I would like you to come back at 11:30, and I

23  have 30 minutes to take the last motion.

24          **MR. ORD:**  Your Honor, one housekeeping matter.  I

25  have a courtesy copy of a document which filed yesterday, which

1    I want to give you.

2              THE COURT:  Well, I don't know if I'm going to look

3    at it yet.  We can talk about it when I come back.

4              (Recess taken at 9:59 a.m.)

5              (Conclusion of excerpt of proceedings)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in C 07-4762 PJH, United States v. Charles Cathcart, et al., were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.


_____/S/ Belle Ball_____

Belle Ball, CSR 8785, CRR, RMR

Friday, August 14, 2009