UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE PHYLLIS J. HAMILTON, JUDGE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | NO. C 07-4762 PJH |
| | ) | |
| CHARLES CATHCART, ET AL., | ) | |
| | ) | San Francisco, California |
| Defendants. | ) | Wednesday |
| | ) | August 12, 2009 |
| _____ | ) | 9:00 a.m. |

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:        UNITED STATES DEPARTMENT OF JUSTICE
                        TAX DIVISION
                        Post Office Box 7238
                        Ben Franklin Station
                        Washington, D.C.  20044
              BY:  NATHAN ELLIOTT CLUKEY
                        ELLEN K. WEIS

For Proposed Liquidators of Optech:

                        Law Office of David McNeil Morse

                        595 Market Street
                        Suite 1350
                        San Francisco, California  94105-2825
              BY:  DAVID MCNEIL MORSE, ESQ.

Reported By:      Belle Ball, CSR 8785, RMR, CRR
                  Official Reporter, U.S. District Court

(Appearances continued, next page)

**APPEARANCES, CONTINUED:**

For Defendants Optech, Hsin and Thomason:
      Ord & Norman
      233 Sansome Street
      Suite 1111
      San Francisco, California  94104
   BY:  EDWARD O. C. ORD, ESQ.


For Defendant Nagy:  Jenkins Goodman Neuman & Hamilton
      417 Montgomery Street
      10th Floor
      San Francisco, California  94104
   BY:  TOM PROUNTZOS, ESQ.


For Defendants Hsin and Thomason:
      Ord & Norman
      233 Sansome Street
      Suite 1111
      San Francisco, California  94101
   BY:  JENNY C. LIN-ALVA, ATTORNEY


For Defendant Cathcart: CHARLES CATHCART
      Appearing Pro Se


Reported By:  Belle Ball, CSR 8785, RMR, CRR
      Official Reporter, U.S. District Court

1  WEDNESDAY, AUGUST 5, 2009                          9:00 A.M.

2                    P R O C E E D I N G S

3          THE CLERK:  Calling Civil Case No. 07-4762, United

4  States versus Charles Cathcart, et al.

5          MR. PROUNTZOS:  Good morning, Your Honor.  Tom

6  Prountzos appearing for Robert J. Nagy.

7          MR. CLUKEY:  Nathan Clukey for the United States

8  Department of Justice.

9          MS. WEIS:  Ellen Weis for the United States

10  Department of Justice.

11          MR. MORSE:  Good morning, Your Honor.  I'm David

12  Morse.  I'm asking to be allowed to appear this morning for the

13  liquidators, the provisional liquidators for Optech.

14          THE COURT:  And you are asking, why?  Are you not a

15  member of the bar here?

16          MR. MORSE:  Oh, I am a member of the bar, but I --

17          THE COURT:  Okay, all right.

18          MR. MORSE:  Certainly.

19          THE COURT:  Then, yes.  And, for the other

20  Defendants?

21          MR. ORD:  Your Honor, Mr. Edward O. C. Ord, appearing

22  on behalf of -- I guess technically I'm provisionally for

23  Optech.  The Defendant's still alive.  And for Charles Hsin and

24  Franklin Thomason.

25          THE COURT:  I thought Mr. Morse was for Optech.

1            Oh, you're for the liquidators.

2            **MR. MORSE:**  I'm for the liquidators.

3            **THE COURT:**  Liquidators, okay.

4            **MS. LIN-ALVA:**  Good morning, Your Honor, Jenny

5  Lin-Alva, for Defendants Hsin and Thomason.

6            **THE COURT:**  Okay.  Does that take care of everyone?

7            **MR. CATHCART:**  Good morning, Your Honor.  Charles

8  Cathcart, appearing pro se.

9            **THE COURT:**  All right.  Good morning.

10            **MR. ORD:**  Your Honor, Mr. Debevc has notified me he

11  can't afford to come, so he's not going to be here today.

12            **THE COURT:**  All right.

13            Now, a couple of preliminary matters.  First of all,

14  let me just make sure I have all the parties correct.

15            The individual Defendants that remain in the case are

16  Charles Cathcart, Yurij Debevc, Robert Nagy, and Charles Hsin.

17  Correct?

18            **MR. CLUKEY:**  And Franklin Thomason, Your Honor.

19            **THE COURT:**  Oh, I'm sorry.  And Franklin Thomason.

20  All right.

21            They are all represented here, except Mr. Debevc, who

22  is pro se and absent, correct?

23            **MR. CLUKEY:**  Correct.

24            **THE COURT:**  Okay.  Scott Cathcart has been dismissed.

25            And, have all the Derivium entities -- are there more

1  than one?  Is it Derivium Capital LLC and Derivium Capital,

2  Inc., are those the only two Derivium entities?

3          **MR. CLUKEY:**  Yes, Your Honor.  Derivium Capital,

4  there is an injunction entered into against them.  Derivium USA

5  is still a Defendant in this case.

6          **THE COURT:**  Derivium USA is still a Defendant?

7          **MR. CLUKEY:**  Correct.

8          **THE COURT:**  Okay.  And what about Veridia?

9          **MR. CLUKEY:**  There's an injunction against Veridia,

10 as well.

11         **THE COURT:**  All right.  So, the only three Defendants

12 that have either been dismissed or stipulated to an injunction

13 are Scott Cathcart, Derivium Capital LLC, and Veridia Solutions

14 LLC.

15         **MR. CLUKEY:**  Correct.

16         **THE COURT:**  All right.  Now, with regard to the

17 motions that we have on this morning, we have the United

18 States' motion against all Defendants, individual and entity

19 Defendants, correct?

20         **MR. CLUKEY:**  Yes.

21         **THE COURT:**  We have the individual Defendants' motion

22 against the United States -- I'm a little unclear.

23         Has Mr. Nagy joined that motion that was originally

24 filed by two other Defendants?  Or are there only four of the

25 individual Defendants?

 1          **MR. PROUNTZOS:**  Your Honor, yes.  My name is Tom

 2  Prountzos.  I'm the attorney for Robert Nagy.

 3          Robert Nagy has joined that motion with regard to the

 4  due-process arguments.  However, has not joined in the mootness

 5  arguments.

 6          **THE COURT:**  Okay.  So he's joined in part?  Not

 7  joined in part?

 8          **MR. PROUNTZOS:**  Correct.  Joined in part, Your Honor.

 9          **THE COURT:**  All right.  And then we have a third

10  motion, brought by Optech and Mr. Hsin, versus the United

11  States.  Correct?

12          **MR. CLUKEY:**  Yes.

13          **THE COURT:**  And then the fourth motion is the Hsin

14  and Thomason motion to strike.

15          All right.  Those are the four matters that we have

16  on?  Have I missed anything?

17          I have to say it's really hard to know what's going

18  on with this case, given that this (Indicating) is the stack of

19  documents that you all have filed in connection with these

20  motions.

21          And, we've had had lots of difficulty in securing

22  chambers copies that were usable.  Even with the phone calls

23  and the Clerk's notice that went out telling you what some of

24  the problems are, we're still stuck with papers that we've

25  spent countless hours just trying to figure out.

1          A couple of the problems, the ones -- the

2    deficiencies noted in the Government's papers I think are

3    particularly inexcusable.  You have submitted -- you have

4    submitted exhibits, bound to briefs, some without any

5    declaration whatsoever authenticating the documents.  They have

6    no pages, no declarations in front of them.

7          One set, there's a blank sheet of paper before it.

8    I'm not even sure whose exhibits they belong to.  That's one of

9    the problems.

10          For instance, these (Indicating).  There's nothing.

11   There was nothing attached to it.  If you attach thing with a

12   paper clip, I -- I don't know how we're expected to keep them

13   together.

14          We did receive three declarations, I believe, from

15   Ms. Weis with respect to some of them.  For instance, we were

16   provided something called "United States' Motion for Partial

17   Summary Judgment," that has a brief, and then attached to it

18   are deposition transcripts.  There's no declaration in there at

19   all (Indicating).

20          Some of the exhibits submitted by the Government have

21   these little notations, "Exhibit A" in the bottom, which kind

22   of help us go through, and figure out, and put little flags on

23   them, ourselves, which I don't think we should have to do.

24          But some of the other exhibits submitted submitted

25   submitted don't even have anything in the corner, so it's kind

1  of hard to tell where one exhibit starts and the next one

2  begins.

3           Additionally, the briefs cite -- give citations to

4  the record, such as "Exhibit A."  Well they don't say Exhibit A

5  to what.  Typically a citation to the record would be "Exhibit

6  A to Declaration of X."

7           So, not only are they not marked, and we have to go

8  through and mark them ourselves, we have to hunt for them,

9  there are no -- inadequate authenticating declarations.

10          I don't even understand -- you all understand the

11 concept of a courtesy copy.  A courtesy copy is for the Court.

12 I have 500 cases.  We don't have the time to go through and to

13 tab the exhibits.

14          I would think that some -- that any attorney desiring

15 to persuade the Court of a course of conduct would draw a map

16 for the Court, would try to make it as easy as possible to find

17 the exhibits.

18          The defense records suffer from some of the same

19 defects, although not quite as extreme as the Government's.

20          In any event, I've struggled; my law clerk has

21 struggled.  We've spent more time than need be, just trying to

22 find the evidence.

23          Maybe I found the right exhibits, maybe not.  We'll

24 see, when you get our order.

25          **MS. WEIS:**  Your Honor, we strongly apologize for the

1  difficulty that you've had.

2          When we originally filed the motion for partial

3  summary judgment, we submitted a -- we believe we Fed Ex'ed to

4  chambers a bound document, binder, with my declaration

5  authenticating all of the exhibits.  And the exhibits were

6  tabbed.  It appears that Your Honor did not receive that.

7          And when we received the Court's order, notifying us,

8  which is the first time we understood there was some

9  difficulties, I apologize if what which sent was inadequate.

10          We also called to see if there were any problems, and

11  hadn't heard anything else from the Court since then.  So, you

12  -- you mentioned some phone calls.  And I think that there's

13  been some miscommunications, but we are deeply sorry that you

14  have had difficulties.

15          And if -- if you need new courtesy copies --

16          **THE COURT:**  We are going to go forward with the

17  hearing now.  And maybe I've found the right exhibits, maybe

18  not.  But if not, then you'll know -- you'll know why.

19          **MS. WEIS:**  Okay.

20          **THE COURT:**  I mean, with four motions, we do our best

21  to keep our papers together.  But like I said, I have 500

22  cases.  And I expect it to be easier than this was, to simply

23  go through the papers.

24          All right.  Let's start with the first motion.  The

25  Government's motion.  Who wishes to argue the case?

1          MR. CLUKEY:  I'll argue on behalf of the Government,

2   Your Honor.

3          THE COURT:  All right.  Your motion essentially

4   raises a discrete issue, whether the transaction is a loan or a

5   sale.  That's primarily the issue.

6          I would like you to get right to that.  Our time is

7   limited this morning.  Like I indicated, I have to leave at

8   10:00.  If you all want to wait around, perhaps after this

9   meeting that I have to attend I could come back.

10          But, let's make best use -- let's just get to the

11   heart of the dispute.

12          MR. CLUKEY:  Your Honor, the heart of the dispute,

13   there is no -- there's no dispute, no facts in dispute that

14   there was -- that under the structure of the operation of the

15   program, if we look to whether there was a bona fide loan,

16   first -- and we can treat the sale authorities as well, but

17   looking first to the loan authorities and whether there was a

18   bona fide loan, at a minimum you have to have genuine

19   indebtedness for there to be a loan.  That's a simple

20   requirement, before there can ever be a loan.

21          The Defendants admit, in their reply brief, that the

22   way that the program was structured, if a customer provides --

23   once a customer provides the stock that they called collateral,

24   if that stock later goes up and the customer wants it back

25   pursuant to this agreement, the way that the agreement was

1  structured, it necessarily for the -- for Derivium, because

2  they immediately sell the stock as soon as they get it, for --

3  Derivium then has to go out into the marketplace and buy this

4  stock, because they don't hold it, they don't hold the stock as

5  collateral as one would think you would hold as collateral.

6          When they go out and buy that stock, because it's

7  appreciated above the amount that's due at maturity, they

8  necessarily suffer a loss, by doing that.

9          So what the customer does, in order to get the stock

10  back, the customer has to repay the principle that was given to

11  it, the 90 percent, and then has to weigh whatever interest is

12  due, supposed interest.  And that's just -- that's what it's

13  called in the terms of the contract.

14          When a customer does that, Derivium necessarily

15  suffers a loss because the stock that it has to purchase is

16  greater than the value of that interest that's due, and it's

17  greater than the value of the stock.

18          And so, then they have to run purchase -- purchase

19  this in the marketplace.  They then provide it back.  And

20  they've now suffered a loss.

21          (Reporter interruption)

22          **MR. CLUKEY:**  I'm sorry.

23          So, they necessarily suffer a loss.  In their briefs,

24  they admit that they -- they don't dispute that they suffer a

25  loss.  It's not disputed.  They simply call it a business risk

 1   of the lender.

 2           Well, it may well be a business risk of the scheme,

 3   but it cannot be, by definition, a business risk of a lender.

 4   A lender cannot suffer a loss if the money that you have lent,

 5   funds that you've supposedly lent, when repaid back to you,

 6   along with interest, causes you to suffer a loss.  It cannot

 7   be -- that is not genuine indebtedness.  There is no -- there

 8   is no debt.

 9           The only way that Derivium can make a profit here is

10   if the customer defaults.  So, Derivium is in the opposite

11   position of a lender, necessarily.

12           So if we start with that basic premise, and there are

13   a lot -- there's numerous authorities that we've cited in our

14   briefs that all talk about genuine indebtedness, and what you

15   need to have a loan.

16           If we just start there, false -- false statements

17   have been made concerning tax benefits about whether this was a

18   loan, because there is no indebtedness.  And it's by virtue of

19   operation of the -- of the program, and there are -- there are

20   no facts disputing that.

21           Secondly, if we then turn to the sale authorities --

22   there are obviously numerous sale authorities that we talk

23   about.  Under the sale authorities, when you look at, again,

24   the undisputed facts of how this transaction is structured,

25   again, applying those authorities to this case, this -- this

1  transaction should properly be characterized as a sale.

2          I -- I think under the loan authorities, we don't

3  even have to get there.  But if we do, it's simply another way

4  to show that this transaction cannot work.

5          Some of the important facts that we've cited that are

6  undisputed are the way that the transaction -- the transaction

7  works.  When you look under the master loan agreement -- and

8  I'm sorry if you had trouble finding the copy of the master

9  loan agreement that we submitted.  The Defendants also

10 submitted a copy of the master loan amendment, pursuant to

11 Charles Cathcart's declaration.

12         And when you look there, the master loan agreement

13 makes clear that the transaction is not consummated, thus,

14 there is no transaction until the stock has been submitted by

15 the customer, until Derivium then hedges -- engages in hedging

16 transactions, and then thereafter funds the loan.

17         Before that happens, the master loan agreement

18 specifically says that there -- that either party can walk away

19 before that.

20         The hedging transactions, in all cases -- and this is

21 not disputed -- is the actual sale of the stock.  So what

22 happens is the customer contributes the stock to Derivium

23 pursuant to this arrangement.

24         Derivium then takes that stock, and then they sell

25 it, on the open market, without a contract with a third party

1    to return that stock, as you might see in a marginal account --

2    they just simply sell it on the open market to anybody, or to

3    multiple people.  It's just sold, through a brokerage.

4          At that point, they don't even know -- before that

5    happens, the customer doesn't even know how much their loan is

6    going to be.  They have an estimate.  And the -- and we

7    submitted exhibits showing how that process works.

8          The process is a -- a document called a valuation

9    confirmation is issued by Derivium.  And again, they don't

10   dispute this.  And this is in Debevc's testimony.

11         That valuation confirmation simply provides an

12   estimate of how much the customer thinks he's going to get.

13   So, that's prior to the sale.

14         After the sale, another document is issued, called an

15   activity confirmation.  That activity confirmation spells out

16   specifically the amount that they're going to get.  It's the

17   sales proceeds.  It says, this is how much -- and they call it

18   hedge (Indicating quotation marks), the hedge proceeds.

19         So -- and in all cases, I've said the hedge proceeds

20   are simply the sale proceeds.

21         And, it says -- you know, it lists 100 percent of the

22   sale proceeds, and then the customer gets an amount equal to

23   ninety percent of that.

24         Then the loan is funded.  So, all of this occurs

25   prior to the funding.

1          We believe that all of the authorities -- the

2   Defendants focused on this issue of what's the initiation of

3   the transaction.  We argue you cannot have the initiation of a

4   transaction if the customer can still back out, and if you

5   don't even know how much money you are going to get.

6          So, that doesn't -- you don't know how much money

7   you're going to get until the stock is sold.  So once that

8   happens, we believe that's the -- that's the initiation of the

9   transaction of the sale.

10          So at the outset of the transaction, there is a sale

11  of the stock, or the initiation, there is a sale of the stock.

12          There is no other collateral that Derivium has.

13  They're giving -- you've got $100 worth of stock, we're giving

14  $90 worth of stock -- $90 in cash back.  You've converted all

15  the collateral to cash.  You're giving $90 back.  You've got

16  ten bucks.  You can do whatever you want with $10 but that's

17  all you have left, if you want to call that collateral.

18          There's a series of authorities that we cite, that

19  talk about what's the value of the collateral that you have

20  remaining.  And it can't be -- the value of the collateral has

21  to -- typically has to be equal to or more than whatever the

22  loan is that you want to have repaid.

23          Here, you have $10, and they've given a loan of 90,

24  it's 900 percent greater.  The loan amount is 900 percent

25  greater.  Or the collateral is 900 percent less.  That --

1  that -- again, under those authorities, you cannot -- again,

2  that's going back toward the loan.

3        I'm mixing this up a little bit, because -- because

4  this is so -- because all of these effects are so intertwined.

5        But, again, just looking at these sale authorities,

6  if you've got the initiation, the initiation starts with the

7  sale of the stock, there is no collateral that's left, and

8  therefore, this has to be a sale.

9        There clearly is a right that the customer has under

10 this transaction to get its stock back.  That's clearly -- that

11 clearly exists.  But that's the customer's right.  It doesn't

12 go to what Derivium is doing here.

13       And, I think all of the authorities look to the

14 entirety of the transaction.  You can't just segregate this,

15 and just look at this from the customer's perspective.  The

16 customer may well have been duped as to what is going on here.

17 They're not told that it's being sold.  They're told it is

18 being hedged.  And the documents, that master loan agreement

19 clearly says that.  It doesn't say "sale" anywhere in there.

20       Mr. Debevc, during his deposition, testified, as did

21 Mr. Charles Cathcart, they don't -- they don't tell the

22 customers that this stock is being sold.  So, it's possible

23 that customers were duped here.

24       But that's -- but that doesn't -- in fact, that only

25 reinforces the fact that there was sale, at least on one part

1  when you are looking at the entire transaction, that a sale

2  actually was occurring.

3          Finally, if you look at the substance-over-form

4  authorities, Your Honor, those are very clear.  The Supreme

5  Court, going back into the 1940's.

6          You can't simply paper a transaction to be one -- and

7  call it one thing, and that makes it that thing.  It's

8  basically *ipse dixit*.  You cannot -- just because you have

9  papers in place that call this transaction a loan, clearly

10 cannot make it so.  And the Supreme Court has recognized that

11 for over half a century.

12         So the fact that Derivium created these master loan

13 agreements and structured it in this way we believe is only

14 simply part of the deception, and that's only the starting

15 point.

16         The Defendants would have you look simply at those

17 documents, and argue that there's some presumption -- because

18 these documents were created, there's a presumption that this

19 transaction works.

20         Well, all of the substance-over-form authorities say

21 you have to go deeper than that.  You have to look at the

22 substance and economics of the transaction before you can -- in

23 effect, there is no presumption that this transaction works,

24 when you take into account all of these elements.

25         **THE COURT:**  Okay.  All right.  Thank you.

1          Who speaks on behalf of the Defendants?

2          **MR. PROUNTZOS:**  Are we only allowed one counsel for

3  this opposition, Your Honor?

4          **THE COURT:**  Who filed the brief?

5          **MR. PROUNTZOS:**  We filed the employment brief, our

6  office and Mr. Ord's office.

7          **THE COURT:**  All right, then the two of you can speak.

8  One or both.

9          **MR. PROUNTZOS:**  Okay.

10          **THE COURT:**  Have you divided up the argument?  I

11  don't want to hear the same argument from two people.

12          **MR. PROUNTZOS:**  We have divided it up, Your Honor.

13          **THE COURT:**  That's fine.

14          **MS. LIN-ALVA:**  Good morning, Your Honor.

15          As to some of the points that Counsel has just made,

16  I wish to point out that we objected to some of the evidence

17  submitted by Government.

18          I'm not aware -- not sure that the Court has had a

19  chance --

20          **THE COURT:**  It's in here somewhere.  I'm aware of

21  that.

22          **MS. LIN-ALVA:**  Okay.  Some of the points that Counsel

23  made are exactly like Wall Street margin loans, no different

24  than margin loans.  Yet, the Government has never proceeded to

25  attack those loans as anything other than loans.

1          And, we have not admitted to anything, even though

2    Counsel states again and again that Defendants have admitted in

3    their briefs to certain facts.

4          In the Government's brief, they are cherry-picking

5    what terms in the master loan agreement to support their

6    arguments, and yet at times, they specifically argue to

7    disregard the terms of the agreement when it's maybe favorable

8    to Defendants.

9          And, as to the substance-over-form argument, the tax

10   court, the general common law has stated several factors to

11   determine whether it's a sale or it's a loan, depending on what

12   perspective you are starting from.  And those are designed to

13   determine the real substance of the transactions.  And if those

14   factors are fulfilled, then the transaction should be respected

15   as a loan.

16         In the Government's brief, they also rely heavily on

17   the case, *Provost*.  And I just wish to point out that *Provost*

18   is not applicable, because it's a stamp tax case.  The

19   theory -- the legal theory that triggers the tax in *Provost* is

20   completely different than in the income tax context.

21         Specifically, if you look at Footnote 1 of the

22   *Provost* opinion, the Court recites what the statute says

23   triggers a taxable event.

24         And it states specifically that it's triggered upon

25   basically a sale of or a transfer of legal title, and whether

1  or not it entitles the holder in any manner to the benefit of

2  each stock or not.

3          The Government states in its motion on Page 11 and 14

4  that the test for whether a sale has occurred is whether the

5  benefits and burdens of ownership has passed.

6          And, this is not the test that's being used in

7  *Provost* and the statute at issue, to determine whether a

8  taxable event has occurred.

9          In several places, again, *Provost* indicates that the

10 Court was solely concerned with whether there was a transfer of

11 legal ownership -- that means title -- and not whether the

12 benefits and burdens were transferred.

13          For instance, on Page 456, the Court concludes that

14 both the loan and the stock and the return of borrowed stock

15 involved transfers of legal title, not benefits and burdens of

16 ownership as would be used in an income-tax context.

17          Page 457, the statute at issue was amended to

18 specifically add the language as to the transfer of legal

19 title, in response to the IRS Commissioner's incorrect comment

20 that a stamp tax did not apply to transfers involved in

21 borrowing and returning borrowed stock.

22          Page 458 again, the Supreme Court specifically states

23 that the statute at issue evidences an intent by Congress to

24 tax all transfers of legal title, whether technical sales or

25 not.

 1          And so, it even notes that other transfers that are

 2    not clearly sales, such as gift transfers and transfers in

 3    trust, would also be subject to the stamp tax.

 4          Again, legal title is only but one of many factors in

 5    the income tax area to determine whether there's been a

 6    transfer that would trigger a taxable event, such as a sale.

 7    The -- *Grodt* specifically mentions that's one factor, that's

 8    one of the tests that the Government mentioned in its brief.

 9          So, *Provost* clearly does not control, and cannot be

10    used to say that there's been a precedent that sets the

11    characterization of this transaction at issue.

12          The Government in this brief also admits in

13    discussing some of the factors in *Grodt* and in *Welch* that some

14    loans were repaid.  But then it says it doesn't matter, it

15    doesn't affect the characterization.

16          This again shows that each loan must be determined by

17    the facts of their own individual case.  It cannot be summarily

18    determined in this proceeding as to the transaction as a whole,

19    as the Government is seeking to do here.

20          **THE COURT:**  Hmm.  Okay.  Thank you.

21          Briefly, any response?

22          **MR. CLUKEY:**  Yes, Your Honor.  The margin loan issue?

23    Margin loans are specifically exempt from taxation under a

24    provision called Section 1058 of the Internal Revenue Code.  So

25    that's -- and the Defendants have never claimed that 1058

1   applies here.

2           Absent 1058, margin loans could be subject to tax,

3   if -- if the broker who obtains the stock from a client

4   thereafter lends it out in a securities lending transaction.

5   And therefore, Congress, to make sure that these transactions

6   would not be taxed, enacted 1058.

7           Two of the Defendants, Mr. Nagy and then

8   Mr. Cathcart, were both aware of this.  Mr. Nagy wrote a tax

9   opinion on the application of 1058 in 2000.  He then sent it to

10  Mr. Cathcart.  And we cite this in -- in our reply to their

11  opposition is where that's attached.

12          And in it, Mr. Nagy says -- Charles Cathcart was

13  asking Mr. Nagy about 1058, and whether they could use it.  And

14  Mr. Nagy says "No, we can't use it.  It's impossible for us to

15  comply with 1058 here," for the specific reason that 1058 has a

16  series of requirements.  It's basically a safe harbor.  And

17  it's got a series of requirements.

18          One of those requirements mandates that the broker be

19  able to return the stock to the customer within five days'

20  notice.  Well, per the terms of the master loan agreement, that

21  couldn't happen here.  It's a three-year agreement.  And in

22  fact, there were customers that tried to get their stock back,

23  and Derivium would point to the master loan agreement and say,

24  "No, this is -- there's this three-year limitation."

25          Mr. Nagy specifically notes that in the memo to

1  Mr. Cathcart, that it would be impossible for them to comply

2  with 1058.  And he also says there's another reason why he

3  wouldn't be able to do it, because 1058 also requires that

4  there not be elimination of both the opportunity for profit and

5  the risks of loss.

6          And then Mr. Nagy opines that here, this transaction

7  clearly eliminates the risk of loss, because the stock is sold,

8  and it's non-recourse.  The loan is non-recourse to the

9  customer.  So therefore, they wouldn't meet it.

10          And nowhere in the pleadings do the Plaintiff -- do

11  the Defendants argue that they have met 1058, or that 1058 even

12  applies.

13          So, that's one point with respect to margin loans.

14  The other is factually, this transaction is wholly

15  distinguishable from margin loans.

16          We submitted also in our opposition to their motion

17  for summary judgment an exhibit that was prepared by Mr. Debevc

18  in one of his trials.  That exhibit walks through step by step

19  or outlines step by step the distinctions between margin loans

20  and between the 90 percent loan.

21          And when you look, when you look through that, there

22  are very, very few similarities that are left.  And we outline

23  all the material distinctions in our brief, as well.

24          The Defendants say that we haven't admitted -- that

25  we've -- we've said that there're things that they've admitted,

1  that they haven't.  I would specifically like to draw your

2  attention to Page 12, Note 8, of their -- I believe that's the

3  right citation -- of their opposition to this motion.

4          In there, they call it a -- that's where they say, in

5  response to our characterization that it's impossible for them

6  to profit if this is actually paid off, if the loan is actually

7  paid off, that's where they call it -- they say -- they don't

8  dispute that, they don't dispute that fact.  Instead, they say

9  that -- that's where they characterize it as a business risk,

10 in the footnote.

11         It's Page 12, I'm sorry.  The footnote's actually

12 Note 6.  And I'll read you the quote (As read):

13              "The possibility that the stock

14              collateral could appreciate during the loan

15              term is simply a business risk of the

16              90 percent loan lender."

17         So we believe that that singular point, they've

18 conceded that it's impossible that there was genuine

19 indebtedness here, because they cannot profit if this supposed

20 loan is repaid.  Even with the interest repaid back to them.

21         The substance-over-form analysis we believe is

22 broader than as just characterized by the Defendants.  And, the

23 Supreme Court has opined on this numerous times.

24         There's a very -- there's a recent case that's called

25 *BB&T*, out of the Fourth Circuit.  And it actually looks at

1  substance over form in the case of genuine indebtedness.  And

2  it doesn't go all through the traditional sale factors.  It

3  simply looks at the overall economics of the transaction, and

4  looks to whether there's genuine indebtedness.

5           Certainly we can look at the sale -- all the sale

6  features, we can look at all the loan features, and we've done

7  that in our briefs.  And we believe, after you do that, it's

8  very clear that either there's no indebtedness here, and/or

9  this is a sale.

10          With respect to *Provost*, we cite *Provost* merely for

11 the notion that the Supreme Court, back in the Twenties, looked

12 to see whether there was a sale or disposition in a stock

13 lending transaction.

14          Clearly, there was a different provision that was in

15 place, it was a stamp tax act.  But what the Court did look to

16 was this sale, disposition, exchange, that notion.  And in

17 doing that, it found the transfer of legal title was paramount

18 there.

19          And we're not saying that's the only factor.  We

20 simply cite *Provost* for this notion that clearly, the transfer

21 of legal title was significant.  The Supreme Court has held

22 it's significant, with respect to calling such a transfer a

23 disposition.  And so, that's the only reason why we cite

24 *Provost*.

25          And then lastly, the Defendant just mentioned that

 1   loans are repaid here.  And we don't deny loans were repaid

 2   here.

 3          Not only do we not deny loans were repaid here, it

 4   makes our point.  The only -- first of all, Charles Cathcart

 5   testified that the vast majority -- and this is cited in

 6   deposition testimony that we cited -- the vast majority of

 7   these transactions were never repaid.

 8          So that's how they're -- because that's how they are

 9   profiting.  They're profiting when the customer walks away from

10   the transaction.  That's their profit.

11          The fact that some of the transactions were repaid in

12   fact, the reason why that makes our point is because that's

13   what causes Derivium to suffer a loss when those are repaid.

14          And therefore, there can be no genuine indebtedness

15   here, by virtue of the fact that some of the loans here were

16   repaid.  You certainly can't look to that as a factor in

17   support of them.

18          We believe that that closes the door.

19          **THE COURT:**  All right.  Counsel?

20          **MR. PROUNTZOS:**  Your Honor, if I may add, initially

21   in response to the U.S.'s argument regarding whether or not

22   Derivium or the lender suffers a loss if the loan is repaid,

23   they're essentially saying that non-recourse loans are invalid.

24   And that's not the case.

25          *Milenbach*, which we've cited to in our brief,

1  expressly states that non-recourse loans are -- are considered

2  bona fide loans, if at the time of the transaction when it's

3  entered into, the amount of the collateral that's provided in

4  exchange for the loan is equal to or greater than the amount of

5  the loan.  And that's also provided in other cases that we have

6  cited to.

7          In this case, the collateral that's transferred over

8  by the borrower to the lender in exchange for the loan is --

9  is -- is greater than the amount of the loan.  The loan is only

10 ninety percent of the amount of the collateral.  And what do

11 you consider when you are looking at the value of the

12 collateral?  It's what a borrower is providing to the lender as

13 security for the loan.  And here, it is the stock.  The loan is

14 for ninety percent of the value of the stock.

15         And whatever happens with regard to the value of the

16 collateral during the life of the loan is irrelevant to

17 determining whether the non-recourse obligation is a valid,

18 bona-fide loan.  And, we have cited to cases that expressly

19 provide that.

20         Secondly, I would like to address the fact that the

21 motion that the U.S. is making is of a peripheral,

22 non-determinative issue.  The Court does not have to arrive at

23 any determination of whether or not the ninety-percent loan is

24 in fact a bona-fide loan, if it determines that the conclusions

25 of my client, Robert J. Nagy, and the conclusions of the other

1  Defendants with regard to the bona fide nature of the

2  transaction were reasonable.

3          All of the cases that the U.S. has cited in support

4  of its argument that this motion is permitted all deal with

5  motions for partial summary judgment of either liability or of

6  damages.

7          Here, their motion would not decide an issue that is

8  conclusive on either liability or any aspect of damages, Your

9  Honor.  There is simply no reason to decide this issue at this

10 time.

11         **THE COURT:**  But there's nothing that precludes the

12 Court from deciding it if the Court so elects, is there?

13         **MR. PROUNTZOS:**  Well, there is a split in authority,

14 Your Honor.  Some courts do address motions for partial summary

15 judgment on issues of liability or of damages.

16         I have not seen any case law out there that provides

17 that a court can decide a motion for partial summary judgment

18 of an issue that's not determinative of either liability or of

19 damages.

20         Here, a determination that the ninety-percent loan is

21 not a bona-fide loan would not lead to the next step of a

22 finding of liability or entitle the U.S. to any item of

23 damages.

24         **THE COURT:**  It is a necessary finding along the way,

25 isn't it?  There couldn't be a finding of liability against the

 1  Defendants without a finding that the loan wasn't really a

 2  loan.

 3          It couldn't be based just upon the intent of the

 4  Defendants, could it?

 5          **MR. PROUNTZOS:**  Your Honor, the Court could find that

 6  the ninety-percent loan is not a bona-fide loan, yet find that

 7  Defendants are not liable or --

 8          **THE COURT:**  Sure.  Sure, but the Defendants can't be

 9  found liable unless there is a finding of both their intent and

10  that this is not a bona-fide loan.

11          **MR. PROUNTZOS:**  I agree with that point, Your Honor,

12  but at this point it's premature.

13          **THE COURT:**  Let's not spend a lot of time on it.  I'm

14  going to reach the issue that's before me.  There's no law that

15  precludes me from doing so.

16          **MR. PROUNTZOS:**  Okay.

17          **THE COURT:**  Okay.  Is that enough on this motion?

18          **MR. PROUNTZOS:**  Your Honor, I wanted to add something

19  with regard to *Provost*.

20          Mr. Clukey mentioned that the court there -- one of

21  the things that the court considered was that there was a

22  transfer of legal title.

23          Well, in that case, the tax stamp statute provided

24  that transfers of legal title in stock were taxable.  That was

25  the express language of the statute.

1              So, *Provost* is clearly inapplicable.  The court's

2    decision in this case was based upon the specific language of

3    the tax stamp statute.  That does not apply here.

4              And with regard to the *Grodt* and *Welch* cases, those

5    are the cases that deal with whether a transaction is a sale

6    versus a loan, we go into each of the various factors in detail

7    in our brief.  And you will see that --

8              **THE COURT:**  I have.

9              **MR. PROUNTZOS:**  Thank you, Your Honor.

10             **THE COURT:**  All right.  Let's move on.  Let's move on

11   to --

12             **MR. CLUKEY:**  Your Honor, may I address just two of

13   his points that he just made?

14             **THE COURT:**  Very, very briefly, please.

15             **MR. CLUKEY:**  Sorry.  He characterized her argument

16   that we're challenging all non-recourse loans as being invalid.

17   Clearly, that has never appeared in our briefs, and we are

18   certainly not doing that.  We are challenging the specific

19   transaction.

20             And then secondly, collateral, again, we

21   characterized the -- the issue of collateral, you have to look

22   at inception.

23             And so, in order to determine what inception is, you

24   have to look at all the factors.

25             **THE COURT:**  Okay.  I understand.

1          **MR. CLUKEY:**  Thank you.

2          **THE COURT:**  All right.  Yes.  Mister --

3          **MR. CATHCART:**  Your Honor, may I make a few comments?

4          **THE COURT:**  Come forward.  You're Mr. Cathcart,

5   right?

6          **MR. CATHCART:**  Chuck Cathcart.  Your Honor, there

7   were some specific statements that are factually wrong, that

8   has been made by the Government.

9          First of all, he's argued that there's not an

10  indebtedness because the lender cannot make money if a stock

11  goes higher, and the loan has to be repaid.  And, that's not

12  correct.

13         The lender has the use of the collateral during the

14  loan term, and it made investments with that collateral during

15  the loan term.  If those investments were sufficiently

16  successful, then it was able -- it would have been able to

17  repay, as the -- return the stock as the loan was repaid.

18         And it's similar to a bank that takes deposits.  It

19  makes loans with those depostis, it pays interest to the

20  depositors.  And it's a successful transaction if the loans are

21  repaid to the transaction bank.  So, it's a similar type of

22  business here.

23         And yes, it's a business risk, just as there is with

24  a bank that's making commercial loans.  And as we've seen in

25  the last year, a lot of those have not worked out.

 1          So, it's completely invalid to say that there's not

 2    an indebtedness if there is a risk that the lender has in the

 3    transaction.

 4          He also said, I think, that you cannot have an

 5    indication of a transaction -- initiation of a transaction if a

 6    customer can back out.

 7          And, that's not true.  On Wall Street, there are

 8    transactions that take place every day, under agreements where

 9    there is a final trigger point.  And typically, it will be with

10    something like a hedge.

11          If you are getting a mortgage loan, for example, the

12    lender may commit to a loan interest rate, and it's a risk for

13    the lender if it does that and you don't take the loan, and

14    there can be a requirement that you go forward at that point.

15          So, hedging as a trigger for the initiation of the

16    actual transaction is a standard procedure in banking.  And so,

17    I don't think there's any logic to what he says there.

18          Mr. Prountzos addressed the issue of adequate

19    collateral.  It was always 10 percent more collateral than the

20    loan amount.  So, it was fully collateralized.  More than fully

21    collateralized.

22          Mr. Clukey stated that it does not say "sale"

23    anywhere in the loan agreement.  Actually, there is a specific

24    provision that the lender has the right to sell, short-sell,

25    and do what it wishes with the collateral during the loan term.

1   And the customer recognizes that.  And that's stated, that can

2   take place without notice to the client, and the lender has the

3   right to all of the benefits from that, and from the use of the

4   collateral during the loan term.

5           With regard to substance over form, the intention of

6   the parties is a very important element of that.  And there are

7   all kinds of indications that both the borrowers -- many of

8   those who haven't gotten their stock back have sued and won

9   substantial judgments.  They certainly viewed it as a loan, and

10  not a sale of their stock.

11          And there are many, many things that the lender did

12  that indicated that it also viewed as a loan --

13          **THE COURT:**  Okay.

14          **MR. CATHCART:**  -- the returned stock.

15          **THE COURT:**  All right, thank you.  Let's move on.  We

16  just have about 15 minutes, and I don't think we can adequately

17  address all of the motions.

18          What I would like to do is to address the Optech/Hsin

19  motion and the motion to strike, because I think we can do

20  those in 15 minutes.

21          And then, hopefully we can reconvene between 11:00

22  and 11:30 and devote an additional 30 minutes to the last

23  motion, which is what I would like to do.

24          All right.  So, Optech/Hsin?

25          **MR. MORSE:**  Your Honor, David McNiel Morse again,

1  appearing on behalf of the Optech liquidators.  I wanted to

2  address the -- this -- the motion for summary judgment on

3  behalf of the liquidators.

4          Essentially, making two arguments here, Your Honor.

5  The first involves sovereign immunity, and the second involves

6  mootness.

7          What has happened here, which I think the Government

8  really has failed to recognize in their papers, is that Optech

9  no longer exists.  It's -- the analogy here would be to -- to a

10 person having died.  And what -- all that's left is the estate.

11 I'm here on behalf of the liquidators, they are the sole

12 representatives of what's left of Optech at this point.

13          So this, in terms of this litigation, it really has

14 two, two related effects.  The first is that the Court has to

15 now look as to whether the Court has subject matter

16 jurisdiction over the liquidators, who are in Hong King, who

17 are -- have been appointed by the Court in Hong Kong and

18 essentially are functioning as a branch of the Hong Kong

19 government and are Hong Kong citizens, have not -- not involved

20 in any commercial activity on behalf of Optech.

21          They have one function, and one function, alone,

22 under the irrevocable wind-up order that's been issued by the

23 Court in Hong Kong, which is to wind up the affairs of Optech

24 and dissolve Optech.

25          So, this raises, first of all, a question as to

1  whether the Court -- this lawsuit -- even has jurisdiction over

2  the liquidators, in their role as representatives of Optech.

3          Secondly, this goes to the question of mootness,

4  because essentially the Government is now attempting to get an

5  injunction against an entity that no longer exists in any

6  practical sense.

7          Again, this wind-up order is irrevocable.  My

8  clients, the liquidators, have only one function.  And that is

9  to wind up the affairs of Optech.  And in fact, in a

10 declaration from one of the liquidators that we filed in

11 support of our reply, it is this litigation, actually, that's

12 one of the only things that's holding up the dissolution of

13 Optech.

14          The Government argues in their opposition that in

15 fact Optech still exists, and that therefore, there is

16 something -- there is a matter still in controversy here that

17 they -- it's meaningful to get an injunction against Optech,

18 because until it's dissolved, it still exists.

19          The irony here is that one of the sole reasons that

20 it still exists in any form is because of this litigation.  So,

21 if the Court were to grant the motion, Optech would be very

22 speedily dissolved.  And, there would be nothing left of it.

23          This -- these are -- that's essentially our motion.

24 I just reserve the rest of my time for a response.

25          **THE COURT:**  All right.  I'm pretty much persuaded by

1  the mootness argument, not by the FSIA argument.  So, why don't

2  you address that.

3        **MS. WEIS:**  All right.  Well, with respect to

4  mootness, the first thing we would like to point out is that

5  Optech, as recognized, does exist in at least a legal form.

6        And, we've submitted evidence with our opposition to

7  the Defendant's motion for summary judgment showing that Optech

8  functions as a -- functions or functioned as an alter ego of

9  Charles Cathcart.  So, to the extent that it has assets or that

10 it, we believe, is in privity with other entities or persons

11 that could be enjoined, that relief is relevant.

12       Optech has now three law firms representing it.  And

13 I think that in terms of whether or not it has assets or has an

14 interest in avoiding this injunction that it says is pointless,

15 that certainly undermines their argument.

16       Ultimately Optech bears a very heavy burden of

17 showing that it's absolutely clear that there is no relief that

18 this Court could grant that would have a bearing on it.  It

19 continues to exist, as they acknowledged, and we believe that

20 it continues to have assets and be in privity with at least one

21 individual, Defendant Charles Cathcart.

22       And, that Optech also makes a number of factual

23 assertions in its brief in support of mootness.  It's saying

24 that it stopped several years ago soliciting customers, that it

25 hasn't had any loans in the United States for several years,

1  that it -- you know, it goes on.

2          And as we point out in our opposition memorandum,

3  those points are, at a minimum, in dispute.  That Optech's own

4  records do not support the factual assertions that they are

5  making.

6          And so we believe at a minimum, there's a genuine

7  issue of material fact as to the factual basis for Optech's

8  mootness argument.  And therefore, it hasn't satisfied at this

9  point its heavy burden of showing that this -- absolutely clear

10 on *Friends of the Earth*, there can be no recurrence of or there

11 is no threat that its -- that the injunctive relief could

12 address.

13         **THE COURT:**  All right.  Did you --

14         **MR. MORSE:**  Just briefly, Your Honor.  The -- the

15 Government makes allegations in terms of things that Optech had

16 done prior to September of 2008, which was when the final

17 wind-up, irrevocable wind-up order was issued.

18         I may be mistaken, but I do not believe, in reviewing

19 the Government's opposition, that I have seen any mention of

20 any activity by Optech after September of 2008.

21         Optech has no assets.  We've -- that's been

22 established by the evidence that we've presented.  The

23 Government has not presented anything in opposition.

24         And I believe we absolutely have met the standard of

25 showing that there is absolutely no possibility of Optech

1  taking any action which would -- which could be enjoined at at

2  this point by the relief the Government is seeking.

3         **THE COURT:**  All right.  Mr. Ord, do you wish to be

4  heard?

5         **MS. WEIS:**  Could I -- sure.

6         **THE COURT:**  (Inaudible)

7         **MR. ORD:**  Your Honor, on behalf of Charles Hsin and

8  Mr. Thomason -- first I'll start with Mr. Hsin.  He was pretty

9  much tied to Optech.  And in the deposition which the Court

10 has, and references we have made, he tells the story which the

11 Government developed, that he took this over, it became not

12 only not profitable, it collapsed in on itself economically.

13 And he had to borrow $220,000 from his wife to meet some of the

14 commitments to some calls.

15        And then the Bancroft (Phonetic) was not honoring its

16 responsibility as a lender.  So, he got advice.  He stopped --

17 he shut down the business in the second quarter of 2007, which

18 I think is before they were joined in the lawsuit which was in

19 2008, because he lost his shirt.  And, he put it into

20 liquidation.  And by operation of law, he's been severed from

21 that.  But, he financially has lost a lot of money in this

22 matter.

23        And we cited a Fifth Circuit case that says where the

24 transaction itself collapses on itself -- which clearly is

25 shown, there's no issue of fact -- the Fifth Circuit has said

 1   that's enough for mootness.

 2             In addition to that, he's retired, he's in poor

 3   health, and he doesn't do anything any more.  And he also has

 4   these default judgments that were entered against him, and with

 5   a lot of money.  So he basically poses no threat at all of any

 6   recurrence at all, from a very practical matter.

 7             **THE COURT:**  Right now I'm just entertaining the

 8   mootness argument with regard to Optech, not the individuals.

 9             **MR. ORD:**  Oh, I'm sorry.  I thought you want to hear

10   from Hsin as well.

11             **THE COURT:**  No, no.  You said you were representing

12   Optech.

13             **MR. ORD:**  No, Your Honor.  Well, I'm -- I'm here

14   technically in case there was some questions about I had to say

15   something, but I -- I'm here also on Hsin and --

16             **THE COURT:**  Okay.  We're just on the Optech motion,

17   although I understood that Hsin had joined in it.

18             All I'm saying is that right now, I'm only

19   entertaining argument with respect to the mootness of the

20   relief as to Optech.  Not as to Hsin.

21             **MR. ORD:**  Your Honor, I think Mr. Morse has pretty

22   well covered this situation.

23             **THE COURT:**  That's fine.

24             **MR. ORD:**  It's a legal impossibility that they're

25   going to do anything.

1          **THE COURT:**  Okay.  Yes.  Any reply?

2          **MS. WEIS:**  Yes.  Much of the response from the

3    liquidators' counsel referred to that we don't cite any

4    evidence after September of 2008, and that they have no assets.

5    Which are evidentiary issues that, as a preliminary matter, we

6    haven't been able to explore at all because Optech has refused

7    to even tell us who is paying their attorneys' fees for the

8    three firms that are representing them.  So, that's a first

9    point.

10          Second, when Optech filed for bankruptcy, it did so

11   voluntarily.  And the voluntary cessation of that activity

12   shouldn't -- can't support a finding of mootness on its own.

13   And we believe that in addition, while they say that there are

14   no assets, there's someone paying several law firms to

15   represent them.

16          Also, we have moved to compel certain -- well, we've

17   been working with Hsin's counsel in order to get documents from

18   Mr. Hsin that are responsive to our document requests.  And his

19   counsel has represented that those are coming from an Optech

20   computer.

21          Now, we don't know whether that would qualify as what

22   they have claimed is an asset, but we believe that there are

23   proprietary information and other assets that even if they are

24   going to be sold, we believe that it would be relevant to at

25   least know who these are going to be sold to, given that all of

 1  Optech's assets have to do with the ninety-percent loan

 2  program.

 3          Lastly, just as a point, this Court has already

 4  entered a preliminary -- or permanent injunction against

 5  Derivium Capital, which is a company that's in Chapter 7

 6  liquidation proceedings.  And in that case, found that -- you

 7  know, we would presume -- found that there was subject matter

 8  jurisdiction to enter the injunction against an entity that had

 9  entered Chapter 7.

10          **THE COURT:**  All right.  Was there something else?

11          **MR. MORSE:**  Just briefly, it sounds like the

12  Government's more concerned about discovery and obtaining

13  information than addressing, really, the issue as to whether

14  there's any reasonable possibility of Optech taking any action.

15          And that if the Government wished, they could join in

16  the liquidation proceeding in Hong Kong.

17          **THE COURT:**  Hmm.

18          **MR. MORSE:**  And --

19          **THE COURT:**  All right.  All right.  With regard to

20  the motion to strike, I don't think we really need to address

21  that.  I'm prepared to rule on that without any real argument.

22          I think a motion to strike under Rule 12(f) is too

23  late.  It's untimely.

24          On the other hand, I read the papers, and the

25  proposed injunctive relief language that is being sought.  And

 1   I haven't a clue as to what it means.  I have no clue as to

 2   what is meant by the language that -- Let me see if I can find

 3   it:

 4            "The Defendants shall not engage in any

 5            conduct that interferes with the

 6            administration and enforcement of the

 7            Internal Revenue laws."

 8            To the extent that it's -- that it's intended to mean

 9   that they can't violate IRS laws, well, that goes without

10   saying.  I mean, there's no reason to impose an injunction

11   against doing something which the law already prohibits.  And

12   indeed, there's certainly precedent that counsels against

13   entering such an injunction.

14            To the extent that it intends to prevent the

15   Defendants from engaging in specific illegal conduct that is

16   conduct that is prohibited by a specific statute or regulation,

17   then it should state what the statute or regulation is.

18            So, even though I'm denying the motion as untimely, I

19   want you all to know that this is not the kind of language I

20   would normally include in an injunction that I'm writing.

21            I understand that there were stipulated injunctions

22   that were filed and which I signed off on.  If both parties are

23   in agreement, fine.  But if it's contested, I'm going to make

24   sure that the language is clear, and at least at a minimum,

25   that I understand it, if I'm going to be called upon to enforce

 1  it.  I don't understand this language.

 2          So, that should give you whatever guidance you need

 3  in terms of trying to fashion injunctive language that might be

 4  appropriate.

 5          **MR. ORD:**  Your Honor, we indicated -- would you be

 6  willing to appoint another Federal Judge to conduct settlement?

 7  Because I think, with your indication, this has been a bone in

 8  the throat, of not being able to agree on an injunction.

 9          I think we might be able to get an agreed injunction

10  as long as that abstract wording is not in there.  We have to

11  work out a couple of other things.  But, I don't want to reveal

12  the --

13          **THE COURT:**  Who have you been working with?

14          **MR. ORD:**  Mr. Clukey, Your Honor.

15          **THE COURT:**  No, no, no.  Who -- have you been working

16  with a --

17          **MS. WEIS:**  Judge Spero, Your Honor.

18          **THE COURT:**  -- Magistrate Judge.  He's been doing

19  discovery.

20          **MS. WEIS:**  Correct.

21          **MR. ORD:**  Yes, Your Honor.

22          **THE COURT:**  Not settlement.  Has anybody been

23  assigned to preside over settlement?

24          **MS. WEIS:**  Not to my knowledge.

25          **THE COURT:**  Are both sides in agreement that

1  settlement might be helpful?

2          **MS. WEIS:**  For the United States, settlement is a bit

3  of a tricky issue, because the trial attorneys don't have the

4  authority, the ultimate settlement authority.  So any

5  settlement conference would be preliminary, because our --

6  there's a hierarchy, basically.

7          **THE COURT:**  That's always the case when we are

8  dealing with the Government.

9          Yes, I'll make a referral to a different Magistrate

10  Judge.  It would not be Judge Spero, since he's been handling

11  discovery.  Our process is that we separate the two.

12          Do you all have a preference?  I would send you

13  probably -- well, given that this trial date is coming up, I

14  would have to find out who is available in the next month,

15  sixty days at the latest, before you begin your trial

16  preparation.  All right, we'll will do that.

17          Like I said, I have this administrative matter.  We

18  have the last motion.  Why don't you all take this opportunity

19  to meet and confer about some of these issues, and then you can

20  let me know when I come back.  Hopefully I'll be finished some

21  time between 10:00 and 11:30.

22          I think I would like you to come back at 11:30, and I

23  have 30 minutes to take the last motion.

24          **MR. ORD:**  Your Honor, one housekeeping matter.  I

25  have a courtesy copy of a document which filed yesterday, which

1  I want to give you.

2          THE COURT:  Well, I don't know if I'm going to look

3  at it yet.  We can talk about it when I come back.

4          (Recess taken from 9:59 to 11:29 a.m.)

5          THE COURT:  All right.  Now, thank you all for your

6  patience.

7          We have the remaining motion, and that's the motion

8  made by the individual Defendants for summary judgment.  And as

9  I understand, Mr. Nagy's involved as well.  He's joined in.  I

10  was a little unclear about that.  But it's all five of the

11  individual Defendants.

12          MR. PROUNTZOS:  Yes, Your Honor.

13          THE COURT:  All right.  Who is going to argue the

14  motion?

15          MR. ORD:  (Raises hand)

16          THE COURT:  All right.  Mr. Ord, come forward.

17  Counsel?

18          MR. ORD:  Your Honor, the motion has several grounds,

19  and maybe I could start first, since -- on the mootness with

20  respect to Charles Hsin and Frank Thomason, because I think

21  with respect to them, that is, you know, the clearest way to

22  get this resolved with respect to them.

23          The deposition of Charles Hsin shows that he acquired

24  Optech, I think it was 2005, in the middle of 2005.  And by the

25  second quarter of 2007, the operation had economically

1  collapsed.  And he testified he had borrowed, I think it was

2  $200,000 from his wife to help meet some of these demands

3  because the -- Bancroft (Phonetic) was not honoring their

4  hedging contracts, and there was another Japanese company that

5  was doing hedging.  And so, there they were.  They didn't

6  have -- it's like operating without insurance.

7            And, he lost so much money that he shut down the

8  operation completely in the second quarter of 2007.  And,

9  closed the office, and it hasn't operated since then.

10           Then in 2008, after getting advice from some of his

11 business associates in Hong Kong, who told him he should just

12 put it into bankruptcy, so he filed the forms to start the

13 bankruptcy proceeding.

14           And at that point -- I think that was in July of

15 2008.  And then -- and then in September, the liquidation order

16 was issued, the Court issued it, and then he was no longer a

17 director.

18           British companies don't have officers.  British

19 companies have just directors, managing directors who act as

20 agents for the company.  So, he was automat- -- by operation of

21 law, was no longer a director.

22           He lost a lot of money on his own in this operation.

23 And he walked away from it.  And, he has not engaged in any

24 loan transaction since that time.  And I don't think that's --

25 that's clearly the situation.

1          He also got these default judgments.  Due to his not

2    being sophisticated, he allowed a couple of very large default

3    judgments to be entered against him for -- I don't know, huge

4    amounts of money, millions and millions of dollars.

5          And he's also in poor health, he's retired, he lives

6    with his family in New York.  And, I mean, as a practical

7    matter, there's no likelihood he's going to go back into the

8    business.

9          **THE COURT:**  Is that the standard, though, that it's

10   not likely that he is going to go into the business?  I mean,

11   the burden is to establish mootness.  This is not even close to

12   the showing that Optech has made about the impossibility of

13   doing so.

14         You have argued that he lacks financial incentive to

15   do so; he's not likely to because of all the other

16   circumstances.  But there's certainly been no showing that he

17   cannot engage in the same kind of conduct in the future.

18         **MR. ORD:**  Well, Your Honor, I believe the Fifth

19   Circuit pointed out that there's mootness where the

20   transaction, itself -- which would be the ninety-percent loan

21   operation -- economically collapses in on itself.  And that

22   clearly has been shown to be the case.  And so, that's grounds

23   for mootness.

24         The reason why I can't look you in the eye and say

25   it's impossible for him to do it, in theory, yes.  But as a

 1  practicality, how is he going do it?  The thing doesn't work,

 2  he lost all his money.  And he's got all these judgments

 3  against him.  He's in poor health.  And, as a practical matter,

 4  he isn't going to do it again.

 5          And it's -- but -- and I hate to say no, we're not

 6  going grant mootness, because there's always this theoretical

 7  possibility he could do it.  He isn't.

 8          I'll give you another reason.  This civil-action

 9  complaint basically puts him on fair notice that the government

10  thinks the operation -- continued operation of this loan

11  agreement is criminal.  They use the word "evasion."  That's

12  tax-evasion statute.

13          And as -- no one is going to now continue to go in

14  that, because if they do, they're going to get indicted.  So,

15  who wants to do that?

16          So I'm saying, Your Honor, you have to be practical.

17          **THE COURT:**  Is not likely, and not practical, is that

18  enough?

19          **MR. ORD:**  Yeah, I think it's enough.  I think you

20  have to be practical, Your Honor, in applying this abstract

21  concept that it will never happen.  And I don't read the cases

22  that way.

23          I read the cases to say if there's sufficient

24  extrinsic factors pressing down on this person so they aren't

25  going to go back into it, I think you have to use that

 1  objective criteria.  Not well, in theory, he could go back into

 2  it.

 3          **THE COURT:**  I don't understand.  If it's so clear,

 4  why hasn't he stipulated to an injunction prohibiting him from

 5  engaging in the same conduct?

 6          **MR. ORD:**  Because, Your Honor, it would be

 7  professional malpractice for me to have him agree to that with

 8  that abstract wording in it.

 9          I don't want to go into the negotiations with

10  Mr. Clukey, but we tried in the very beginning to get this

11  stipulated to.  But, no one in their right mind is going to

12  agree to that.  No one knows what it means.  It could be

13  anything.

14          And that's been the bone in the throat.  And that's

15  why I filed this motion to strike, because the government, you

16  know, maintains that they have a right to have this in the

17  injunction.

18          So, that's the reason why we haven't been able to do

19  it.

20          **THE COURT:**  All right.  Well, the standard that I'm

21  applying is the standard found in *Friends of the Earth,* a

22  Supreme Court case.  All right?  And the standard is as follows

23  (As read):

24                  "A defendant's voluntary cessation of a

25                  challenged practice does not deprive a

1          Federal Court of the power to determine the

2          legality of the practice."

3          I view the cessation of the practice is voluntary on

4  your client's part.

5              "If the courts did, the courts would be

6          compelled to leave the Defendant free to

7          return to his old ways."

8          And, the Supreme Court further says:

9              "A case might become moot if subsequent

10         events made it absolutely clear that the

11         alleged wrongful behavior could not

12         reasonably be expected to recur."

13         That's a pretty high standard, "absolutely clear that

14 the...wrongful behavior could not reasonably be expected to

15 recur."  I have not been persuaded by any of the individual

16 Defendants that this standard has been met.

17         **MR. ORD:**  Your Honor, I don't want to argue against

18 that ruling.  All I'm saying is I think, applying a reasonable

19 standard here, that he -- it's clear that he's not going to do

20 it again, because he lost money.  It's not profitable.

21         And number two, he lost the vehicle.  He's got these

22 judgments against him.  He can't go out and raise credit or

23 anything like that.

24         **THE COURT:**  I think it's probably not likely he will

25 do it again, but that's not good enough.

1          **MR. ORD:**  I don't want to argue against your ruling.

2   I just -- that's our position.

3          **THE COURT:**  All right.  I'm not going to grant your

4   request on mootness grounds.

5          Is there any other ground that you would like to

6   address?

7          **MR. ORD:**  Well, I haven't mentioned Frank Thomason.

8   He resigned after 12 months because he felt that -- it was a

9   disaster, that was not going to work.  And he resigned from the

10  company, he moved to China.  He's domiciled in China.  And

11  under his visa, he's not allowed to work.

12         And Your Honor, over in China, you violate your visa,

13  they just clap you in jail over there.  None of this

14  due-process stuff.  And, he's married to a woman who's from the

15  village where he's living.

16         And I think that for him, it certainly ought to --

17  the Court ought to require -- it's a certainty he's not going

18  to go back to it.

19         **THE COURT:**  Is he precluded from returning to this

20  country?  Has he relinquished his U.S. citizenship?

21         **MR. ORD:**  No, he has not, Your Honor.

22         **THE COURT:**  So he could live here.  And it might be

23  enough to find if indeed he was a Chinese citizen that he isn't

24  likely to reengage in the conduct in China, but the U.S. only

25  has jurisdiction over U.S. citizens who are doing this conduct

1    here.

2              And since he's not precluded from returning, my

3    ruling is the same.

4              **MR. ORD:**  All right.  All right, Your Honor.

5              The other argument here basically is due-process fair

6    notice.  And, I think the situation here is very clear under

7    the law of this circuit.  There has to be relevant precedent.

8    The *Dahlstrom* (Phonetic) case.

9              And it has to involve an enforcement action.  This is

10   not a civil tax refund suit by a taxpayer, where you have to

11   make a decision on whether it was a loan, what the intent was,

12   is it a sale in the first year of the loan, or is it a sale in

13   the last year of the loan.  This is an enforcement action.

14             And, the law in the circuit is very clear, and the

15   others, I think, that there has to be relevant precedent.  If

16   there isn't relevant precedent, Your Honor, then the Court

17   would be violating their due-process fair-notice rights by

18   making a determination based on past history, and then saying,

19   "You violated, this conduct is subject to a penalty, and you're

20   enjoined."

21             And, like I've said, we pointed out that in these

22   tax-shelter case, normally the IRS writes warning letters, and

23   puts you on notice.  Then if you don't stop, just like the SEC,

24   if you don't stop, then you get what's coming to you.

25             Not only were no letters written, when requests were

 1  made, they were ignored.

 2           And then you've got these adjucations, informal

 3  adjucations under the Administrative Procedures Act,

 4  involving -- at least Scott Cathcart, no changes on his eleven

 5  loans.  And people were aware of that, he was one of the people

 6  involved.  And those adjucations were fair notice that this

 7  transaction was bona fide.

 8           And the agent testified, who did the audit, that

 9  because the -- allowed the interest deduction, the loan had to

10  be bona fide.  And the adjucation of no change means that the

11  tax return, line by line, was accepted as true and correct,

12  under oath.  That is the adjucation.

13           And, though the government is free to change their

14  position, and they obviously did, the first part of the

15  complaint says that the IRS chief counsel made a decision and

16  sent this injunction case forward, and it is a total change in

17  position.  And they can do that, but they can't do it

18  retroactively.  They have to give you fair notice.

19           I cited that one case involving the pollution case

20  with the EPA, where the Circuit said that from the time they

21  were polluting up until they got this letter saying you're not

22  exempt anymore, that the Court couldn't enter an injunction or

23  punish them for that.  Only after the time they got the letter.

24  And, they reversed the District Court, in that the District

25  Court said due-process fair notice applied to everything.

1           And, the *Dahlstrom* case is a due-process fair notice

2    case.  And it is not limited just to criminal cases.  We point

3    out in our brief, it applies to any civil or criminal

4    enforcement, including private Attorney General actions.

5           Number three, the adjucations are inconsistent.  They

6    have adjucations in the early years.  Now they have come out,

7    the Internal Revenue Service made a secret adjucation that this

8    is all fraudulent and everything, and they forward to the

9    Justice Department, and they brought the complaint.  Now,

10   that's inconsistent adjucations.  And it's clear under the case

11   law we cited to you that that's due-process fair notice.

12          Further, government counsel points to this new case

13   that has a new theory.  The point is, the courts are in

14   confusion on what is a loan and what is a sale.  There's three

15   different methods that can be used.

16          And, in the one case that we cited from the tax

17   court, you can take judicial notice, is the judge wanted the

18   tax court briefs to brief both approaches, because the judge

19   didn't know which one to apply.

20          And so the point we are trying to make is this is an

21   enforcement action.  And because of that, they have to give

22   fair notice before they can bring the enforcement action.  And

23   for Your Honor to decide all this now and say, "Based on the

24   past, you were wrong, and now we're going to enjoin you," which

25   is an enforcement action, I think it violates due-process fair

1  notice.

2          Another aspect of -- this is a Ninth Circuit case

3  that is saying that where there are frank differences of

4  opinion as to what the law is, you cannot bring an enforcement

5  action.  And the particular case, the *Anton* case, was an

6  enforcement action.

7          So all we are saying is the government should have

8  written a letter and given them notice of the change, and told

9  them to stop, like they have done in other cases which we have

10 cited.  And by not doing that, they can't come along now and

11 say, "Well, we've changed our position, these adjucations are

12 not binding on us."

13         And, we're not saying they are binding.  What the

14 courts say is that Your Honor has to look at due-process fair

15 notice from the viewpoint of the defendants, not the government

16 agency or what they were doing in secret.  And, if you look at

17 it from that way, we were -- they were aware of these

18 adjucations, these adjucations were -- were under the

19 Administrative Procedures Act.

20         The IRS can only rule-make and make adjucations, just

21 like every other agency.  And that's why you cannot go to court

22 until there is a final agency action, which -- with the IRS

23 it's normally a deficiency notice.

24         And we cited one case where a deficiency notice was

25 issued, and he didn't explain, and under the Administrative

1  Procedures Act, the Court of Appeals reversed the entire de

2  novo trial in the tax court, and made the tax court send it

3  back to be rewritten, and redo the adjucation.  And then when

4  it came back, to start all over again.  And they pointed out in

5  there that under the administrative law, you know, you have --

6  these adjucations count, and they have to be made properly.

7          So from our viewpoint, from the viewpoint of the

8  promoters here, and -- I think these adjucations have put us on

9  fair notice that these loans were allowable.  And the penalty

10 specialist came in, and she didn't propose any penalty conduct

11 against Derivium  Capital and Derivium Capital was not doing

12 loans.  It was not making loans.  So there was no income tax

13 implications.  So she was brought in to look at the penalties.

14 And she didn't propose any penalties.

15          **THE COURT:**  All right.  You need to wrap it up.

16          **MR. ORD:**  Also, both in *Dahlstrom* and in this case,

17 the Treasury's never issued regulations for guidance under

18 6700.  And that's what caused all the uncertainty in the

19 *Dahlstrom* case.  And it causes confusion here.  They've issued

20 no guidance as to what constitutes a violation of 6700.

21          And, this was passed in 1986.  So this is another

22 reason why the lack of -- of due-process fair notice.

23          **THE COURT:**  All right.  Response, please?

24          **MR. CLUKEY:**  Yes, Your Honor.  As a starting point, I

25 think the Defendants misconstrue the scienter requirement

1    that's actually in play here by analogizing to *Dahlstrom*.

2          *Dahlstrom* is a criminal case where the standard was

3    willfulness.  And under willfulness standard in the criminal

4    context, the Supreme Court has said you have to have a mal or

5    bad intent, bad motive.

6          The standard here can be met, the scienter standard

7    can be met by showing there was a false statement that the

8    Defendant knew or had reason to know was false.  That is not

9    the same thing as the willfulness requirement in a criminal

10   case, although this is an enforcement action.

11         Secondly, the Defendants complain that there was no

12   relevant precedent here.  As we argued in connection with our

13   motion -- or partial motion for summary judgment, there's

14   extensive precedent here.

15         The Defendants purported to offer a product that was

16   a loan.  They called it a loan.  There's case law going back

17   over half a century as to what is a loan, what is genuine

18   indebtedness.  There was clear precedent there.  There's also

19   case law going back even further as to what is a sale and what

20   constitutes a sale.

21         We believe that if you use either one of the

22   authorities, it's clear that the Defendants knew or had reason

23   to know that the statements that they were making about this

24   being a valid loan product were false.  Or they -- they either

25   knew they were false, or they had reason to know that those

1  were false.  So, there's extensive precedent here.

2          The Defendants are focusing on an item called a

3  no-change letter, and they use it in a variety of different

4  ways.  One, to say that they didn't have fair notice.  They

5  said -- we believe that these authorities make it clear they --

6  they had fair notice that you can't offer -- if it's a loan,

7  it's got to be a valid loan.

8          But we also address eight different ways why the

9  no-change letter was issued -- that was issued really have no

10  bearing on this case, whatsoever.  There's -- the *Capp*

11  (Phonetic) decision immediately comes to mind, where there was

12  a penalty, an enforcement action.  And the Ninth Circuit said

13  you can't look to a no-change letter to bar an enforcement

14  action.  That's just not proper.

15          In addition, there's the -- the Federal Court in the

16  Southern District of New York, addressing Derivium's similar

17  claim that was made, said clearly a no-change letter cannot bar

18  a 6700 investigation.  And, further facts and evidence that are

19  developed by the IRS about the operation of the program,

20  clearly, you can bring a 6700 enforcement action after the IRS

21  or the government has come into possession about further facts.

22          What the IRS didn't know at the time was that it was

23  impossible for the Defendants to profit under this scheme, that

24  there was -- in no way was this -- could this be valid

25  indebtedness.

1    The IRS did know initially or learned that this was

2  most likely a sale.  And then began, shortly after issuing a

3  no-change letter -- which did nothing -- it says nothing.  The

4  no-change letter simply says there's no change to the income

5  tax of Derivium, which is now enjoined, or to Scott Cathcart,

6  who is now enjoined.  It was not issued to any of the -- any of

7  the Defendants here.

8    Anyway, so the -- so the Southern District of

9  New York, in looking at that, said clearly you can go ahead and

10 bring an action when further facts are known.  So, so the IRS

11 believed that this was likely a sale, and so it began the 6700

12 investigation based on that.

13    We now know, which is I think is even stronger proof

14 as to the false statements and the invalidity of this action,

15 the economics of this program.  Those were not clearly

16 understood, and they are clearly fully understood now.

17    I'll address one point that Mr. Cathcart said

18 previously when he came up.  He cited to nothing in the record

19 that disputes -- disputing the fact that the supposed lender

20 here cannot profit from the transaction based on the funds --

21 in connection with the funds that are advanced to the -- to the

22 customers here.

23    So, the interest component that is supposedly charged

24 and the funds that are advanced, the lender cannot profit from

25 that because when that amount is repaid by the customer, then

1  Derivium necessarily suffers a loss because they have to go out

2  and buy the this appreciated stock in the marketplace.

3        Mr. Cathcart alluded to the fact that potentially

4  Derivium could have made its own investments, just like a bank,

5  and could have profited under other investments from the money

6  that it had.  But that has nothing to do with profiting in

7  connection with the loan, the actual loan, itself, and whether

8  this was a valid loan obligation.  So, we now know that this

9  transaction can be challenged on both counts.

10        In addition, a no-change letter basically means

11  nothing.  It affords no -- it affords nobody -- it affords no

12  person any rights in connection with it.  It's simply the IRS

13  passing on a transaction, and that's it.  And the Defendants

14  would construe that to constitute some kind of final agency

15  action.

16        Well, if the IRS doesn't do anything, it is, by

17  definition, doing nothing.  And so, how that could constitute a

18  final -- an adjudication or a final agency action, we're

19  somewhat puzzled.

20        Again, the -- you know, further following up on that

21  point that none of the Defendants here ever received this --

22  never had it issued to them, as well, so it couldn't have

23  affected their tax years.  So for them now to say that the IRS

24  somehow concluded this was a valid transaction, when the

25  no-change letter simply says nothing of the kind, and obviously

1  there were multiple issues that were examined, would be akin to

2  saying that any time the IRS issues a no-change letter for any

3  issue that could have been considered at any point in time, the

4  IRS is barred from further challenging that action.  And that

5  just simply can't be -- that's not the law, and it simply can't

6  be the law.

7        **THE COURT:**  With respect to another taxpayer.

8        **MR. CLUKEY:**  With respect to any taxpayer.  Because

9  the IRS -- that's a good point, Your Honor.  A no-change letter

10  issued even -- if I get one, the IRS can still come back and

11  challenge my taxes.  They are permitted under the Internal

12  Revenue manual to reopen my tax -- it is not foreclosed, by any

13  sense.

14        The only way that you can foreclose my tax year is

15  you have to enter into a closing agreement or a settlement

16  agreement.  Then if I do that, then those tax years cannot be

17  challenged.  The issues in those tax years could be challenged

18  at a later point in time, but those particular years are

19  closed.  A no-change letter has no effect.

20        The IRS is permitted under the Internal Revenue

21  manual to go back to the exact same year, to go back to the

22  exact same issues, and reopen those.  There are some procedural

23  hurdles they have to do for that particular taxpayer to do

24  that, but they are certainly entitled to do that.

25        **THE COURT:**  All right.  You are going to need to wrap

 1   it up, too.

 2            **MR. CLUKEY:**  Understood.

 3            Two cases that the Defendants mentioned, they

 4   mentioned the *Anton* case, and called it an enforcement action.

 5   That was a private action under the False Claims Act, by a

 6   teacher.  And, it was not -- it did not say that where there

 7   are frank differences, an action can't proceed by the

 8   government.

 9            I think we've covered the point that we believe

10   there's extensive authority saying that this is either a loan

11   or a sale, so it's inapplicable, in any case.

12            And Mr. Ord also alluded to the *Fisher* (Phonetic)

13   case, in talking about final agency action.  And the *Fisher*

14   case was simply an action where the statute at issue involved

15   the commissioners' discretion.  And the issue before the tax

16   court was whether the commissioner had properly exercised his

17   discretion at the time.

18            From the reading of the case, the commissioner had

19   done nothing, had simply issued a statutory notice, which is

20   your ticket to the tax court which allows you to go litigate

21   before the tax court.  And that is all that had happened.

22            So, the taxpayer went before the tax court, lost,

23   appealed it, and the court say "We don't know what happened

24   because there's no record as to whether the commissioner

25   exercised any discretion or not."

1          So, it's wholly inapplicable with respect to a

2    no-change letter, which as I said earlier, just simply passes

3    on -- on particular years.

4          **THE COURT:**  All right.  You get the last word,

5    briefly.

6          **MR. ORD:**  All right.  Your Honor, our argument is

7    being seriously mischaracterized.  We're not saying the

8    government's bound by anything.  But, the APA is very clear.

9    This was an adjucation.  And with tax returns, you either

10   adjucate no change, which is they allow the return, accept it

11   as filed, or they adjust items and they propose income-tax

12   deficiencies.

13         And this was an adjucation.  It was an adjucation on

14   these loans with one of the promoters, Scott Cathcart.  And

15   they were -- also did this audit on Derivium Capital, on the

16   penalty.

17         So, there are adjucations, and the IRS agents

18   admitted that they had made a determination that Scott

19   Cathcart's loans were bona-fide loans.  She also testified this

20   whole area about the 90 percent loan transaction was a gray

21   area.  She also said she didn't think there was any fraud

22   involved.  These are admissions by the United States in the

23   depositions.

24         And another agent in the tax court case -- we're

25   waiting for a decision on that -- said that the 90 percent loan

1  agreement here is just like the stock margin loan agreements.

2          I don't know if you have one, Your Honor, but

3  basically what they are complaining about here is what goes on

4  with stockbrokers.  They take the stock, they sell it, they do

5  whatever they want with it.  They just have to return it.

6          I know of no case that says a no-change letter cannot

7  -- adjucation cannot be relied on for fair notice.  The case

8  he's citing, taxpayers are trying to argue that the no-change

9  final AG action was binding.  It's not binding.

10          He's right, they can go back and undo it, but

11  nevertheless, they didn't.  And the IRS officials admit that

12  they treated the loans as bona fide.  So, therefore, even

13  though we found this out later --

14          **THE COURT:**  As I understand your argument, you are

15  essentially arguing that there was some reliance upon the fact

16  that the United States had passed on these, and it okayed it

17  with regard to Derivium and Scott Cathcart.  And it's

18  reasonable for the other Defendants to have relied upon that,

19  whether it's an adjudication or otherwise, but to have relied

20  upon that conduct of the United States in passing --

21          **MR. ORD:**  I don't think we even have to say we rely

22  on it.  It was a notice.  The government, in effect, by -- by

23  allowing these, led people to believe correctly that the IRS

24  had approved all this.  And they did.

25          **THE COURT:**  The other Defendants.

 1          **MR. ORD:**  The other promoters.  Yes, Your Honor.

 2  They were all watching this like a hawk, because one of the

 3  promoters was being audited.

 4          The other -- so we're not saying it's binding.  We're

 5  just saying that under -- Your Honor --

 6          **THE COURT:**  Others read it and relied upon it in

 7  continuing their conduct.

 8          **MR. ORD:**  Well, they were made aware of it.  And so

 9  they continued to operate because they had gotten, in effect,

10  notice, fair notice, that this thing was okay.  And, we have to

11  rely on it.

12          Your Honor has to look at -- put yourself in a

13  defendant's shoes, and determine whether you feel that those

14  adjucations were -- put them on notice that the IRS was not

15  challenging this thing.

16          **THE COURT:**  Yeah.

17          **MR. ORD:**  And then --

18          **THE COURT:**  We're saying the same thing, Counsel.

19          **MR. ORD:**  All right.  Well, I didn't want to say

20  "reliance," because then they're going to argue -- we carefully

21  stayed away from estoppel.  We didn't argue estoppel here.  We

22  don't think we need to do that.

23          The other point I want to make, Your Honor, is that

24  the government says on *Dahlstrom*, that due process turns on

25  criminal intent.  It doesn't.  It turns on whether the statute

 1   and the regulations put you on fair notice.  And it's

 2   irrelevant whether it is willfulness or not.

 3          In the Ninth Circuit cases, some of the statutes

 4   don't have willfulness in them.  They have other intent.  It

 5   doesn't turn on -- *Dahlstrom* basically says that the statute

 6   and the regulations -- or there has to be relevant case law

 7   involving your particular investment.  Not another one.

 8          And that's the law of this circuit.  It's not limited

 9   to criminal cases, and it's not limited to willfulness.

10   Because *Anton* was a -- was a private enforcement action under

11   the Fraud Claims Act.  But that's another enforcement action.

12          **THE COURT:**  Okay.  All right.  I understand your

13   position.  All right.  Matter is submitted.

14          Madam Clerk, would you pull up the calendar and tell

15   me when the trial is scheduled for?

16          **THE CLERK:**  November 16th.

17          **THE COURT:**  So your pretrial papers are going to be

18   due September 29th.  That's 30 days before the pretrial

19   conference.

20          I think you all need to try to settle this before you

21   incur the expenses necessary to prepare the case for trial.

22   That means that you have almost two months to try to do so.

23          All right, I'm going to refer to you a Magistrate

24   Judge as soon as I figure out which one is going to be

25   immediately available.  You are going to have to make

1  yourselves available to participate with this Magistrate Judge

2  sometime over the next sixty days, to try to settle the case.

3          **MR. CLUKEY:**  Thank you, Your Honor.  Your Honor, in

4  connection with that referral, would it be possible to -- we

5  would like to do -- not have a settlement conference with

6  everybody at once.  We would like to do it individually, if

7  possible, because people are represented by different counsel,

8  and they have different objectives as part of the settlement.

9          **THE COURT:**  That's something that you need to take up

10 with the Magistrate Judge in terms of scheduling.  Perhaps he

11 or she will set aside a whole day, and then can stagger them.

12 I'll make a request that they do as to.

13         **MR. CLUKEY:**  Thank you, Your Honor.

14         **THE COURT:**  But it will be up to them to figure out

15 the timing of it all.  But, you are not going to get a lot of

16 notice, obviously, if I need you to have this done within the

17 next sixty days.

18         But we will do our best to get something out as

19 quickly as possible with regard to the Magistrate Judge

20 referral.

21         In terms of an order on this case, on this motion,

22 there are a couple of things that seem pretty clear to me,

23 after listening to your arguments.  What I actually -- if you

24 are going to settle it, I would rather not expend the resources

25 of my offices in preparing a long and detailed order.

 1          Given the amount of paper that you filed, there's an

 2   awful lot of evidence that obviously I'm going to need to make

 3   sure we've relied upon appropriately, assuming we can find it

 4   all.  So, I would like to avoid having to issue a long,

 5   detailed order if you can settle.  So, the emphasis should be

 6   on you all trying to come to come up with a mutually-agreeable

 7   injunction, stipulated injunction, sooner rather than later.

 8          But, just tentatively, I'm -- I am inclined to rule

 9   in favor of Optech with regard to the mootness question.  But

10   against the individual Defendants with regard to the mootness

11   question.

12          With regard to the merits issues, that's whether or

13   not this was a loan versus a sale, I'm inclined to find in

14   favor of the Government.  And with regard to the fairness issue

15   that was raised by the Defendants, I'm inclined to find against

16   them.

17          All right, so that's kind of my tentative ruling.

18   I'm not exactly sure, after I actually sit down with all of the

19   papers and go through them, that I would come out the same way.

20   But that's my tentative, which I think you might very well need

21   in terms of trying to get the case settled.  All right?

22          But, I'm not going to get to this soon.  I just have

23   a lot of other work.  And if I can avoid it, that's what I

24   would like to do.  So we will send out a notice, today or

25   tomorrow, with regard to the settlement.  And I want it done as

1    quickly as it can be.

2              **MR. CLUKEY:**  Thank Your Honor.

3              **THE COURT:**  Okay?  All right.  We are adjourned.

4              (Conclusion of Proceedings)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in C 07-4762 PJH, United States v. Cathcart, et al., were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.


_____/S/ Belle Ball_____

Belle Ball, CSR 8785, CRR, RMR

Thursday, August 20, 2009